United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **YOLANDA BANKS-REED, ET AL.,**<br>Plaintiffs,<br>vs.<br>**BAY AREA RAPID TRANSIT, ET AL.,**<br>Defendants. | CASE NO. 18-cv-05755-YGR<br><br>**ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br>Re: Dkt. No. 32 |

On January 3, 2018, decedent Sahleem Tindle ("Tindle") was shot and killed by a Bay Area Rapid Transit ("BART") police officer. Plaintiffs herein are Yolanda Banks-Reed, the decedent's mother; S.A.T. and S.I.T., the decedent's minor children, who are represented in this action by their guardian ad litem, Ciara Turner; and the decedent's estate. Plaintiffs' complaint alleges four causes of action against defendants BART, BART Chief of Police Carlos Rojas, and BART police officer Joseph Mateu III for: (i) violations of the Fourth and Fourteenth Amendments of the United States Constitution, pursuant to 42 U.S.C. section 1983; (ii) violation of California Civil Code section 52.1 (the Bane Act); and (iii) wrongful death.

Now before the Court is defendants' motion for summary judgment, which came on for hearing on October 22, 2019. Having carefully considered the papers submitted, the arguments of the parties at the hearing, the admissible evidence, and the pleadings in this action, and for the reasons set forth below, defendants' motion is hereby **DENIED** as to the Fourth Amendment claim, including qualified immunity, and as to the state law claim for wrongful death, and **GRANTED** as to all other claims.

## I. BACKGROUND

The initial facts of this incident are not materially in dispute: On January 3, 2018, at approximately 4:39 p.m., Sgt. Mateu was on duty at the West Oakland BART Station when two loud "pops" were heard. Bystanders ran into the BART station and sought cover. Sgt. Mateu asked what had happened, and a bystander shouted, "They're shooting." Sgt. Mateu ran out of the station and towards the gunfire. As he ran, Sgt. Mateu spoke into his radio, "Shots fired at West Oakland." Seconds later, Sgt. Mateu reached the sidewalk where Tindle and another man, Rayvell Newton, were engaged in a physical struggle. As he approached, Sgt. Mateu shouted, "Let me see your hands! Let me see your hands, now! Both of you! Both of you! Let me see your hands!" The parties take different positions as to what transpired next.

Defendants' version: When Sgt. Mateu arrived on the scene, he saw Tindle on the ground, lying on his left side, with a gun in his left hand. Despite Sgt. Mateu's repeated commands, Tindle did not surrender. Less than two seconds later, Tindle rolled over onto his knees, with his back to Sgt. Mateu, and lifted up his left elbow. Sgt. Mateu concluded that Tindle had transferred the gun to his right hand. Tindle then turned towards Newton, still with his back to Sgt. Mateu and both of his hands concealed. One second later, Tindle moved his empty left hand into view of Sgt. Mateu. A fraction of a second later, Sgt. Mateu fired the first shot. Within a half second, he had fired two more shots. He then stopped to reassess the threat, and after seeing the gun fall from Tindle's right hand and land on the ground, he ceased firing.

Plaintiffs' version: When Sgt. Mateu arrived on the scene, Newton was on his knees, leaning over Tindle, who was lying on the ground. Newton had his hand on Tindle's hand, in a mutual struggle for the gun. Tindle then rolled onto his knees, with his back to Sgt. Mateu. The two men continued to struggle, with Tindle hunched over on his knees and Newton reaching over Tindle's neck for his hands. Sgt. Mateu ordered, "Let me see your hands!" two more times. Newton did not comply. Tindle, by comparison, raised his left arm, which was his only free arm, in an attempt to surrender. Sgt. Mateu immediately fired three shots at Tindle in a single contiguous motion.

The body camera footage from Sgt. Mateu is consistent with each party's version of the facts in some respects but is unclear in others. The footage confirms that Sgt. Mateu repeatedly shouted, "Let me see your hands," namely, five times during the course of the incident.[1] Further, the footage shows that when Sgt. Mateu reached the sidewalk, Newton was on his knees, struggling with Tindle, who was lying on his left side. However, the exact position of Tindle's hands, Newton's hands, and the gun, at the moment Sgt. Mateu arrived on the scene, are not clear based on the angle and quality of the video. Moreover, the footage confirms that Tindle rolled from his left side onto his knees, with his back to Sgt. Mateu and his hands out of view of Sgt. Mateu and the body camera, while he continued to struggle with Newton. In addition, the footage shows that Tindle raised his empty left hand a split-second before Sgt. Mateu shot him.

## II.  LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations . . . admissions, interrogatory answers, or other materials," or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* 56(c)(1)(A), (B). Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A moving party defendant bears the burden of specifying the basis for the motion and the elements of the causes of action upon which the plaintiff will be unable to establish a genuine issue of material fact. *Id.* at 323. The burden then shifts to the plaintiff to establish the existence

---

[1] Sgt. Mateu shouted, "Let me see your hands" for the first time when he was approximately halfway across the street and continued until he was on the sidewalk where Tindle and Newton were engaged in the altercation.

3

of a material fact that may affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In the summary judgment context, the court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004). If the plaintiff "produces direct evidence of a material fact, the court may not assess the credibility of this evidence nor weigh against it any conflicting evidence presented by" defendants. *Mayes v. WinCo Holdings, Inc.*, 846 F.3d 1274, 1277 (9th Cir. 2017). "[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from facts are jury functions, not those of a judge." *George v. Edholm*, 752 F.3d 1206, 1214 (9th Cir. 2014) (alteration in original) (quotation omitted). Thus "where evidence is genuinely disputed on a particular issue—such as by conflicting testimony—that issue is inappropriate for resolution on summary judgment." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (internal quotation marks omitted).

### III. DISCUSSION

#### A. Excessive Force Claim

Defendants first move for summary judgment on plaintiffs' Fourth Amendment excessive force claim, on grounds that Sgt. Mateu used objectively reasonable force and is entitled to qualified immunity. Plaintiffs maintain that Sgt. Mateu's use of force was patently unreasonable, that material fact questions preclude summary judgment on whether his actions were objectively reasonable, and that viewing the facts in the light most favorable to plaintiffs, it has been clearly established that his use of force was a constitutional violation. The Court first considers whether a genuine dispute of material fact exists, and if so, proceeds to the qualified immunity analysis.

*1. Objective Reasonableness of Force*

The Fourth Amendment of the United States Constitution guarantees citizens the right "to be secure in their persons" against "unreasonable seizures." *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Tennessee v. Garner,* 471 U.S. 1, 7-8 (1985). "[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Garner*, 471 U.S. at 7.

4

A Fourth Amendment claim of excessive force requires an examination of "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them," which "requires a careful balancing of the 'nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396-97 (citations omitted). "The strength of the government's interest in the force used is evaluated by examining three primary factors: (1) 'whether the suspect poses an immediate threat to the safety of the officers or others,' (2) 'the severity of the crime at issue,' and (3) 'whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Glenn v. Washington Cty.*, 673 F.3d 864, 872 (9th Cir. 2011) (quoting *Graham*, 490 U.S. at 396). Of these factors, the Ninth Circuit has held that the most important is "whether the suspect poses an immediate threat to the safety of the officers or others." *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994).

"[T]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application . . . [and] requires careful attention to the facts and circumstances of each particular case[.]" *Graham*, 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8-9 and *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. "[H]owever, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. "Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)).

The parties agree that Sgt. Mateu's use of lethal force was "extreme" and "implicates the highest level of Fourth Amendment interests." *A.K.H. ex rel Landeros v. City of Tustin*, 837 F.3d

5

1005, 1011 (9th Cir. 2016). For purposes of summary judgment, the Court determines whether the government's use of force here was objectively reasonable as a matter of law. To do so, the Court considers (a) whether Tindle posed an immediate threat to the safety of Sgt. Mateu or others, (b) the severity of the crime at issue, and (c) whether Tindle was actively resisting arrest or attempting to evade arrest by flight. *See Glenn*, 673 F.3d at 872.

                                            a.        Immediate Threat To Safety

The most important factor in the governmental interest analysis is whether Tindle presented an immediate threat to another's safety when he was shot. *Chew*, 27 F.3d at 1440. Defendants argue that Sgt. Mateu reasonably concluded that Tindle presented such a threat because Tindle initially had possession of the gun in his left hand, failed to comply with Sgt. Mateu's commands to surrender, and immediately before being shot, turned towards Newton with the gun in his right hand.

Certain undisputed evidence supports defendants' position. Namely, the body camera footage confirms that Tindle failed to comply with Sgt. Mateu's repeated commands and turned towards Newton just before he was shot. However, at least two material issues of fact remain in dispute to evaluate this element. The first is whether Tindle had possession of the gun in his left hand when Sgt. Mateu arrived on the scene. Although Sgt. Mateu testified that Tindle had possession of the gun when he arrived on the scene, later in his deposition, he testified that *both* men had their hands on the gun and were wrestling for control over it. (Dkt. No. 40-1 ("Mateu Dep."), 72:1-8, 80:17-25, 82:11-13.) The body camera footage does not clearly corroborate this testimony. Indeed, the video footage does not clearly show the position of Newton's hands, Tindle's hands, or the gun at *any* moment during the incident.[2]

Second, a question remains as to whether Tindle was attempting to surrender just before he was shot, such that he did not pose an immediate threat. The body camera footage shows that just

---

    [2] Sgt. Mateu also testified that Newton could have been the person responsible for the two gunshots Sgt. Mateu heard from the BART station, while Tindle could have been trying to wrestle the gun away from Newton. (*Id.*, 80:2-5; *see also id.*, 67:20 ("Q: So you didn't know who fired the shots? A: Yes. . . . Q: How would you know who had fired the shots when there are two men struggling over a gun? A: I did not know.").)

6

before he was shot, Tindle partially raised his left arm at a right angle, showing what appeared to be his empty left hand. Sgt. Mateu confirmed as much in his deposition. (*Id*., 85:3-6.) Sgt. Mateu also testified that he did not know whether Tindle failed to raise his right hand because Newton had control of it. (*Id*., 94:20-23.) Under plaintiffs' version of the facts, just before he was shot, Tindle was in the process of surrendering and had not yet raised his right hand because Newton was preventing him from doing so.

Viewing the facts in the light most favorable to plaintiffs, a genuine dispute exists as to possession of the gun and whether Tindle was attempting to surrender.[3] The first governmental interest factor therefore weighs against defendants.[4]

### b. Severity of the Crime at Issue

Second, the Court considers "the severity of the crime at issue." *Glenn*, 673 F.3d at 872. The undisputed fact that Newton and Tindle were fighting over a gun, combined with the two initial gunshots and bystander reports of a shooting, indicate that a serious crime was evolving when Sgt. Mateu approached Tindle and Newton.

Generally, if there is probable cause to believe that a suspect has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary. *Garner*, 471 U.S. at 11-12. Active shooters in a public, heavily trafficked area are a cause of grave concern. Officers enter dangerous situations while others flee. They are not required to know the originating details of every evolving, dangerous situation. The fact that

---

[3] Defendants' reliance on *Blanford v. Sacramento County*, 406 F.3d 1110 (9th Cir. 2005) to argue that Sgt. Mateu's use of force was objectively reasonable fails to persuade. In *Blanford*, the Ninth Circuit concluded that officers' use of lethal force was objectively reasonable where a man carrying a sword in a residential neighborhood raised the sword, made growling or roaring sounds, continued to try to gain access to a home even after being shot once by officers, and ignored officers' repeated commands to drop the sword, which continued for about two minutes. The facts here do not show an unambiguous aggressor. Thus, *Blanford* is distinguishable.

[4] Even if Sgt. Mateu had consistently testified that he "fear[ed] for his safety or the safety of others," such evidence would not be enough to satisfy the objective reasonableness standard, as "there must be objective factors to justify such a concern." *Mattos v. Agarano*, 661 F.3d 433, 441-42 (9th Cir. 2011).

7

1 Tindle may have been a victim does not alter that the crime at issue was severe. For this reason,
the second governmental interest factor weighs in defendants' favor.

c. <u>Actively Resisting or Evading Arrest</u>

Third, and finally, the Court considers whether Tindle was "actively resisting arrest or attempting to evade arrest by flight." *Glenn*, 673 F.3d at 872. As described, the evidence shows both that Tindle failed to comply with at least some of Sgt. Mateu's repeated commands to surrender, but also that he raised his empty left hand immediately before he was shot.[5] Given the evidence that Tindle raised his left hand, the parties reasonably disagree as to whether he was actively resisting. For example, Sgt. Mateu testified that the raising of one hand would not necessarily be consistent with surrender because "it[] [is] only one hand." (Mateu Dep., 83:20-84:2.) Plaintiffs' expert, on the other hand, concluded that Sgt. Mateu had "far more reasonable less-than-lethal force options available besides shooting Mr. Tindle—including allowing Mr. Tindle time to comply, and continuing giving orders to show his hands, which would have afforded Sergeant Mateu the opportunity to learn that Mr. Tindle was attempting to comply." (Dkt. No. 40-4 ("Pl. Expert Report"), at ECF p. 18.) Moreover, although Sgt. Mateu testified that Tindle "did not appear to . . . [be] giving up," he also testified that he did not know whether Tindle failed to raise his right hand because Newton had control over it. (*Id*. at 94:11-23.)

Viewing the evidence in the light most favorable to plaintiffs, a genuine dispute exists as to whether Tindle was attempting to surrender when he was shot. The third factor therefore weighs against defendants.[6]

---

[5] Citing *Young v. Cty. of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011), plaintiffs contend that even if Tindle failed to comply with Sgt. Mateu's orders, this failure does not rise to the level of "active resistance." *Young*, however, held that where "a suspect's disobedience of a police officer takes the form of passive noncompliance that *creates a minimal disturbance and indicates no threat*, immediate or otherwise, to the officer or others, it will not, without more, give rise to a governmental interest in the use of significant force." 655 F.3d at 1165 (emphasis supplied). Thus, this case only supports plaintiffs' position insofar as Tindle's failure to comply did not indicate a threat.

[6] Courts may also consider whether proper warnings were given as part of the "objective reasonableness" calculus. *S.B. v. Cty. of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017). Here, the body camera footage shows that Sgt. Mateu did not identify himself as an officer when he

In sum, balancing plaintiffs' strong Fourth Amendment interest against the governmental interest at stake, disputes of material fact preclude a finding that Sgt. Mateu's use of force was objectively reasonable.

*2. Qualified Immunity*

Next, the Court considers whether to grant summary judgment on plaintiffs' section 1983 claims on the basis of qualified immunity.

Qualified immunity is a question of law, not of fact. *Torres v. City of Los Angeles*, 548 F.3d 1197, 1210 (9th Cir. 2008). The qualified immunity doctrine shields a government official performing discretionary functions from liability for civil damages if the officer's conduct does not violate a "clearly established statutory or constitutional right of which a reasonable person would have known." *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) (quoting *White v. Pauly*, 137 S.Ct. 548, 551 (2017)). "Because the focus is on whether the officer had fair notice that [the] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004). "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna,* 136 S.Ct. 305, 308 (2015) (internal quotation marks omitted). Use of excessive force is an area of the law "in which the result depends very much on the facts of each case," and thus, police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue. *Id.* at 309 (emphasis deleted). While the doctrine "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White,* 137 S.Ct. at 551.

---

shouted commands at Tindle and Newton. Further, as plaintiffs note, Sgt. Mateu did not warn Tindle that he would use deadly force if Tindle failed to comply with his commands. *See Gonzalez v. City of Anaheim*, 747 F.3d 789, 794 (9th Cir. 2014) ("[W]e have recognized that an officer must give a warning before using deadly force 'whenever practicable.'"); *Mercado v. City of Orlando*, 407 F.3d 1152, 1154 (11th Cir. 2005) ("The officers identified themselves and ordered Mercado to drop his knife at least two times . . . but he refused. . . . At no time did the officers warn Mercado that force would be used if he did not drop his weapon.").

Citing *Kisela*, defendants contend that qualified immunity attaches to Sgt. Mateu's actions. In *Kisela*, the Supreme Court considered circumstances in which a woman called 911 to report that another woman was acting erratically and cutting at a tree with a kitchen knife. 138 S.Ct. at 1150-51. Three officers responded to find one woman standing near a car in a driveway, and another emerging from the house next to the driveway, holding a large knife. *Id.* at 1151. The woman with the knife, who matched the description from the 911 call, walked toward the woman in the driveway and stopped about six feet away from her. *Id.* Both women were on the opposite side of a chain-link fence from the officers. *Id.* The officers commanded the suspect to drop the knife at least two times, but she did not comply. *Id.* Moments later, one officer shot the suspect four times through the chain-link fence. *Id.* The officers testified that they believed the woman near the car was in danger. *Id.* They later learned that the suspect had a history of mental illness. *Id.* The Supreme Court reversed the Ninth Circuit's finding of a Fourth Amendment violation and denial of qualified immunity, holding that the facts presented "far from an obvious case in which any competent officer would have known that shooting [the suspect] to protect [the roommate] would violate the Fourth Amendment." *Id.* at 1153.

Plaintiffs, in turn, cite three cases to demonstrate a clearly established constitutional violation against using deadly force in a mutual combat situation over a gun where the aggressor is unknown and the plaintiff was attempting to comply with the officer's orders. In the first, *Estate of Lopez by & through Lopez v. Gelhaus*, 871 F.3d 998, 1001 (9th Cir. 2017), officers were on patrol when they confronted a 13-year-old boy holding what the officers believed was an AK-47. The officers parked approximately forty feet from the boy, drew their pistols, and yelled at the boy to "drop the gun," although they did not warn the boy that he would be shot if he failed to comply. *Id*. at 1002-1003. The boy did not drop the gun but began to rotate his body around, potentially raising the gun slightly. *Id*. at 1003. The officers then shot the boy multiple times. *Id*. The officers later discovered that the boy had been holding a plastic gun designed to replicate an AK-47. *Id*. The Ninth Circuit held that under the circumstances, a reasonable jury could conclude that the boy did not post an immediate threat of safety to the officers or others, and thus, the officer's use of deadly force was not objectively reasonable. *Id*. at 1011.

In the second, *George v. Morris*, 736 F.3d 829, 832 (9th Cir. 2013), the suspect, a 64-year-old male with terminal brain cancer, awoke in the middle of the night, retrieved his gun, and loaded it with ammunition. His wife called 911, and three deputies were dispatched to the residence. *Id.* at 832-33. The wife met the deputies at the front door and said that her husband was on the back patio with his gun. *Id.* at 832. The husband eventually appeared in view of the deputies, using a walker and holding a gun. *Id.* The officers identified themselves as law enforcement and instructed the husband to show his hands. *Id.* Although an officer testified that the husband then pointed the gun at him, *id.* at 833 n.4, based on the evidence presented, the court assumed that the husband did not take other actions that were objectively threatening. *Id.* at 838. On those facts, where officers shot the decedent "without objective provocation while he used his walker, with his gun trained on the ground," the Ninth Circuit held that "a reasonable fact-finder could conclude that the deputies' use of force was constitutionally excessive." *Id.* at 838-39.

Finally, in *Curnow By & Through Curnow v. Ridgecrest Police*, 952 F.2d 321, 323 (9th Cir. 1991), the police broke down a suspect's front door because they believed the suspect had injured a woman inside. As they entered the house, the suspect was standing next to a rifle. *Id.* An officer shot the suspect in the back as the other police officers entered. *Id.* A witness stated that "police officers could not reasonably have believed the use of deadly force was lawful because [the victim] did not point the gun at the officers and apparently was not facing them when they shot him the first time." *Id.* at 325. Viewing the evidence in the light most favorable to the plaintiffs, the Ninth Circuit concluded defendants were not entitled to qualified immunity. *Id.*

Sgt. Mateu is entitled to qualified immunity only if, assuming he used excessive force, he did so based on a reasonable, though mistaken, belief that under established case law, his conduct was reasonable. Drawing all reasonable inferences in plaintiffs' favor, and for the reasons discussed in the previous section, disputes of material fact exist with respect to possession of the gun and surrender. Given these factual disputes, qualified immunity is not appropriately decided on summary judgment. *Kisela* does not require otherwise. In *Kisela*, neither of those issues was in dispute.

11

Accordingly, defendants' motion for summary judgment on plaintiffs' Fourth Amendment claim is **DENIED**.

### B. Due Process Claim

Plaintiffs' due process claim requires a showing that Sgt. Mateu engaged in conduct that "shocks the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) ("[O]nly official conduct that 'shocks the conscience' is cognizable as a due process violation."). The Court must consider "whether the circumstances are such that 'actual deliberation is practical.'" *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998) (citation omitted). "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (citing *Moreland*, 159 F.3d at 372). If the officer "did not have time to deliberate, a use of force shocks the conscience only if the officer[] had a 'purpose to harm' the decedent for reasons unrelated to legitimate law enforcement objections." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 797 (9th Cir. 2014) (citation omitted). The Ninth Circuit has recognized that it is a "rare situation[] when the nature of an officer's deliberate physical conduct is such that a reasonable factfinder would conclude the officer intended to harm, terrorize[,] or kill." *Porter*, 546 F.3d at 1141 (citation omitted).

Here, Sgt. Mateu ran towards the sound of gunfire, and as he approached the scene, he faced an evolving situation involving a gun that had been fired and two men embroiled in a physical altercation.[7] Even assuming that, as plaintiffs argue, Sgt. Mateu could have and should have taken additional time and steps before firing his gun, the altercation between Tindle and Newton necessitated fast decision-making. Plaintiffs have not produced any evidence suggesting that Sgt. Mateu had a purpose to harm Tindle and therefore rose to the higher level of culpability that applies to a due process claim. *See Moreland*, 159 F.3d at 373 (where officers "were responding to the extreme emergency of public gunfire," they did not intend any harm unrelated law enforcement objectives when they inadvertently shot a bystander); *Bingue v. Prunchak*, 512

---

[7] Defendants assert, and plaintiffs do not dispute, that Sgt. Mateu was responding to "an active shooter." (Dkt. No 41, Plaintiffs' Responsive Separate Statement of Fact and evidence cited therein (hereinafter, "Pl. Fact"), No. 7.)

12

F.3d 1169, 1177 (9th Cir. 2008) (officer who struck vehicle during high-speed chase did not act with "intent to harm" where he believed he was responding to an emergency).

The Court finds no genuine issue of material fact with respect to plaintiffs' due process claim, and thus, defendants' motion is **GRANTED** as to this claim.

### C. *Monell* Claim

The Court next considers defendants' motion for summary judgment on plaintiffs' *Monell* claim, alleged against BART and Chief Rojas.

Defendants argue that the *Monell* claim fails because there is no underlying constitutional violation, and additionally, because there is no evidence that BART or Chief Rojas (i) negligently hired Sgt. Mateu; (ii) failed to supervise, train, or discipline their officers; (iii) had inadequate customs, policies, or procedures; or (iv) were deliberately indifferent to a pattern of misconduct.

Tellingly, plaintiffs point to only two purported facts in support of their *Monell* claim, neither of which persuades the Court that plaintiffs have carried their burden of establishing a disputed issue of material fact. First, plaintiffs note that Sgt. Mateu testified that he was trained to shoot twice to the chest and once to the head when using lethal force, and consistent with this training, he shot Tindle three times. (Mateu Dep., 110:9-111:20.) According to plaintiffs, such conduct "will certainly lead to the death of citizens rather than achieving the goal of eliminating the threat." However, the use of *lethal* force, by definition, may lead to death. Plaintiffs fail to explain how Sgt. Mateu's training regarding use of lethal force was insufficient such that plaintiffs may pursue a *Monell* claim. Second, plaintiffs contend that other BART officers have shot suspects in the back in violation of their constitutional rights, citing *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159 (9th Cir. 2013), and suggest that BART and Chief Rojas therefore must have ratified officers' impermissible use of lethal force. *Johnson*, however, involved the 2009 shooting of a BART passenger by a BART officer, and plaintiffs' make no attempt to draw a connection between this decade-old case and BART and Chief Rojas' conduct at the time of the events at issue in this case. Further, in *Johnson*, the court held that the officer was not entitled to

qualified immunity, but it did not render a determination on whether the officer's use of force was "impermissible." 724 F.3d at 1170. Plaintiffs' reliance on *Johnson* therefore fails to persuade.[8]

In sum, plaintiffs fail to provide evidence to raise a genuine issue of material fact related to inadequate hiring, training, or policies, or past patterns of deliberate indifference of constitutional violations. Nor do plaintiffs point to any evidence that BART or Chief Rojas' customs, policies, or practices caused this incident. The Court concludes that, even viewing the evidence in the manner most favorable to plaintiffs, a reasonable jury could not find defendants liable on plaintiffs' *Monell* claim, and thus, the motion for summary judgment is **GRANTED** as to this claim.

### D. State Law Claims[9]

Next, the Court determines whether defendants are entitled to summary judgment on plaintiffs' state law claims for (i) violation of the Bane Act, and (ii) negligence.

#### 1. *Bane Act*

Section 52.1 of the California Civil Code, also known as the Bane Act, creates a right of action against any person who "interferes by threat, intimidation, or coercion . . . with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or . . . of this state." Cal. Civ. Code § 52.1(a). A Bane Act claim requires a

---

[8] In their separate statement, plaintiffs identify two additional portions of Sgt. Mateu's deposition testimony that purportedly raise material fact questions related to their *Monell* claims. First, Sgt. Mateu testified that he was not trained "to overcome fear, panic[,] and emotional reactions." (Mateu Dep., 36:23-25.) Plaintiffs rely on this evidence to argue that there is a dispute as to whether BART training meets Peace Officer Standards and Training (P.O.S.T.) requirements. (Pl. Fact, No. 1 at ECF p. 9.) Importantly, however, plaintiffs fail to identify any P.O.S.T. requirement that is contrary to this training. Further, this testimony does not mean, as plaintiffs assert, that Sgt. Mateu "was trained that *reasonableness* of a particular use of force *is informed* by the officer's feelings of fear." (Pl. Fact, No. 10 at ECF p. 11, emphasis supplied.) Second, Sgt. Mateu testified that he was trained that under certain circumstances, officers could shoot without giving a person an opportunity to surrender. (Mateu Dep., 63:23-64:9.) Plaintiffs contend that this testimony also shows that Sgt. Mateu was trained in ways inconsistent with P.O.S.T. requirements. Again, however, plaintiffs do not point to any relevant P.O.S.T. requirement.

[9] Plaintiffs contend that defendants waived consideration of their arguments on plaintiffs' state law causes of action by failing to include these arguments in their pre-filing letter. Not only does the analysis of these claims naturally flow from the other claims, but they were discussed at the conference, and given the full briefing on each, the Court proceeds to consider defendants' arguments.

showing of "specific intent" on the part of the officer to violate the constitutional right at issue. *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1044 (9th Cir. 2018) ("[T]he specific intent requirement . . . is consistent with the language of Section 52.1, which requires interference with rights by 'threat, intimidation or coercion,' words which connote an element of intent."); *B.B. v. Cty. of Los Angeles*, 25 Cal. App. 5th 115, 133 (Ct. App. 2018) ("Like . . . *Reese*, we conclude that, to establish liability under the Bane Act, a plaintiff must prove the defendant acted with a specific intent to violate the plaintiff's civil rights."). "The act of interference with a constitutional right must itself be deliberate or spiteful." *Julian v. Mission Community Hospital*, 11 Cal.App.5th 360, 395 (2017) (citation omitted).

As discussed with respect to the due process claim, plaintiffs have not provided any evidence that Sgt. Mateu acted with specific intent to violate Tindle's rights. As such, defendants' motion for summary judgment as to the Bane Act claim is **GRANTED**.

### 2. *Wrongful Death – Negligence*

Plaintiffs also raise a state law negligence claims for wrongful death. Under California law, public employees "are statutorily liable to the same extent as private persons for injuries caused by their acts or omissions, subject to the same defenses available to private persons." *Hayes v. County of San Diego*, 57 Cal.4th 622, 628-29 (2013). In addition, "public entities are generally liable for injuries caused by the negligence of their employees acting within the scope of their employment." *Id*. at 629.

"Under established law, police officers have a duty to use reasonable care in deciding to use and in fact using deadly force. An officer's lack of due care can give rise to negligence liability for the intentional shooting death of a suspect." *Brown v. Ransweiler*, 171 Cal.App.4th 516, 534 (2009) (internal quotation marks and citations omitted). Here, as discussed with respect to plaintiffs' excessive force claim, there are genuine disputes of material fact regarding the reasonableness of Sgt. Mateu's use of force.[10] Accordingly, defendants' motion for summary judgment on the negligence claim is **DENIED**.

---

[10] Where an officer's pre-shooting conduct did not cause the plaintiff any injury independent of the injury resulting from the shooting, negligence "liability can arise if the tactical

### E. Punitive Damages

Finally, the Court considers whether defendants are entitled to summary judgment on plaintiffs request for punitive damages.[11] In a section 1983 action, a plaintiff may recover punitive damages where the officer's conduct is "shown to be motivated by evil motive or intent, or . . . reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). As discussed with respect to plaintiffs' due process and Bane Act claims, there is no evidence that Sgt. Mateu acted with intent, nor is there evidence of culpability that rises to the level of reckless indifference. Thus, defendants' motion for summary judgment with respect to punitive damages is **GRANTED**.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is **DENIED** as to the Fourth Amendment claim, including qualified immunity, and as to the state law claim for wrongful death, and **GRANTED** as to all other claims.

This Order terminates Docket Number 32.

**IT IS SO ORDERED.**

Dated: November 15, 2019

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

---

conduct and decisions leading up to the use of deadly force show, as part of the totality of circumstances, that the use of deadly force was unreasonable." *Hayes*, 57 Cal.4th at 626. Plaintiffs' expert takes the position that Sgt. Mateu made tactical errors when approaching Tindle and Newton (Pl. Expert Report, at ECF p. 17), which raises the potential for additional material fact issues related to plaintiffs' negligence claims.

[11] In their motion, defendants assert that BART is immune from punitive damages under section 1983 and California Civil Code 3294(a), citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981) and California Government Code section 818. Section 818 provides that "a public entity is not liable for damages awarded under Section 3294 of the Civil Code or other damages imposed primarily for the sake of example and by way of punishing the defendant." *City of Newport*, likewise, holds that a municipal corporations are entitled to "absolute immunity" from "punitive damages for the bad-faith actions of its officials." Plaintiffs do not dispute this limitation and only sought such damages as to Sgt. Mateu. (Dkt. No. 1, ¶ 22.)

16