**Volume 7**

**Pages 746 - 1023**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

| | |
|---|---|
| THE ESTATE OF SHALEEM TINDLE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| VS. ) | **NO. CV 18-05755-YGR** |
| ) | |
| JOSEPH MATEU, III,, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

Oakland, California
Tuesday, March 10, 2020

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

LAW OFFICES OF JOHN L. BURRIS
7677 Oakport Street - Suite 1120
Oakland, CA  94621
**BY:  JOHN L. BURRIS, ESQUIRE**
**BENJAMIN NISENBAUM, ESQUIRE**
**LATONIA ROBINSON, ESQUIRE**

For Defendant:

ALLEN, GLAESSNER, HAZELWOOD & WERTH LLP
180 Montgomery Street - Suite 1200
San Francisco, CA  94104
**BY:  DALE J. ALLEN, ESQUIRE**
**PATRICK MORIARTY, ESQUIRE**

Reported By:       Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
Official Reporter

<u>**I N D E X**</u>

Tuesday, March 10, 2020 - Volume 7

|                                          | **PAGE** | **VOL.** |
|------------------------------------------|----------|----------|
| Plaintiffs Rest                          | 826      | 7        |
| Defense Rests                            | 945      | 7        |
| Jury Instructions                        | 946      | 7        |
| Closing Argument by Mr. Nisenbaum        | 953      | 7        |
| Closing Argument by Mr. Moriarty         | 964      | 7        |
| Rebuttal Argument by Mr. Burris          | 1001     | 7        |

**PLAINTIFFS' WITNESSES**                  **PAGE**   **VOL.**

**TURNER, CIARA (RECALLED)**
| (PREVIOUSLY SWORN)                            | 764 | 7 |
| Cross-Examination resumed by Mr. Moriarty     | 764 | 7 |
| Redirect Examination by Mr. Burris            | 808 | 7 |
| Recross-Examination by Mr. Moriarty           | 818 | 7 |
| Redirect Examination by Mr. Burris            | 825 | 7 |

**DEFENDANT'S WITNESSES**                  **PAGE**   **VOL.**

**MATEU, JOSEPH**
| (SWORN)                                       | 757 | 7 |
| Direct Examination by Mr. Moriarty            | 757 | 7 |
| Cross-Examination by Mr. Nisenbaum            | 760 | 7 |

**CARDOZA, MICHAEL**
| (SWORN)                                       | 827 | 7 |
| Direct Examination by Mr. Moriarty            | 827 | 7 |
| Cross-Examination by Mr. Nisenbaum            | 853 | 7 |
| Redirect Examination by Mr. Moriarty          | 873 | 7 |
| Recross-Examination by Mr. Nisenbaum          | 881 | 7 |
| Examination by The Court                      | 882 | 7 |
| Redirect Examination by Mr. Moriarty          | 883 | 7 |
| Recross-Examination by Mmr. Nisenbaum         | 885 | 7 |
| Examination by The Court                      | 887 | 7 |

**WONG, HELENA**
| (SWORN)                                       | 891 | 7 |
| Direct Examination by Mr. Moriarty            | 892 | 7 |
| Cross-Examination by Mr. Nisenbaum            | 911 | 7 |
| Redirect Examination by Mr. Moriarty          | 917 | 7 |
| Examination by The Court                      | 920 | 7 |
| Redirect Examination by Mr. Moriarty          | 922 | 7 |
| Recross-Examination by Mr. Nisenbaum          | 923 | 7 |

## <u>I N D E X</u>

| **<u>DEFENDANT'S WITNESSES</u>** | **<u>PAGE</u>** | **<u>VOL.</u>** |
|---|---|---|
| **<u>EVANS, DEMOREA</u>** | | |
| By Deposition Deposition | 925 | 7 |

## <u>E X H I B I T S</u>

| **<u>TRIAL EXHIBITS</u>** | **<u>IDEN</u>** | **<u>EVID</u>** | **<u>VOL.</u>** |
|---|---|---|---|
| 10B | | 752 | 7 |
| 101A, 101B, 101C, and 101D | | 753 | 7 |
| 107 | 769 | | 7 |
| 108 | 817 | | 7 |

<u>**Tuesday - March 10, 2020**</u>                                    **7:59 a.m.**

 1

 2                        **P R O C E E D I N G S**

 3                           **---000---**

 4       (Proceedings were heard out of presence of the jury:)

 5           **THE COURT:**  Is there anything we need to talk about?

 6           **MR. BURRIS:**  Not to my knowledge.

 7           **MR. MORIARTY:**  No.

 8                   (Discussion held off the record.)

 9           **THE CLERK:**  Calling Civil Action 18-5755, Estate of

10   Sahleem Tindle vs. Mateu.

11       Counsel, please state your appearances.

12           **MR. NISENBAUM:**  Ben Nisenbaum for the plaintiffs.

13           **MR. MORIARTY:**  Patrick Moriarty and Dale Allen with

14   Joseph Mateu.

15           **THE COURT:**  Okay.  Good morning.

16       Ms. Banks-Reed, good morning.

17       Mr. Mateu, good morning.

18           **THE DEFENDANT:**  Good morning.

19           **THE COURT:**  So we will finish up with Ms. Turner;

20   right?

21           **MR. NISENBAUM:**  Correct.

22           **THE COURT:**  And then what?  The plaintiff.

23           **MR. NISENBAUM:**  That would be the close of plaintiff's

24   case, subject to any exhibits, of course, that haven't been

25   moved in that need to be.  I think everything has been moved

1    in.

2              **THE COURT:**  Well, we should go through them.

3              **MR. NISENBAUM:**  Right.

4              **THE COURT:**  So then the plaintiff will close.

5         Then what's the defense bringing?

6              **MR. MORIARTY:**  We are going to call Michael Cardoza

7    first.  Second we'll call Helena Wong.  Third we will call

8    Joseph Mateu for the same brief one about the gun.  I think

9    that should be about four or five minutes.  And then finally we

10   will read in the testimony of Demorea Evans, and at that point

11   we'll rest.

12             **THE COURT:**  Okay.  And then -- let's see.  And then

13   we'll do closings.

14             **MR. NISENBAUM:**  Yes.

15             **THE COURT:**  Okay.  I have ordered lunches in for them

16   so that we could try to get it all in today.

17             **MR. MORIARTY:**  Right.

18             **MR. NISENBAUM:**  Perfect.

19             **THE COURT:**  I will probably give them half an hour, I

20   think, for lunch, but we will hopefully do it once -- hopefully

21   the timing will work.  I'm trying to -- we'll get it to them at

22   some point.

23        Let's look at exhibits here.  So what I show as having

24   been admitted -- let me know when you're ready.

25             **MR. NISENBAUM:**  I'm ready.

1      **THE COURT:**  So on the 7 series, A, B, C, D, E, then H,

2   then O.

3      **MR. NISENBAUM:**  A through E and then H.  That's right.

4   Definitely H.  And then -- I think that's correct.

5      **THE COURT:**  Okay.  On the 8 series, I just have B, C,

6   and G.

7      **MR. NISENBAUM:**  B -- we also had G; right?

8      **THE COURT:**  Right.  B, C, and G.

9      **MR. NISENBAUM:**  Correct.

10      **THE COURT:**  Okay.

11      **MR. NISENBAUM:**  That's what I have.

12      **THE COURT:**  On the 9 series, A through X.

13      **MR. NISENBAUM:**  Correct.

14      **THE COURT:**  On the 10 series, I have 10B-1 and 10D.

15   We used 10B, but I don't have it as being admitted.

16      **MR. NISENBAUM:**  That should be admitted.  That's the

17   unredacted version.

18      **MR. MORIARTY:**  Yeah.  That's fine.  That's the entire

19   one.

20      **MR. NISENBAUM:**  It's the entire one.  I believe so.

21      **THE COURT:**  All right.  So 10B is admitted.

22      **MR. NISENBAUM:**  Yes.

23         (Trial Exhibit 10B received in evidence)

24      **THE COURT:**  And then I have 103A, E, E-1, and H.

25      **MR. MORIARTY:**  Correct.

```
 1                   (Mr. Burris, enters the courtroom.)

 2               THE COURT:  Good morning, Mr. Burris.  Are you fine

 3     now?

 4               MR. BURRIS:  Great.

 5               MR. NISENBAUM:  So we have 103 --

 6               THE COURT:  A, E, E-1, and H.

 7               MR. NISENBAUM:  I think that's correct.

 8               THE COURT:  Okay.

 9               MR. NISENBAUM:  Is there anything missing?

10               THE COURT:  Anything else from your side?

11               MR. MORIARTY:  No.

12         And then, Your Honor, as with last trial, it was -- we put

13     in 103A -- excuse me.  101A, B, C, and D, and we've had those

14     remarked with new tags on it that I'm going to -- it's the same

15     pictures.  It's just that we need to remark them.  I will give

16     one to the Court and one to Frances.

17               THE COURT:  Okay.

18               MR. MORIARTY:  Those will be the final ones today.

19               THE COURT:  Any objection to 101A, B, C, and D?

20               MR. NISENBAUM:  No.

21               THE COURT:  All right.  Those are admitted.

22     (Trial Exhibits 101A, 101B, 101C, and 101D received in

23     evidence)

24               THE COURT:  And then do we have any issues with

25     respect to transcript impeachment?
```

1          **MR. MORIARTY:**  No, we don't.

2          **THE COURT:**  Did you bring one in case you're going to

3     have to impeach?

4          **MR. MORIARTY:**  Yes.  On Thursday, the Court said that

5     you have a copy, and then if we get to the point where we need

6     to impeach, I will have an extra copy of the prior trial

7     transcript for Ms. Turner.

8          There is only one question that I had that I think I can

9     make do with.  At one point, there is a question I asked her at

10    the prior trial that refers to a jury in the question, and

11    because the motion in limine is that we don't refer to a prior

12    trial, what I had anticipated, if it's okay with the Court, if

13    she needs to be impeached there, I'm not going to say, "Are you

14    telling this jury."  I'll just ask the question as it was posed

15    without any reference to the jury.

16         I don't think there is any other references to the jury

17    that would violate our motion in limine not to refer to the

18    prior trial.

19         **THE COURT:**  Okay.  All right.  Good enough.

20         So as soon as they get here, we'll get started.  We will

21    stand in recess until then.  Thank you.

22                    (Recess taken at 8:08 a.m.)

23                 (Proceedings resumed at 8:22 a.m.)

24       (Proceedings were heard out of presence of the jury:)

25         **THE COURT:**  They're all here.  We're ready.

1          **MR. BURRIS:**  Ciara is not here yet.  I was thinking we

2    could go on to reading the testimony.

3          **MR. MORIARTY:**  No.  We're doing that last.

4          **THE COURT:**  Where is she?

5          **MR. BURRIS:**  I don't know.  I assume she's on her way.

6    She lives in Antioch.

7          **THE COURT:**  Can someone call her?

8          **MR. BURRIS:**  We can try, yeah.

9          **MR. NISENBAUM:**  I'm trying to reach Ms. Turner.

10         **THE COURT:**  And?

11         **MR. NISENBAUM:**  No answer.  She may be under the

12   impression that 8:30 is the start time.  I'd expect her to be

13   answering her phone either way.

14         **THE COURT:**  I would expect her to be, too.

15                    (Off the record.)

16         **MR. NISENBAUM:**  Your Honor, Ms. Turner indicated that

17   she's running about 10 minutes late and that she will be here

18   at 8:40.  I apologize.

19         **MR. ALLEN:**  Mr. Moriarty and I talked about this.  If

20   you would like, Joe Mateu needs to go back on the stand for

21   maybe ten minutes, and it doesn't impact the cross-examination

22   of Turner, so we are willing to do that.

23         **THE COURT:**  All right.  Let's put him on first.

24         **MR. NISENBAUM:**  She's taking public transportation.

25         **THE COURT:**  Let's bring them in.  We will start with

1   Mr. Mateu.

2           **MR. MORIARTY:**   This is going to be very quick, though,

3   Your Honor.

4           **THE COURT:**   That's fine.   We have ten minutes.

5       (Proceedings were heard in the presence of the jury:)

6           **THE COURT:**   We are back on the record.   The record

7   will reflect the jury is with us.

8       Good morning.   Welcome back.

9       You may all be seated.   Our goal is to complete phase 2

10  today.   We'll take lunch when your sandwiches get here or

11  around that time, and we'll probably take like half an hour

12  whenever that happens so that you don't get indigestion because

13  I'm forcing you to eat those sandwiches so quickly.

14      I appreciate everybody being back.   I know folks are

15  concerned about what's going on out there in the greater world,

16  but these days, I am told we don't shake hands anymore.   We

17  kind of pump elbows, do the pumping-elbow thing.   There is a

18  lot of soap back there.   Wash your hands a lot.   We're still

19  operating business as usual around here so so far so good.

20      No one is feeling like they have a fever; right?   If you

21  have a fever, let me know.   I'll send you home.   And no flu

22  symptoms; right?   No.   Okay.   Good.

23      All right.   Ms. Turner is running a little late, so we're

24  going to take Mr. Mateu, who has to -- in this phase he has a

25  little bit of extra testimony.

1          Mr. Mateu, if you will come back, sir, please.

2                          **JOSEPH MATEU**,

3     called as a witness for the Defendant, having been duly sworn,

4     testified as follows:

5               **THE WITNESS:**  I do.

6               **THE CLERK:**  Please be seated.  Then please state your

7     full name and spell your last name.

8               **THE WITNESS:**  Joseph Mateu, M-A-T-E-U.

9               **THE COURT:**  Good morning.

10              **THE WITNESS:**  Good morning, Your Honor.

11              **THE COURT:**  You may proceed.

12              **MR. MORIARTY:**  Thank you, Your Honor.

13                       **DIRECT EXAMINATION**

14    **BY MR. MORIARTY:**

15    **Q.**   Good morning.

16    **A.**   Good morning.

17    **Q.**   Sergeant, I just want to ask you a few questions about the

18    shooting incident of January 3, 2018.

19         You had a firearm that day.  Could you explain to the jury

20    what type of firearm that was?

21    **A.**   Glock 22.  Basically a .40 caliber semiautomatic handgun.

22    **Q.**   What type of ammunition did you use that day in your .40

23    caliber Glock?

24    **A.**   Federal brand, .40 caliber.

25    **Q.**   How many times did you shoot your firearm on January 3,

1  2018?

2  **A.**   Three times.

3  **Q.**   When you shot your firearm, did you aim at Mr. Tindle?

4  **A.**   Yes, I did.

5  **Q.**   Did you hit him with each of the shots?

6  **A.**   Yes, I did.

7  **Q.**   Did you fire your weapon at Mr. Rayvell Newton?

8  **A.**   No.

9  **Q.**   To your knowledge, did any of your shots hit Mr. Newton?

10  **A.**   No.  None.

11  **Q.**   After your shots were fired, did you recover a weapon from

12  the sidewalk?

13  **A.**   Yes, I did.

14  **Q.**   What did you do with that?

15  **A.**   I picked up the SIG Sauer and I put it in the front

16  driver's seat of my partner's patrol vehicle and locked it in

17  there.

18  **Q.**   After the shooting incident, you remained at the scene of

19  7th and Chester; correct?

20  **A.**   Yes.

21  **Q.**   Did Mr. Rayvell Newton remain at the scene?

22  **A.**   Yes.

23  **Q.**   Was he handcuffed?

24  **A.**   Yes.

25  **Q.**   Was he searched?

1    **A.**    Yes.

2    **Q.**    To your knowledge, was any weapon found on him?

3    **A.**    There was no weapons on him.

4    **Q.**    After the shooting, did you learn that Mr. Rayvell Newton

5    was hit with a bullet?

6    **A.**    Yes.

7    **Q.**    What did you learn?

8    **A.**    Well, while I was on scene, my partner was tending to him,

9    and he said that he's -- he was shot, and my partner asked him

10   "who shot you," and he pointed to Mr. Tindle and said "that

11   guy" or something to that relevance, to "that guy" or "him."

12   **Q.**    Did you see if medical attention was given to Mr. Newton

13   while he was still on the scene?

14   **A.**    Yes.  By that -- by that time, OPD showed up, and I was

15   trying to look for a trauma kit inside my partner's patrol

16   vehicle, but then I just saw one -- a couple of the OPD

17   officers put a tourniquet on his leg.

18   **Q.**    That would be the leg of Mr. Newton?

19   **A.**    Yes.

20        **MR. MORIARTY:**  That's all the questions I have,

21   Your Honor.

22        **THE COURT:**  Okay.  Anything on that, Mr. Nisenbaum?

23        **MR. NISENBAUM:**  Very briefly.

24

25

1    **CROSS-EXAMINATION**

2    **BY MR. NISENBAUM:**

3    **Q.**   How long were you at the scene after you fired your

4    weapon?

5    **A.**   15, 20 minutes.

6    **Q.**   Okay.  And you had a chance to look around in the area,

7    the immediate area?

8    **A.**   I mean, it was very chaotic at that time.

9    **Q.**   I understand.  But you did have a chance to look at some

10   of the area; correct?

11   **A.**   Yeah.

12   **Q.**   Did you notice gunshots into the barber shop window?

13   **A.**   No.

14   **Q.**   So you didn't see that.  And the words that Mr.-- that

15   Mr. Newton told you --

16   **A.**   He didn't tell me.  He told my partner.

17   **Q.**   Oh.  So you actually don't know that.  You don't know what

18   Mr. Newton said?

19   **A.**   Well, actually I do because I was probably about 10, 15

20   feet away.

21   **Q.**   So the words that you heard Mr. Newton say, that's all he

22   said; right?

23   **A.**   Yes.

24   **Q.**   Okay.  He didn't tell you who started it then; right?

25   **A.**   No.

1          **MR. NISENBAUM:**  Thank you.  No further questions.

2          **THE COURT:**  Okay.  Any questions?  No?  All right.

3     Sir, you may step down.

4     All right, Ladies and Gentlemen.  Then we'll just, I

5     guess -- do we know if she's in the building yet?

6          **MR. NISENBAUM:**  I will check.  She indicated she would

7     be here at 8:40.  It's 8:35 now.

8          **THE COURT:**  Right.  But it takes time to get into the

9     building.

10    Okay.  Why don't I go ahead and let you guys go back to

11    the jury room.  We should just be a couple minutes, it looks

12    like.  If I was a good joke teller, I would tell you jokes,

13    but...

14         (Proceedings were heard out of presence of the jury:)

15         **THE COURT:**  So, Mr. Nisenbaum, you understand, if we

16    were on time limits, the clock would be ticking.

17         **MR. NISENBAUM:**  I do understand.  Absolutely.

18         **THE COURT:**  I may dock your close if we get to the end

19    of the day and we still need time, so I hope she gets here.

20         **MR. NISENBAUM:**  She said she's not in the building

21    yet.

22              (Off the record.)

23         **MR. NISENBAUM:**  As of two minutes ago, she was not in

24    the building yet.

25         **THE COURT:**  Mr. Nisenbaum, Mr. Burris, I'm not waiting

1    forever, and I can tell you that if she does not get here, I'm

2    going to strike her testimony, and you're going to close.  So

3    you better figure out where she is.

4           **MR. NISENBAUM:**  I'll try and reach her now, again.

5                  (Off the record.)

6           **THE COURT:**  Back on the record.

7        Ms. Turner is now 12 minutes late.  We have no idea where

8    she is exactly.

9           **MR. BURRIS:**  Well, we have an idea that she has

10   communicated with us and said she is close by.

11       I would only ask the Court to give due consideration to

12   the fact that this is a single mom with two children who are

13   small children.  She indicated last week that her children were

14   not doing well, and she's making as much effort as she can to

15   be here on time.  I recognize that she should be here, but she

16   isn't.  I'm asking the Court to give due consideration to that.

17   And that we could, in fact, move on to testimony that is not

18   directly impacted by anything that she has to say.

19       I know the police officer is here, Cardoza is here.  And I

20   also know we have testimony that is going to be reread to the

21   Court that has no impact as to her testimony.

22       I've got the issue.  I want to make sure that we don't

23   have credibility issues unnecessarily generated, but it seems

24   to me that it's easiest enough to read the other testimony here

25   to allow for that --

1          THE COURT:  Mr. Burris, as you well know, that

2     testimony is very good testimony for the defense, and the fact

3     that they want to read it at the end of their case is entirely

4     appropriate, and because your person is late, that shouldn't

5     impact their trial strategy.

6          In addition, you've got a lot of people who are showing up

7     for this trial, and someone could have helped Ms. Turner if

8     they had wanted to.  And there's no one who apparently is

9     helping her.

10          She is asking this jury for a lot of money on behalf of

11     her children.  The least she could do is be here on time.

12          MR. BURRIS:  I'm not making excuses for it.  I just

13     offered up an opportunity.  That's all.

14          THE COURT:  All right.

15          MR. BURRIS:  And I recognize the strategy involved,

16     and I'm not trying to, in any way, impact in an unnecessary way

17     to that.

18          The testimony around the police officer, though, is a

19     little bit different than the reading of the testimony.  But I

20     understand what the Court is saying and I understand the

21     defense strategy and all that, so I'm not trying to impinge

22     upon that.  I was just offering a way and recognizing

23     Ms. Turner should be here.  On the other hand, I think that a

24     little self-indulgence around that -- Court indulgence around

25     that.  It's our time.  That's all I'm asking.

```
1          THE COURT:  Mr. Nisenbaum?

2          MR. NISENBAUM:  She indicated she had just got off on

3    12th.  She is a block away on foot.  One block away.

4          MR. BURRIS:  12th Street BART?

5          MR. NISENBAUM:  I believe so.  Actually, the bus stop.

6    She was on the bus.

7               (Off the record.)

8          THE COURT:  Let's call the jury in.

9      Ms. Turner, you may come back to the stand, please.

10     (Proceedings were heard in the presence of the jury:)

11         THE COURT:  The record will reflect we are back in

12   session.  Ms. Turner, is here.

13     Good morning, Ms. Turner.

14         THE WITNESS:  Good morning.

15         THE COURT:  I will remind you, you are still under

16   oath.  You may proceed.

17                        CIARA TURNER,

18   called as a witness for the Plaintiffs, having been previously

19   duly sworn, testified further as follows:

20              CROSS-EXAMINATION   (resumed)

21   BY MR. MORIARTY:

22   Q.  Good morning, Ms. Turner.

23   A.  Good morning.

24   Q.  You were last here on Thursday, and during that testimony

25   I asked you about some prior domestic violence incidents you
```

1    had with Mr. Turner.  Do you remember those questions and

2    answers?

3    **A.**    Yes.

4    **Q.**    I asked you about a domestic violence incident that

5    happened in 2015, and you testified you had no memory of being

6    a victim of domestic violence in 2015; correct?

7    **A.**    Correct.

8    **Q.**    In May of 2015, you lived at 98 Blythedale, spelled

9    B-L-Y-T-H-E-D-A-L-E, Avenue in San Francisco; correct?

10   **A.**    Correct.

11   **Q.**    At the time of May, 2015, you were three months pregnant

12   with your daughter Sionye; correct?

13   **A.**    I believe so, yes.

14   **Q.**    She was born in the fall of 2015?

15   **A.**    November.

16   **Q.**    Is a gentleman by the name of Connel Ward your uncle?

17   **A.**    Yeah.

18   **Q.**    Who is Karmeiska Edwards?

19   **A.**    Friend.

20   **Q.**    On May 11, 2015, Ms. Edwards and Mr. Ward came to your

21   residence at 98 Blythedale Avenue; correct?

22   **A.**    I think so.

23         **MR. BURRIS:**  Objection.  Relevancy, Your Honor.

24         **THE WITNESS:**  I don't know.

25         **THE COURT:**  Overruled.

**BY MR. MORIARTY:**

**Q.**   And you testified that Mr. ward was who?  Is that your

uncle?

**A.**   Family, yeah.  Uncle.

**Q.**   And that day of May 11, 2015, Mr. Ward called the police

to your residence at 98 Blythedale Avenue in San Francisco;

correct?

**A.**   I'm guessing if that's what you see.

**Q.**   That day you had an argument with Mr. Tindle?

**A.**   I don't know.  It could have been the argument with me and

Karmeishka because that's who was staying with me then, her and

Mr. Tindle, so I don't know.

**Q.**   Well --

**A.**   If she had came or what happened.

**Q.**   Okay.  Isn't it true that you had an argument at 98

Blythedale Avenue on May 11, 2015, and that argument with you

and Mr. Tindle turned physical?

**A.**   If that's what it says, sir.  Like I said, I don't

remember.

**Q.**   Isn't it true --

**A.**   I remember the last one in 2016, like I said.

**Q.**   We'll get to that one next.  I want to concentrate on

May 11, 2015.

     So you agree with me that Mr. Ward was at your apartment

that day?

1    **A.**    If that's what it says, sir.

2    **Q.**    Okay.  Do you agree that Ms. Edwards was there?

3    **A.**    If that's what it says.

4    **Q.**    Do you agree that Mr. Tindle was there?

5    **A.**    If that's what it says.

6    **Q.**    And that day, May 11, 2015, Mr. Tindle punched you in the

7    face; correct?

8    **A.**    No.

9    **Q.**    Following the punch in the face, you had a bloody lip;

10   correct?

11   **A.**    No.

12   **Q.**    Following the punch to the face, you had large, swollen

13   cheeks; correct?

14   **A.**    Sir, no.  And Mr. Tindle, if he did go to jail, he was

15   never charged with anything.

16   **Q.**    We'll get to that.

17          After he, being Mr. Tindle, hit you, he said to you, "If

18   you call the police, I will kill you, bitch"; correct?

19              **MR. BURRIS:**  Objection.  It's argumentive.

20              **THE WITNESS:**  Sir, I don't know.

21              **MR. BURRIS:**  There is no foundation.  There is no

22   proof that any of this happened.

23              **THE COURT:**  Overruled.  He has got a basis for asking

24   the questions, and she can tell us what her version of it is.

25          Ladies and Gentlemen, remember, an attorney's questions

1   are not evidence.  All right?

2       Proceed.

3   **BY MR. MORIARTY:**

4   **Q.**   I don't know if I got an answer to the last one, so let me

5   try it again, Ms. Turner.

6       On that day of May 11, 2015, after Mr. Tindle hit you, did

7   he say, "If you call the police, I will kill you, bitch"?

8   **A.**   No.

9   **Q.**   When the police -- well, you can agree that the police

10  arrived at the residence of 98 Blythedale on May 11, 2015;

11  right?

12  **A.**   I'm guessing, sir.  I don't remember.

13  **Q.**   And when the police arrived, Mr. Tindle tried to escape

14  out the back door of the residence; correct?

15  **A.**   I don't think so, no.

16  **Q.**   The --

17  **A.**   He never tried to run or anything.  I just think he was

18  arrested.

19  **Q.**   Okay.  When -- you talked to the police that day, though;

20  correct?

21  **A.**   With not wanting to, yeah.

22  **Q.**   I'm sorry?

23  **A.**   With not wanting to.  I didn't have a choice.

24  **Q.**   Right.  The police responded to your house because your

25  uncle called the police.  You didn't call the police, did you?

**A.**    No.

**Q.**    But nonetheless, the police responded and they talked to you about the incident?

**A.**    It was a big fight that day.  My uncle had a swollen face, too.  There was a lot going on.

**Q.**    Okay.  But there was one person at the scene who was treated by the medics and that was you; correct?

**A.**    Yes -- no.  Actually, no medics came.

**Q.**    Okay.  Do you remember an ambulance coming and checking you out?

**A.**    Nobody came to check me out.  They arrested him, and that was it.

**Q.**    Photographs were taken of your face; correct?

**A.**    No.  I don't think so.  No ambulance came.

**Q.**    Okay.  During that --

**A.**    They also took photographs of the same uncle you're talking about.

**Q.**    Okay.

**A.**    Who was involved in a fight also.

        **MR. MORIARTY:**  Your Honor, I'm going to have to have a report marked as the next in line.

        **THE CLERK:**  107.

        (Trial Exhibit 107 marked for identification)

        **MR. MORIARTY:**  Can I approach the witness, Your Honor?

        **THE COURT:**  You may.

1  **BY MR. MORIARTY:**

2  **Q.**   Ms. Turner, I'm -- sorry.

3        For the record, I've handed Ms. Turner Exhibit 107, which

4  is San Francisco Police Department Report 150409849.

5        Ms. Turner, if you could turn to page 4 of 5 in that

6  report.   The pages are numbered at the bottom.

7  **A.**   I've turned to it.

8  **Q.**   Okay.   I'm going to refer you to a few areas in the

9  report.   Okay?

10              **THE COURT:**   Do we have a question, Mr. Moriarty?

11              **MR. MORIARTY:**   I'm sorry, Your Honor.   Sorry.

12  **Q.**   Could you turn to the -- thank you, Your Honor -- page 5,

13  which is the next page.   On the -- do you see the second

14  paragraph?   If you could read the second -- the first -- the

15  first sentence of the second paragraph to yourself, and then

16  I'm going to ask you a question.

17  **A.**   Yeah.   I read it.

18  **Q.**   Okay.   When it's stated that you were interviewed after

19  your medical assessment by medics at the scene, do you now

20  remember that you were assessed by medical staff at the scene

21  after this incident happened and the police arrived?

22  **A.**   I don't remember no medics being there, just the police.

23  **Q.**   Also in that paragraph in the middle of it, there's a

24  reference to your fresh injuries that included swelling to your

25  right cheek and fresh blood on your lip.   Do you remember those

1  injuries being sustained in this incident?

2  **A.**   If that's what it says, but, no.   I'm pretty sure they

3  would have took action.

4  **Q.**   Well, they did take action because Mr.--

5           **MR. BURRIS:**  Objection.   That's argumentative.

6           **THE COURT:**  Sustained as to the form.

7           **MR. MORIARTY:**  Okay.

8  **Q.**   Mr. Tindle was arrested; correct?

9  **A.**   Yeah.   But they didn't have enough evidence to go further

10  with anything, I'm guessing.

11  **Q.**   Can you turn back to page 4, which is the page before the

12  one we were referring to.

13  **A.**   Which is what?

14  **Q.**   Page 4, the third paragraph from the bottom.   Do you see

15  where it says, "Tindle then yelled, 'if you call the police,

16  I'll kill you, bitch'," in the third paragraph from the bottom?

17  **A.**   Yeah.   I see that.

18  **Q.**   Is it --

19  **A.**   Now I found it.

20  **Q.**   Yeah.   Is it your testimony that he did not say those

21  words?

22  **A.**   Yes.

23  **Q.**   On this day, were you afraid of Mr. Tindle?

24  **A.**   No.   But the same person that called the police on him is

25  the same person I had already went to jail for fighting so she

1    never liked myself or Mr. Tindle.  Just to say that that person

2    caused a lot of damage.

3    **Q.**    Pardon me?

4    **A.**    She caused a lot of damage.  I went to jail for fighting

5    her also.

6    **Q.**    That's Ms. Edwards?

7    **A.**    Yes.

8    **Q.**    So it's your testimony you were fighting with Ms. Edwards

9    on the day of the incident?

10   **A.**    We have fought that day and other times.  That's recorded,

11   too, but I'm pretty sure you don't have that.  And that's when

12   I was pregnant also.

13   **Q.**    Could you turn --

14   **A.**    You just have the time where when she called, we were all

15   yelling at each other and stuff so...

16   **Q.**    So Mr. Tindle should not have been arrested this day

17   because he didn't touch you?

18   **A.**    No.  My uncle had bruises and stuff, too.

19   **Q.**    Do you see in that report there is any reference to anyone

20   else having --

21   **A.**    The call wasn't on him.  It was on me but a lot had went

22   on that day.  That's what I'm saying.

23   **Q.**    Okay.  But you told the police that day that, according to

24   the report, "I constantly" -- you said, "I can't send him to

25   jail," referring to Mr. Tindle; correct?

```
1    A.    No.

2    Q.    That didn't happen either?

3    A.    No.  I never said I can't send him to jail.

4    Q.    Do you have any idea why that would be in the report if --

5          MR. BURRIS:  Objection.  Argumentive.  Calls for --

6          THE WITNESS:  You have to ask the person who did the

7    report, sir.  I don't know.

8          MR. BURRIS:  Calls for speculation.

9          THE COURT:  It does call for speculation as to the

10   form.  Sustained.

11        Would you like to approach?

12        MR. MORIARTY:  Sorry, Your Honor.  Let me try it

13   again.

14        Your Honor, can I get 107 back?

15        THE COURT:  Yes, you can.

16        MR. MORIARTY:  Thanks.

17   Q.    Now, on Thursday, you testified about an incident between

18   you and Mr. Tindle that happened in 2016, and I'll describe

19   that incident -- excuse me.  You described it as an incident

20   where a jacket got torn.  Do you remember that?

21   A.    Yeah.

22   Q.    And that was on the street?

23   A.    Uh-huh.

24   Q.    Is that a "yes"?

25   A.    Yes.
```

1    **Q.**   And on Thursday, you testified that it was nothing

2    physical --

3    **A.**   Yeah.  No.

4    **Q.**   And that you and -- you and Mr. Tindle were just

5    tugging --

6    **A.**   Tug-a-war with the coat.

7    **Q.**   Okay.  And that you had your son with you at the time;

8    correct?

9    **A.**   Yeah.

10   **Q.**   And that incident happened on September 21, 2016.  Does

11   that sound right?

12   **A.**   I just know it was in 2016.

13   **Q.**   Okay.  And at that time, you were living in Sausalito;

14   correct?

15   **A.**   Yeah.

16   **Q.**   You had moved from the location of 98 Blythedale into

17   Sausalito; correct?

18   **A.**   Yeah.

19   **Q.**   At the time of this incident on the street, Mr. Tindle

20   still lived at the 98 Blythedale residence; correct?

21   **A.**   Well, I still had both places.  I lived there, too.  I

22   just was trying to get things right for the one in Sausalito.

23   Then I end up not keeping it at all, so...

24   **Q.**   During the September 21, 2016, incident, you were

25   interviewed by the police; correct?

**A.**   Yeah.   I think so.

**Q.**   During that interview, you told the police that you and Mr. Tindle had a dating relationship and had been cohabitants from time to time; correct?

**A.**   No.   He stayed there.   I stayed there.   The children stayed there.

**Q.**   Well, the day that this incident occurred because you were upset --

**A.**   I wasn't going there, but I still lived at 98 Blythedale.

**Q.**   Okay.   On the day of this incident, you got upset because you saw your son walking with Mr. Tindle; correct?

**A.**   Well, he was about to walk with him, and I didn't want him to, and I wanted my jacket, so just turned into something that it shouldn't have.   I got real mad and chased him up the street.

**Q.**   You told the jury on Thursday that nothing got physical; correct?

**A.**   Not with us, but our jacket.

**Q.**   Isn't it true that you told the police during that argument that it did turn physical and he pushed you into a building?

**A.**   We weren't by a building.   We were just on the sidewalk.

**Q.**   Then he ripped the jacket off you.   We've discussed that; correct?

**A.**   The jacket was never on me.   It was in my hand.   And we

1    were playing tug-a-war with the jacket.

2    **Q.**   The argument was about young Sahleem; correct?

3    **A.**   Yeah.  He wanted to go with his dad, and I didn't want him

4    to.

5    **Q.**   Pardon me?

6    **A.**   He wanted to go with his father, and I didn't want him to.

7    **Q.**   And you told the police when they arrived that that upset

8    you because you didn't give Mr. Tindle permission to be with

9    young Sahleem because you had physical custody of your

10   children; correct?

11   **A.**   No.  We both had custody.  He could be with his father.  I

12   never -- I don't have nothing saying I have sole custody or

13   anything.

14   **Q.**   During the incident on the street, you testified on

15   Thursday that a good Samaritan called the police; correct?

16   **A.**   Yeah.  A lady seen me chasing him.

17   **Q.**   That was just a stranger; correct?

18   **A.**   Yeah.  I didn't know her.

19   **Q.**   But it was a lady?

20   **A.**   (Witness nods head.)

21   **Q.**   Is that a "yes"?

22   **A.**   Yes.

23   **Q.**   And that lady had seen the interaction between you and

24   Mr. Tindle on the street; correct?

25          **MR. BURRIS:**  Objection.  Calls for speculation.

1          THE WITNESS:  No.

2          THE COURT:  Sustained.

3          MR. BURRIS:  No foundation.

4          THE COURT:  Sustained.  She can't know what someone

5   else saw.

6   BY MR. MORIARTY:

7   Q.   Okay.  You told us on Thursday a good Samaritan called the

8   police; correct?

9   A.   I'm guessing she seen me chasing him.  I don't know if she

10  called the police, yeah, for them.  I don't know.

11  Q.   Let's talk about it.  There was a lady who saw this

12  interaction between --

13  A.   The lady who saw me chasing him up the street.

14  Q.   Okay.  And you later saw that lady talking to the police;

15  correct?

16  A.   Yes.  I think so.

17  Q.   Right.  And at the time the police were talking to you

18  about the incident; correct?

19  A.   I don't remember.

20  Q.   Did the police --

21  A.   When she called or when she got right there, I just saw

22  she was yelling when she seen me chasing him.  I don't know.

23  Q.   Before you started to chase Mr. Tindle, he had ripped your

24  jacket; right?

25  A.   Yeah.  We ripped it.

**Q.**   Pardon me?

**A.**   We ripped it.

**Q.**   Okay.  And he had taken two cell phones and some of your cash; correct?

**A.**   The cash and my phone was in my coat.

**Q.**   Did those items go with Mr. Tindle when he ran away?

**A.**   The coat ripped and the stuff was still in the jacket, but he didn't run with the jacket.  I already had my jacket back, but I wanted him to come back, basically.  I was chasing him. I was already mad, and it just turned into something it didn't have to be.

**Q.**   When he ran away, he ran away with your son; correct?

**A.**   I had my son and I was chasing -- chasing him.  When the police came right there, I had my son.  He was by me.

**Q.**   Because Mr. Tindle had left your son in traffic after he ran from the police; correct?

**A.**   We were all almost in the middle of the street.  Everybody was running.  I had my son running with me, and Mr. Tindle was up.  When the police got to Mr. Tindle, we were already in the street like on the sidewalk.

**Q.**   When you --

**A.**   I had him.  When we were running, I had my son.  The lady that seen it flagged the police down or called them because she seen two adults running with a child.

**Q.**   We could agree that when the police came, you refused to

1    cooperate with them; correct?

2    **A.**   I cooperated if I was talking to them, so I'm not going to

3    say correct.

4    **Q.**   All right.  And when you talked to the police, you told

5    them that there had been no prior incidents of domestic

6    violence?

7    **A.**   They didn't ask that.

8    **Q.**   They didn't?

9    **A.**   They asked was I okay and what happened, not has there

10   been domestic violence before.

11   **Q.**   Did the officers take photos of you that day?

12   **A.**   No.

13   **Q.**   Did they take photos of your cell phone and the cash that

14   were recovered from Mr. Tindle?

15   **A.**   I don't think so.  They were outside on the sidewalk so I

16   don't remember them taking pictures in a busy street.

17   **Q.**   Ms. Turner, I asked you some questions on Thursday about

18   the case in which Mr. Tindle was arrested in San Francisco and

19   found guilty of an assault with great bodily injury.  Do you

20   remember those questions?

21   **A.**   Yes.  I think so.

22   **Q.**   On a prior occasion, you've testified about those

23   incidents; correct?

24   **A.**   I don't know.

25   **Q.**   I previously have asked you some questions about those

1   incidents, and I want to just be very clear here.

2            THE COURT:  What's your question, Mr. Moriarty?

3            MR. MORIARTY:  I'm getting to it, Your Honor.

4            THE COURT:  Okay.

5            MR. MORIARTY:  I'm getting do it.

6   Q.   Isn't it true that on a prior occasion, you've testified

7   that the incident in San Francisco in which --

8            MR. BURRIS:  Counsel, do you have a page and line

9   number?

10           MR. MORIARTY:  Sure.  It's from the prior testimony.

11  It's page 1119, line 23, to 1120, line 12.

12  Q.   On a prior occasion, you've testified that you knew that

13  Mr. Tindle was convicted in San Francisco of assault with --

14  causing great bodily injury; isn't that correct?

15  A.   I had said I don't know if he was found guilty for it, but

16  I know he was arrested for something like that.

17  Q.   Well, let me simplify it.  You knew he was arrested for

18  what we described as the Muni incident; correct?

19  A.   For the what?  Muni?  Yeah.

20  Q.   For the incident that happened on Muni.  And you've

21  testified before that after that arrest, he was incarcerated in

22  San Francisco; right?

23  A.   Yes.

24  Q.   And there was a jury trial about that incident; right?

25  A.   Yes.

1    **Q.**   And after the jury trial, he went to prison; correct?

2    **A.**   Correct.

3    **Q.**   But you're not positive if he was convicted.  That's the

4    testimony.

5    **A.**   Of great bodily harm, yeah.

6    **Q.**   Okay.  And so previously the following questions and

7    answers were asked, and I will make it more simple.  1120, line

8    4, to line 12:

9         "Q. And so you had an understanding of what led him to

10    prison; correct?

11        "A. I believe so, yes.

12        "Q. Okay.  And that was a case in which he was arrested

13    for robbery and assault; correct?

14        "A. Yes.

15        "Q. And that took place in San Francisco?

16        "A. Yes."

17        And I would next go to page 1122, line 8, through 14:

18        "Q. And you understood that he exercised his right to a

19    jury trial in those criminal charges; correct?

20        "A. Yes.

21        "Q. Did you attend the jury trial?

22        "A. Yes.

23        "Q. You were there when the jury convicted him?

24        "A. Yes."

25        You testified on Thursday that you weren't sure if

1  Mr. Tindle was found guilty of a prior gun charge; correct?

2  **A.**   Correct.

3  **Q.**   And I'd refer the Court and counsel to 1125, line 22, to

4  1126, line 7:

5      "Q. And after Mr. Tindle got out of San Quentin, you

6  learned that he picked up a federal gun case; correct?

7      "A. Yes.  I think so.  Right.

8      "Q. Right.  That was in San Francisco; correct?

9      "A. Correct.

10      "Q. And he was convicted of illegally possessing a firearm

11  because he was a convicted felon; correct?

12      "A. Correct."

13      **MR. BURRIS:**  Your Honor, in the interests of

14  completeness, I would ask that the next two lines be read.

15      **THE COURT:**  He is, Mr. Burris.

16      **MR. BURRIS:**  I'm sorry.  In the interests of

17  completion --

18      **THE COURT:**  No.  Mr. Burris, he said through 7, I

19  thought.

20      **MR. MORIARTY:**  And I'm not done.

21      **THE COURT:**  He's not done yet.

22      **MR. MORIARTY:**  Continuing:

23      "Q. Does it make sense, the timing of that incident, to be

24  in September of 2009?

25      "A. Yes."

1    **Q.**   You have previously testified, Ms. Turner, that you had

2    seen Mr. Tindle with a gun that he took from someone in

3    San Francisco in July of 2017; correct?

4    **A.**   I gave the same scenario of which the fight was --

5    happened -- long story short, the police gave a lot of

6    scenarios, and it got to the point where I started agreeing and

7    making up stuff as I went, hoping I would be able to just go

8    after that.

9    **Q.**   So when you told that -- you agree that you told that to

10   the police, that he had a gun in July --

11   **A.**   I think I pointed to the picture they had.  I don't know.

12   **Q.**   Let me just end it here.  I want to be precise.

13        You told the police he had a gun in July of 2017 that he

14   took off someone in San Francisco.  You said that; correct?

15   **A.**   I think.  I don't -- I said a lot of stuff.

16   **Q.**   But your testimony today is while you said it, you were

17   making it up?  It wasn't true?

18   **A.**   Basically.

19   **Q.**   Okay.  I want to refocus ourselves on the day of the

20   incident.  Okay?

21   **A.**   Yes.

22   **Q.**   Your testimony is that you never saw Mr. Tindle with a gun

23   on January 3, 2018; correct?

24   **A.**   Correct.

25   **Q.**   Never saw it in either of his hands; correct?

1    **A.**   Correct.

2    **Q.**   Never saw it in the jeans that he was wearing; correct?

3    **A.**   Correct.

4    **Q.**   And your testimony is that you wouldn't have any idea why

5    he would have been carrying a gun if, in fact, he was carrying

6    a gun that day?

7    **A.**   Yes.

8    **Q.**   Your testimony is that Mr. Truck Evans -- excuse me --

9    Demorea Evans never became involved in the argument between you

10   and -- excuse me -- among you, Mr. Tindle, and -- Mr. Tindle

11   and Mr. Newton; is that correct?

12   **A.**   Sir, I was yelling myself, so I don't know what

13   Mr. Demorea Evans yelled out or if he did or didn't.

14   **Q.**   So --

15   **A.**   That's what I basically was saying.  I don't know.

16   **Q.**   Okay.  But you were definitely involved in the argument

17   among Tindle, Newton, and yourself; correct?

18   **A.**   It was an argument, yeah.

19   **Q.**   And when Mr. Evans has testified that you were very upset,

20   you agree with that; correct?

21   **A.**   More so confused than upset.

22   **Q.**   Mr. Evans has testified that during the argument,

23   Mr. Tindle --

24       **MR. BURRIS:**  Objection.  There is no evidence that

25   Mr. Evans has testified to anything in this Court.  No

1  foundation for the question.

2          **THE COURT:**  Well, that's true.

3          **MR. MORIARTY:**  Okay.

4  **Q.**   On January 3, 2018, did Mr. Tindle ever say to Mr. Newton,

5  "I should clap your ass"?

6  **A.**   No.

7  **Q.**   You know what that phrase means, though; correct?

8  **A.**   To fight or shoot somebody.

9  **Q.**   Had you ever heard Mr. Tindle use that phrase before?

10  **A.**   No.

11  **Q.**   During the argument among you, Tindle, and Newton, isn't

12  it true that you were encouraging Mr. Tindle?

13  **A.**   No.  I didn't even know there was going to be a fight.

14  Mr. Newton tackled him.  Sahleem didn't know there was going to

15  be a fight.  And if Mr. Evans can testify to anything, he can

16  testify that Sahleem Tindle never walking around Oakland trying

17  to fight anybody.  He was always with his children any time

18  Mr. Evans seen him.  I know he can testify to that.

19          **MR. MORIARTY:**  Motion to strike, Your Honor.  There is

20  no question pending.

21          **THE COURT:**  Sustained.  That entire last piece is

22  stricken, Ladies and Gentlemen.  As I indicated before, she

23  can't know what's in someone else's head.  She can't testify as

24  to what Mr. Evans thought or saw.

25

1    BY MR. MORIARTY:

2    Q.   The initial argument among you --

3    A.   I said saw, not thought.  Any time he seen Shaleem --

4             THE COURT:  Ms. Turner, you do need to wait for a

5    question.  The testimony is stricken.  All right.

6    BY MR. MORIARTY:

7    Q.   Isn't it true, Ms. Turner, that after the initial argument

8    among the three of you, you and Mr. Tindle walked towards the

9    BART station?

10   A.   We were in the street, yeah, trying to finish going to

11   BART.

12   Q.   During that walk towards the BART station, you and

13   Mr. Tindle kept talking about that incident with Mr. Newton;

14   correct?

15   A.   I don't get the question.

16   Q.   Right.

17       The initial argument in front of Upper Kutz ends, and you

18   and Mr. Tindle start walking towards the BART station --

19   A.   The argument never ended because they were -- we were all

20   still talking smack to each other.

21   Q.   Did you and Mr. Tindle physically walk away from --

22   A.   Well, yeah.  And when Mr. Evans -- I mean, Mr. Newton was

23   threatening to come to where we stayed, the argument continued.

24   We walked back towards the -- where Mr. Newton was.  I don't

25   remember Mr. Newton going into a barber shop.  I don't remember

1    that ever happening.  Or Mr. Evans stopping Mr. Newton and

2    holding him back, that never happened.

3    **Q.**    Okay.  Let's just go question and answer.  All right.

4          Do we agree that after the initial -- well, let me

5    withdraw that.

6          During the initial argument, there was nothing physical

7    between Mr. Tindle and Mr. Newton; correct?

8    **A.**    No.

9    **Q.**    No one put their hands on each other?

10   **A.**    It was never going to get physical until Mr. Newton rushed

11   Tindle.

12   **Q.**    Right.  Okay.

13         And after that initial argument, you and Mr. Tindle walked

14   over towards the BART station; correct?

15   **A.**    Yeah.  We were trying to finish going to BART.

16   **Q.**    Right.  And you were still upset; correct?

17   **A.**    We were still all arguing.

18   **Q.**    And then --

19   **A.**    It was never upset to where I was going to try and fight

20   this man.  We were never going to fight.  Mr. Newton did that.

21   **Q.**    Nonetheless, instead of going to BART, you and Mr. Tindle

22   returned to Upper Kutz; correct?

23              **MR. BURRIS:**  Objection.  "Nonetheless" is argument.

24              **THE WITNESS:**  No.

25              **THE COURT:**  Overruled.

BY MR. MORIARTY:

Q.   That's where the shooting took place, right, in front of Upper Kutz?

A.   I don't know if it was in front of Upper Kutz or the tacorea.  The fight was by the tacorea, and they ended up by Upper Kutz.  They fought all right there, so I couldn't tell you where the shooting took place.  I didn't see it.  I just heard it.

Q.   Okay.  When the two of you decided to return to either in front of the tacorea or Upper Kutz, isn't it true that Mr.--

       MR. BURRIS:  Objection, Your Honor.  There is no foundation for them to return.  She said we never left.  We continued.  It's a misstatement of testimony.  It's argumentive.

       THE COURT:  Overruled.  The jury's memory of what the testimony is with respect to where they were, where they went and when -- if at all they came back, that's your decision.

       But go ahead, given this interplay, and state your question again.

       MR. MORIARTY:  Thank you.

Q.   Before the shooting took place, isn't it true Mr. Evans told Mr. Tindle, "It ain't worth it"?

A.   I don't know what Mr. Evans was saying.  I was talking myself.  I don't know.

Q.   Isn't it true that Mr. Evans tried to end this argument

1   between Mr. Tindle and Mr. Newton?

2   **A.**   No.

3   **Q.**   Is it your testimony that Mr. Evans was never involved in

4   this argument --

5   **A.**   Mr. Evans was probably yelling, but I wouldn't know what

6   Mr. Evans said.  I was yelling myself.  Mr. Evans never came in

7   the middle and tried to stop anything.  Mr. Evans was in his

8   shop, from what I could see.

9   **Q.**   He was inside the shop?

10  **A.**   In the doorway, I'm guessing, when they were fighting or

11  probably behind the wall, like you said.

12  **Q.**   The fight between Mr. Tindle and Mr. Newton took place on

13  the sidewalk; correct?

14  **A.**   Correct.

15  **Q.**   During the fight, you heard loud noises that you later

16  realized were gunshots; correct?

17  **A.**   Yeah.  Because it was already the -- what is -- that New

18  Year's stuff had already happened, so I didn't know if it was a

19  shot or firecracker.  Then I realized after the fact it was a

20  shot because I never seen Mr. Newton hurt or -- I don't know.

21  They just fought.  So it didn't look like anybody was shooting.

22  **Q.**   So when you initially heard the first loud bang, you were

23  not sure if it was a gunshot or a firework or just some other

24  noise --

25  **A.**   They were doing fireworks all week, people in Oakland,

1  period.

2  **Q.**   Where were you standing when the fight occurred?

3      Excuse me.  Where were you standing when the fight

4  occurred on the sidewalk?

5  **A.**   When the fight first happened, I don't know if I was on

6  the curb or in the street.  I don't know.  The fight started

7  from the tacorea and ended up by Upper Kutz at the end, so I

8  can't tell you where I was standing at this part, that part.  I

9  don't know.  I just know I was right there.

10  **Q.**   Your testimony is that you never saw anyone with a gun;

11  correct?

12  **A.**   Correct.

13  **Q.**   Your testimony is that you never saw anyone shoot a gun;

14  correct?

15  **A.**   Correct.

16  **Q.**   Your testimony is you never saw the fire come out of a gun

17  that anyone was holding?

18  **A.**   Correct.  I never seen nothing light up or I didn't even

19  see the other man hurt.  I didn't see any of that.  I just seen

20  a fight.

21  **Q.**   Your testimony is that you never saw a gun fall to the

22  ground and go off; correct?

23  **A.**   Correct.

24  **Q.**   You never --

25  **A.**   From where I was standing, I didn't see any of that.

1    **Q.**   You never saw a gun six seconds later fall to the ground

2    and go off; correct?

3    **A.**   Correct.

4    **Q.**   You never -- after the first loud noise, you never heard

5    anyone say something to the effect of, "Oh, shoot, the gun went

6    off"; correct?

7    **A.**   I don't know.  I know it was a lot of stuff going on.

8    People running this way, that way.  I was running to make sure

9    my children didn't see anything.  I don't know where they were

10    standing at the time.

11    **Q.**   After the first --

12    **A.**   Even after that, I never seen anyone hurt, so I didn't

13    think anyone was shot.

14    **Q.**   I want to focus on what you heard because you said that

15    you heard a loud bang?

16    **A.**   Yeah.

17    **Q.**   And then seconds later, you heard another loud bang;

18    correct?

19          **MR. BURRIS:**  Objection.  That's a misstatement of the

20    testimony.  She didn't say that at all.

21          **THE COURT:**  Overruled.

22          **THE WITNESS:**  Yeah.  I don't think I said that.  I

23    think I said I heard a bang because I thought it was only one

24    shot.

25

BY MR. MORIARTY:

**Q.**   All right.  When you heard that loud bang, did you hear anyone say anything to the effect of that was an accident?

**A.**   No.  I seen a fight going on.

**Q.**   You didn't hear anyone yell anything out after that loud noise, did you?

**A.**   No.

**Q.**   You saw Mr. Tindle shoot Mr. Newton in the leg; correct?

**A.**   No.

**Q.**   You saw Mr. Tindle shoot one time into the barber shop; correct?

**A.**   No.

**Q.**   You were -- you remained at the scene after the shooting; correct?

**A.**   I remained at the scene.

         **MR. BURRIS:**  Objection.  Objection.  Vagueness.  What shooting are you talking about?  It's vague as to --

         **THE WITNESS:**  It's two different --

         **MR. BURRIS:**  -- as to time and place.

         **THE COURT:**  Overruled.  Well --

         **MR. MORIARTY:**  I'll clear it up, Your Honor.

         **THE COURT:**  Sustained.

BY MR. MORIARTY:

**Q.**   After Mr. Tindle was shot, you saw that Mr. Newton was also shot; correct?

1    **A.**   I never seen that.  Once Mr. Tindle was shot, I was only

2    there for about 30 seconds, close to a minute.  I thought he

3    was still -- I thought he was still alive so I was trying to

4    make sure my children didn't see it, and I ran upstairs to

5    BART.  That's why, after he was shot, I never come back right

6    there.  I didn't get a chance to.

7        So, no, I didn't see all that.  I ran upstairs to BART,

8    rolled around on the floor to make -- to find my children

9    because they weren't still standing in that same place from

10   where the officer was running.  So, no, I did not stay at the

11   scene when he was shot.  That's why the whole time in question,

12   I thought he was still alive.  I never got to go back by his

13   body or anything.  I never seen Mr. Newton go in the ambulance.

14   I didn't see anything.

15   **Q.**   At the time of the -- could we get -- can I approach,

16   Your Honor?

17            **THE COURT:**  You may.

18            **MR. MORIARTY:**  Can I proceed, Your Honor?

19   **Q.**   Are you okay?

20       Ms. Turner, on Thursday, you testified that you sent your

21   children to the BART station before the fighting, the physical

22   fighting between Mr. Tindle and Mr. Newton began; correct?

23   **A.**   I told them to go -- go ahead with my sister.  I didn't

24   say go in the BART.  Just go ahead because I didn't know a

25   fight was about to happen.  I just didn't want them to see

1    their dad arguing with that man.

2    **Q.**   On a prior occasion, you testified -- and I'd refer the

3    Court and counsel to page 1106, line 3 through 11 -- that your

4    children were watching the fight between --

5            **THE COURT:**  Hold on.

6            **MR. MORIARTY:**  Oh, I'm sorry.

7            **MR. BURRIS:**  You said 1106, counsel?

8            **MR. MORIARTY:**  Yes.  1106, line 3 to 12 -- 3 to 11, I

9    should say.

10           **THE COURT:**  All right.  Go ahead.

11   **BY MR. MORIARTY:**

12   **Q.**   You testified on a prior occasion that your children were

13   basically right there when the fighting began.

14   **A.**   No.  When the argument began, they were right there.  He

15   walked up to my children.

16   **Q.**   Okay.

17   **A.**   Their dad and my sister.

18   **Q.**   I will read from 1106, 3 to 11.  Answer --

19           **THE COURT:**  Hold on.  I don't think that's appropriate

20   impeachment.  She testified that they were fight -- that she

21   didn't want them to see when they were fighting.

22           **MR. MORIARTY:**  Right.  Where I started, Your Honor, I

23   said on Thursday she testified that she sent her kids to the

24   BART station before the fighting began.  And so line --

25           **THE COURT:**  Okay.  Let me read it.

1          **MR. MORIARTY:**  -- 1106, 1 through 6, would be

2      inconsistent with that statement.

3          **THE COURT:**  Let me see.

4              (the Court reads the testimony.)

5          **THE COURT:**  All right.  Go ahead.

6      **BY MR. MORIARTY:**

7      **Q.**   Line 1106, 1 through 11:

8          "Q. So then what happened after you were arguing back and

9      forth?

10         "A. Well, we were arguing, and then my -- I was kind of in

11     the middle of the street, so basically when I was walking off,

12     Sahleem and the man started fighting -- the man start fighting,

13     and I didn't want my children to see, so basically in the

14     middle of the street, trying to tell 'go'.  You know, I didn't

15     want them to -- I didn't want them to see their father

16     fighting.

17         "Q. Who were you telling 'go, go' --

18     **A.**   I was trying to yell across the street to my sister and

19     children, but I never saw where they went --

20         **THE COURT:**  Ms. Turner, hold on.  Let him finish

21     reading please.

22         **MR. MORIARTY:**  Question from line 9:

23         "Q. Who are you telling to 'go, go'?

24         "A. My sister and my children because I didn't want them

25     standing there looking at a fight with their father."

1   **Q.**   So your testimony today is what, Ms. Turner, as far as

2   where your children were when the physical fight between

3   Mr. Tindle and Mr. Newton began?

4   **A.**   That's the thing.  I never knew where they were.  I was

5   trying to look and yell, make sure they weren't right there.

6   That's why after he got shot, I ran upstairs to see if they

7   were up there because they weren't in the parking lot.  They

8   weren't downstairs.  They were upstairs.  I never knew where

9   they were.  I didn't even know if they seen him get shot.  So I

10  was already in the street by the time the officer came trying

11  to make sure my children didn't see that.  I didn't know where

12  they went or my sister.

13  **Q.**   On Thursday, you testified that you were yelling at them,

14  at your children --

15  **A.**   I was yelling, but I don't know where she was.

16  **Q.**   Okay.  But you testified on Thursday that you were yelling

17  at your children when my client, Officer Mateu, was running

18  towards you.

19  **A.**   No.  I was yelling, "His children are right there."  I

20  thought my children was still by the parking lot, which my

21  sister first crossed the street.  I never knew where they were,

22  ever, until after he was shot.

23  **Q.**   And on Thursday, you testified that you were afraid that

24  they were going to get shot; correct?  When Officer --

25  **A.**   I don't know if they were going to get shot.  I didn't

1   want them to see the shot, but I thought I would have been

2   getting shot if I made another sudden step, so I probably did

3   say that.

4   **Q.**   You've previously testified that you were in the middle of

5   the street when the fighting took place; correct?

6   **A.**   I was in the street.  I can't say if I was in the far

7   middle.  I just know I wasn't right there when he got rushed.

8   **Q.**   Okay.  And then on Thursday, you testified that you were

9   on the curb or on the sidewalk when the fighting occurred.  Do

10  you remember that?

11  **A.**   Probably.  I was everywhere that day.  The fighting --

12  like I said, it was a whole block, and the fight didn't start

13  at Upper Kutz.  It started at the tacorea.

14  **Q.**   Where were you located when the physical fight began?

15  **A.**   I'm thinking on the street or on the curb.  I don't know.

16  **Q.**   Okay.

17  **A.**   I just know I was right there, a few feet away.  Like I

18  said in the police interview, I literally pointed a whole

19  different street of where I was really standing.  That's how

20  confused I was by it all.

21       **MR. MORIARTY:**  I refer the Court and counsel to page

22  1106, lines 20 to 24:

23       "A. They were still fighting" --

24       **MR. BURRIS:**  Huh-uh, counsel.  You should read the

25  question first.  17 starts --

1          **THE COURT:**  I agree.  Question first.  Tell me when

2   you're done.

3          **MR. BURRIS:**  I'm fine.  Thank you.

4          **MR. MORIARTY:**  I will go from 17 to 24.

5      "Q. So what happened after you told your children to go

6   and Sahleem or Mr. Tindle and this guy are fighting?  What

7   happened next?

8      "A. They were still fighting.  I was basically in the

9   middle of the street trying to make sure my children were out

10  of the way and trying to keep my eyes on the fight, and that's

11  basically when I heard the bang.  I thought it was one shot,

12  but I guess it was two."

13  **Q.**   So I'm not going to go through all the prior testimony.  I

14  just want to know what your testimony is today, Ms. Turner.

15      When the fight --

16          **MR. BURRIS:**  Objection.  Argumentive.

17          **THE COURT:**  Sustained as to the form.

18  **BY MR. MORIARTY:**

19  **Q.**   When the fighting and the shot took place, where were you

20  standing?

21          **MR. BURRIS:**  Objection.  Asked and answered.

22          **THE COURT:**  Overruled.

23          **MR. BURRIS:**  Objection, Your Honor.  It's which shot?

24  The one shot or the two, three from the cops?  Foundation.

25          **THE COURT:**  Sustained as to --

1          **MR. MORIARTY:**  I agree.

2          **THE COURT:**  Slightly ambiguous.  Not as to foundation.

3          **MR. MORIARTY:**  I agree.

4    **Q.**   When the fighting between Mr. Tindle and Mr. Newman *[sic]*

5    was taking place, you testified you heard a loud bang; correct?

6    **A.**   Yeah.

7    **Q.**   I'm not talking about the three shots from Officer Mateu.

8    Okay?

9    **A.**   Uh-huh.

10   **Q.**   Do you understand where I'm going?

11   **A.**   Yes.

12   **Q.**   And during the time that you were watching the fighting

13   and you heard that initial loud bang, where were you physically

14   located?

15   **A.**    In the street.  Nobody was on the sidewalk when the loud

16   bang happened but the two people fighting.

17   **Q.**   Ms. Turner, is the monitor in front of you working?

18   **A.**   Yes.

19   **Q.**   And do you see -- just for the record, Your Honor, I have

20   in the video the incident which is Bates stamped 0096.

21         Ms. Turner, do you see the counter in the left bottom

22   corner of the screen where it says 0:03:00?

23   **A.**   Yeah.

24   **Q.**   I'm going to play a portion and then I'm going to stop.

25   Okay?  I'm going to play 12 seconds and then stop the video.

1    All right?

2    **A.**    Yeah.

3    **Q.**    And then I'll ask you a question.

4                    (Whereupon, the video was played.)

5    **BY MR. MORIARTY:**

6    **Q.**    Now, I have stopped it at the mark where it says 3 minutes

7    and 12 seconds.  Okay?

8    **A.**    Yes.

9    **Q.**    Do you see that?  Do you see where the cursor is moving on

10    the screen?

11    **A.**    Yes.

12    **Q.**    Tell the jury who the lady I have the arrow over is.

13    **A.**    My sister.

14    **Q.**    To the right of your sister -- what's your sister's name?

15    **A.**    Ardanna.

16    **Q.**    She was the one that was walking with you --

17    **A.**    That I told to go ahead, yes.

18    **Q.**    And to the right of Ardanna, is that young Saleem *[sic]*?

19    **A.**    Sahleem, yes.

20    **Q.**    Young Sahleem.

21         And then in front of Ardanna is your daughter Sionye in

22    the stroller; correct?

23    **A.**    Yes.

24    **Q.**    I'm going to start it again from 3:12.  Okay?

25    **A.**    Yes.

1          (Whereupon, the video was played.)

2     **BY MR. MORIARTY:**

3     **Q.**   I have stopped it at 3:49.  Do you see that on your

4     screen?

5     **A.**   Yes.

6     **Q.**   And do you see where the cursor is?  Is that Upper Kutz,

7     the barber shop?

8     **A.**   Yes.

9     **Q.**   And this, where the cursor is now, is the area where the

10    fighting was taking place; correct?

11    **A.**   Yes.

12    **Q.**   And do you see on the -- what appears to be the curb

13    line --

14    **A.**   The curb, half of the sidewalk, that's me.

15    **Q.**   That's you right there?

16    **A.**   Yeah.

17    **Q.**   I'm going to go ahead and press play at 3:49.  Okay?

18    **A.**   Yes.

19          (Whereupon, the video was played.)

20    **BY MR. MORIARTY:**

21    **Q.**   And when I stopped at 3:54, do you see where I stopped it?

22    **A.**   Yes.

23    **Q.**   And the person whose running away that appears to be

24    almost in the left-hand turn lane of 7th Street, that's you;

25    correct?

1    A.   Yes.

2    Q.   You saw Officer Mateu running across the street; correct?

3    A.   Yeah.

4    Q.   He ran through the middle of 7th Street; correct?

5    A.   Yes.

6    Q.   He was sprinting?

7    A.   Yes.

8    Q.   He was wearing a uniform?

9    A.   Yes.

10   Q.   And you saw his uniform?

11   A.   Yes.

12   Q.   And you saw the gun that he held?

13   A.   Of course.

14   Q.   And you saw -- excuse me -- you heard him yelling

15   commands; correct?

16   A.   Yes.

17   Q.   And there was no question in your mind when you saw and

18   heard Mateu coming to the corner that he was a police officer;

19   correct?

20   A.   Correct.

21   Q.   Ms. Turner, can you see the photograph that's on the

22   screen right now?

23   A.   Yes.

24   Q.   And that, for the record, is 101A, Defense 101A.  Do you

25   recognize that, what's shown in that photograph?

1    **A.**   The Upper Kutz and the taco place.

2    **Q.**   And is that the way the layout looked on January 3, 2018,

3    when this incident took place?

4    **A.**   Yes.

5    **Q.**   Okay.  I want you to take a look at 101C, which is now on

6    the screen.  Do you see Upper Kutz in that photograph?

7    **A.**   Yes.

8    **Q.**   Do you see -- do you see where my pen is?

9    **A.**   Yes.

10   **Q.**   Do you see what appears to be two people who are in a

11   physical fight?

12   **A.**   Yes.

13   **Q.**   And then -- and those people look like they're -- one's on

14   the ground and one's on top.  Do you agree?

15   **A.**   Yes.

16   **Q.**   To the left of those two individuals is a person who is

17   standing.  Do you see that?

18   **A.**   Yes.

19   **Q.**   Is that you?

20   **A.**   Yes.  They were fighting.  I was right there.

21   **Q.**   You were right there --

22   **A.**   Yeah.

23   **Q.**   -- correct?

24   **A.**   Never said I wasn't.  I just wasn't right there when the

25   shooting took place.  I was up on the curb, off the curb, on

1    the other side.  I was everywhere.

2    **Q.**   But during this portion of this incident, it appears to me

3    that -- and you tell me your memory -- that you're within a

4    couple feet of this fight; correct?

5    **A.**   Yes.

6    **Q.**   And your testimony is that you never saw a firearm;

7    correct?

8    **A.**   Correct.  Just seen them fight.

9    **Q.**   Now on the screen is 101D.  Do you see that?

10   **A.**   Yes.

11   **Q.**   Can you tell if the area of the corner with Upper Kutz and

12   the taco shop is shown in this photograph?

13   **A.**   Yes.

14   **Q.**   Does it appear to be another photo that looks similar to

15   the prior one I saw you -- I showed you, I should say?

16   **A.**   Yes.

17   **Q.**   Can you distinguish at all if you can see anyone in the

18   area where I'm now pointing my pen on the corner of 7th and

19   Chester?

20   **A.**   Yeah.

21   **Q.**   Who do you see in that location?

22   **A.**   I think that's me.  The same spot.  It's a different

23   angle.

24   **Q.**   When you say "that's me" -- if I could approach,

25   Your Honor.

```
1      Am I correct -- do you see where my pen is pointing right
2   there?
3   A.   Yeah.
4   Q.   That's what you're talking about?
5   A.   Okay.
6            MR. MORIARTY:   Your Honor, could I approach the
7   witness with this exhibit?
8            THE COURT:   All right.
9   BY MR. MORIARTY:
10  Q.   Handing -- handing the witness 101D, and I also handed her
11  a red pen.
12       Ms. Turner, could you do me the favor of putting a circle
13  to correspond with your prior testimony of that being you in
14  the picture, and then after you draw a circle, could you pull a
15  line --
16           MR. BURRIS:   Counsel, which exhibit is this?
17           MR. MORIARTY:   D.
18           THE COURT:   101D.
19           MR. BURRIS:   Thank you.
20  BY MR. MORIARTY:
21  Q.   And after you draw the circle, could you pull a line into
22  the margin and put your initials with the number 1, please.
23  A.   Circle it, a line.  Okay.  What's the margin or whatever
24  you said?
25  Q.   The white part that's surrounding the picture.
```

1    **A.**   Okay.

2    **Q.**   You can just draw a line up.  I think it will be clear.

3    **A.**   I think I did it.

4    **Q.**   And then if you put your initials and the number 1, is

5    that okay?

6    **A.**   Yeah.

7              **MR. MORIARTY:**  Can I take it from her now, Your Honor?

8              **THE COURT:**  You may.

9    BY MR. MORIARTY:

10   **Q.**   And the 101D is now back on the screen.  Do you see that

11   now, Ms. Turner?

12   **A.**   Yeah.

13   **Q.**   And 101D, you put a circle around you at the location

14   where you were during this portion of the fight; correct?

15   **A.**   Correct.

16   **Q.**   And then above it, you put your initials CT; correct?

17   **A.**   Yes.

18   **Q.**   Were you ever afraid that you were going to get shot?

19   **A.**   What did you say?

20   **Q.**   Were you ever afraid that you were going to get shot?

21   **A.**   When the officer was running right there, yeah, because

22   his gun was already pointed out, and I don't want to make

23   another sudden move and get shot, so I was trying to run.

24   **Q.**   Were you ever afraid that you were going to get shot

25   before you saw the officer?

**A.**   No.

**Q.**   After you heard that loud noise, you stayed in the same location; correct?

**A.**   I was already, like, in the street, sidewalk, so I don't know, but I was right there, yeah.

**Q.**   Right.

**A.**   And then when I seen the officer running towards me and the two people fighting and the gun drawn, that's when I was really trying to yell and say there's children right there, not knowing where my babies were.

**Q.**   Just to be clear, though, it wasn't until you saw the officer that you ran from that corner of 7th and Chester; correct?

**A.**   Away from the fight.  I was already on the corner when I was in the middle of the street and on the curb and all that. It was -- everything happened on the corner.

**Q.**   Give me a second.

**A.**   I didn't know anybody was shot, so I didn't run.

        **MR. MORIARTY:**  Can I have one second, Your Honor, to consult Mr. Allen.

            (Defense counsel confer off the record.)

        **MR. MORIARTY:**  That's all the questions I have, Your Honor.

        **THE COURT:**  Redirect?

        **MR. BURRIS:**  Yes.  Thank you, Your Honor.

1          **<u>REDIRECT EXAMINATION</u>**

2     **BY MR. BURRIS:**

3     **Q.**   Ms. Turner, so you and Saleem *[sic]*-- Sahleem -- of the

4     period of time from after the first child was born until the

5     date of his death, how much time did you live together?

6     **A.**   Probably about seven, eight years.

7     **Q.**   Okay.

8     **A.**   For a while.

9     **Q.**   So would you --

10    **A.**   Long time.

11    **Q.**   -- describe the relationship in terms of there were ups

12    and downs, there were emotional issues?  What was involved?

13    **A.**   There were ups and downs, but more so good times than bad.

14    We were young.  Jealousy.  Yeah, you know, that kind of thing,

15    so ...  It was mostly good times.

16    **Q.**   You were both in your early, mid 20s?

17    **A.**   Yeah.

18    **Q.**   Were there feelings of possession on the part of either

19    one of you?

20    **A.**   Me, myself.

21    **Q.**   Okay.  In terms of the issues around his convictions,

22    those took place back in 2009 and 2010, '11, that period of

23    time?

24    **A.**   Yes.

25    **Q.**   Were there any convictions after that?

1   **A.**    No.  And he got off of federal probation and the regular

2   probation.  He got off of all those things.

3   **Q.**    So there's -- counsel made reference to the fact that

4   there were domestic issues where the police was called on more

5   than one occasion?

6   **A.**    Yeah.

7   **Q.**    What impact, if any, did those events have in connection

8   with his relationship with the children?

9   **A.**    None whatsoever.

10  **Q.**    Okay.  And in what sense?  What was the relationship?

11  **A.**    He had a wonder relationship with them.  To this day, my

12  daughter asks for her father, and my son.  He never miss a

13  field trip for my son and was always at school with them or

14  just spending time with them in class, took them to --

15  **Q.**    So in terms of the relationship that you and he had, rocky

16  at times, what impact did it have on his providing love and

17  attention, all the kind of things that you made reference to?

18  **A.**    None.

19  **Q.**    Okay.  He was a dedicated dad?

20  **A.**    Yes.

21  **Q.**    Okay.  A participating dad?

22  **A.**    Yes.

23  **Q.**    Okay.  Were there any issues of -- did you mention

24  something about child custody?  Was there a custody issue

25  involved?

1   **A.**   No.   We didn't have a custody agreement.   We just did what

2   parents do, took care of our children.

3   **Q.**   So you didn't take him to court or any complaints about

4   him at all in relationship to the children?

5   **A.**   No.

6   **Q.**   And he did -- he did his share of what he could do?

7           **MR. MORIARTY:**   Objection.   Leading.

8           **THE COURT:**   Sustained.

9   **BY MR. BURRIS:**

10  **Q.**   Okay.

11  **A.**   What he couldn't do with money, he did with time.

12          **THE COURT:**   Sustained.   He will ask you a new

13  question.

14  **BY MR. BURRIS:**

15  **Q.**   You guys were not financially well off, I take it?

16  **A.**   Correct.

17  **Q.**   Now, what impact, if any, did this sort of money or lack

18  thereof have on his impact in being a dad?

19  **A.**   None.   What he didn't do with money, he did with time.

20  **Q.**   Okay.   Okay.

21  **A.**   When he did not have money, he gave time.

22  **Q.**   So -- okay.

23          Now, at the time of his passing, were you two living

24  together over on Willow Street?

25  **A.**   Yes.

1    **Q.**   Okay.  And was he engaging in any way with his children

2    during that period of time?

3    **A.**   Yes.

4    **Q.**   In what way?  Describe for us.

5    **A.**   He would always take my son to karate or just go take him

6    to school, pick him up.  If not going to movies, then just

7    being at home with them or them watching their favorite shows

8    together.  He just was in his children's life.

9    **Q.**   Okay.  When you left out on the date of his death -- when

10   you left out from the home, what was his mood like, his

11   emotional mood, if you will?

12   **A.**   He was happy.  He had just made them lunch and got them

13   dressed, because I was doing my sister's hair, and we was just

14   about to leave after the fact.  But he was happy.  Fed them,

15   cleaned up, and we were just -- he was just waiting for me to

16   finish my sister's hair, but he was in a good mood.

17   **Q.**   Was there any discussion that you heard where he was upset

18   with any particular one person?

19   **A.**   No.

20   **Q.**   Was there any discussion about Mr. Newton at all?

21   **A.**   No.

22   **Q.**   Did you know Mr. Newton prior to that day?

23   **A.**   No.

24   **Q.**   Okay.  When he left out that day, his attitude was not --

25   what was his attitude?

1    **A.**   It was just walking and talking, joking, just being his

2    normal self.

3    **Q.**   Okay.  You and he were sort of working through whatever

4    differences you had had --

5    **A.**   Yeah.

6    **Q.**   -- around jealousy?

7    **A.**   Huh?

8    **Q.**   Around jealousy and all?

9    **A.**   Yeah.

10   **Q.**   Okay.  So in terms of the incident itself, counsel has

11   made a lot of references to your location -- first off, the

12   fight itself, getting to that, what was the initial contact

13   that you or he, Sahleem, had with Mr. Newton?

14   **A.**   Mr. Newton came up to us and started yelling about his

15   stuff.  We --

16   **Q.**   Okay.  And were you still on Chester Street when that

17   happened?

18   **A.**   Yeah.

19   **Q.**   Okay.  Were you closer to 8th Street or closer to 7th

20   Street?

21   **A.**   8th.

22   **Q.**   So this is further into the block?

23   **A.**   Yeah.

24   **Q.**   So in walking from 7th and Chester to 7th and Chester --

25   **A.**   Yeah.

1   **Q.**   -- was he with you during that period of time, "he"

2   meaning Mr. Newton?

3   **A.**   Yes.  He was following us down the street.

4   **Q.**   Okay.  And what was going on?

5   **A.**   Arguing, and he had already came about this

6   close (indicating) --

7   **Q.**   When you say "this close," you mean within a foot or two

8   or three --

9   **A.**   Within an inch.  If he was closer, he could have gave

10  somebody a kiss.  He was that close.

11  **Q.**   Was that to you or to Mr. Tindle?

12  **A.**   To myself, the children -- to everybody.  He came in

13  everybody face and was talking a lot of stuff.

14  **Q.**   Okay.

15  **A.**   And that was the whole point of me telling my sister to

16  please walk ahead.  Never said go wait in the BART or anything

17  like that.

18  **Q.**   So in walking along that street where he's sort of in your

19  face, if you will --

20  **A.**   Yes.

21  **Q.**   Okay.  So at any point in time, did you leave the two of

22  them?

23  **A.**   I'm kind of walking up ahead of them more.

24  **Q.**   Okay.

25  **A.**   Yeah.

1    **Q.**   And what happened next after that?

2    **A.**   And then what happened next, we got to -- it was still an

3    argument all the way to the corner.

4    **Q.**   Okay.

5    **A.**   So a whole block of arguing.

6    **Q.**   Okay.  And was threats being made during this time?

7    **A.**   There was.

8           **MR. MORIARTY:**  Objection.  Leading.  Leading.

9           **THE COURT:**  Sustained.

10   **BY MR. BURRIS:**

11   **Q.**   What was being said -- were you feeling uncomfortable

12   about what was going on?

13   **A.**   Yes.

14   **Q.**   What was Mr. Newton saying?

15   **A.**   He's a real Oakland -- the N word.  A real Oakland.  He

16   know where we stay.  He come over there and do this, this and

17   that.  And I -- you know, I'm scared.  How do you know where I

18   live?  I don't even know you, sir.

19   **Q.**   Okay.  What happened next?

20   **A.**   And then the -- it just was more arguing, and I know at

21   one point in time, Sahleem had took his phone out to take a

22   picture of him because he kept saying he was going to come to

23   where we stayed and that's where he was from.

24   **Q.**   Okay.  So did Sahleem take -- did he, in fact, take a

25   picture?

1   **A.**   I'm not sure if he even got the chance.  Mr. Newton had

2   tackled him by that time.

3   **Q.**   So you said Mr. Newton had tackled him.  Describe for us

4   what that means, what you saw.

5   **A.**   I just seen Sahleem, like, kind of standing there and

6   trying to walk off, and Mr. Newton -- just like you tackle

7   somebody on the football field, he tackled him.

8   **Q.**   And did he initiate the action, the physical contact?

9            **MR. MORIARTY:**  Leading.

10           **THE COURT:**  Sustained.

11  **BY MR. BURRIS:**

12  **Q.**   What did Mr. Tingle *[sic]* do in response to him being

13  tackled?

14  **A.**   He tried to fight back.

15  **Q.**   Okay.  So this is two men fighting?

16  **A.**   Yeah.  Like wrestling and punching and headlocks, stuff

17  like that.

18  **Q.**   And where were you?

19  **A.**   I was in the -- in the street at that part and on the curb

20  kind of.  Like, you know, I was more so in the street, though,

21  at that time.

22  **Q.**   And the street -- there's two streets there.  There is 7th

23  Street and there is Chester Street.

24  **A.**   Whatever street is closer to BART.

25  **Q.**   Okay.

1    **A.**   So 7th Street.

2    **Q.**   Okay.  All right.

3        Now, were you in the street when the fighting was going on

4    between the two?

5    **A.**   Yeah.  I was in the street at that time.

6    **Q.**   And -- and where were you at the time Mr. Newton charged

7    Mr. Tingle *[sic]*?

8    **A.**   I was like in the street, because I was -- we were fixing

9    to walk off, but I was already ahead of them -- well, him.  And

10   I was still trying to see because I didn't see my sister on the

11   corner no more, and now I just see him rush him so I'm just

12   right there.  I never went to BART or anything else.  I was

13   looking.

14   **Q.**   So counsel made reference to the fact that somehow you

15   were not really looking for your children; is that true?

16   **A.**   No.

17   **Q.**   Describe for us what you were trying to do in connection

18   with your children as well as when the fight was going on?

19   **A.**   Well, I had already -- when we were still arguing, I never

20   seen my sister standing, like, on the corner, so I'm still

21   trying to see where she went and make sure -- because by now

22   they're fighting and now I'm really yelling this way, "Go,

23   Ardanna."  Ardanna is not even right there.  I didn't even know

24   that.

25       But by the grace -- I'm just thankful she wasn't there

1   because she was smart enough to go.  Once she -- she probably

2   seen him tackle him.  I don't know.  But I just know my sister

3   and children weren't right there.

4       So by this time when the gun is being pointed from the

5   officer, I'm really in the street yelling to go, and nobody's

6   right there.

7   Q.   Okay.  Were you -- while all this was taking place, did

8   you stay in one particular spot for this entire period of time?

9   A.   No.

10  Q.   What did you do?  Describe for us your movements.

11  A.   Well, the -- they were kind of going from the tacorea to

12  Upper Kutz, and the fight is right here (indicating).  Then

13  they're this way (indicating), so I'm moving around myself.

14  I'm in the street.  I'm on the curb.  I'm this way

15  (indicating).  I just wasn't standing in one spot.  The fight

16  wasn't in one spot.

17  Q.   Okay.

18  A.   The fight was half a little block right there.

19  Q.   Okay.

20      Thank you, Your Honor.  I have no further questions.

21          THE COURT:  Recross limited to the scope of redirect.

22          MR. MORIARTY:  Frances, can I have this one marked

23  next?

24          THE CLERK:  108.

25      (Trial Exhibit 108 marked for identification)

1      **MR. MORIARTY:**  May I approach the witness, Your Honor?

2      **THE COURT:**  You may.

3      **MR. MORIARTY:**  I'm handing the witness 108.

4      **THE COURT:**  Do you have a copy for me?

5      **MR. MORIARTY:**  I do.

6      **THE COURT:**  And for Mr. Burris?

7      **MR. BURRIS:**  What is it, for the record?

8      **THE COURT:**  108.

9      **MR. BURRIS:**  Exhibit 108?

10     **THE COURT:**  It just got marked.

11  Did you hand one to Mr. Burris?

12     **MR. MORIARTY:**  I did, Your Honor.

13                          **RECROSS-EXAMINATION**

14  BY MR. MORIARTY:

15  **Q.**  Ms. Turner, you have in front of you Defense Exhibit 108;

16  correct?

17  **A.**  Yes.

18  **Q.**  You just testified that your relationship with Mr. Tindle

19  had its ups and downs; correct?

20  **A.**  Correct.

21  **Q.**  But that your -- the ups and downs with Mr. Tindle had no

22  effect on his relationship with his son; correct?

23  **A.**  Correct.

24  **Q.**  You also testified that there was no issues with legal

25  custody; correct?

1    **A.**   Correct.

2    **Q.**   Can you take a look at the sixth page of Defense Exhibit

3    108, for the record, which is San Francisco Police Report

4    160766300, and I've -- the copy that you have, Ms. Turner, has

5    highlights on it; correct?

6    **A.**   Yes.

7          **MR. BURRIS:**  Counsel, can we have a date of this

8    report?  You make reference.  What's the date on it?

9          **MR. MORIARTY:**  Well, the date is September 21, 2016,

10   which is on the first page of 108.

11         **THE COURT:**  And are you talking about -- are you

12   directing her to the page that shows on the top right 8 of 14?

13         **MR. MORIARTY:**  Correct.  And to make this run more

14   smoothly, as I explained, that page which says 8 of 14 in the

15   upper right-hand corner.

16   **Q.**   Do you see that, Ms. Turner?

17   **A.**   It says what?

18   **Q.**   It says period 8/14, the one you're looking at.

19   **A.**   Mine says 6 slash 14.

20         **THE COURT:**  You can approach and make sure she's on

21   the right page.

22         **THE WITNESS:**  Now I found it.

23         **THE COURT:**  Found it?

24         **THE WITNESS:**  Yeah.

25

1    BY MR. MORIARTY:

2    Q.   Do you have the one that says 8 of 14?

3    A.   Uh-huh.

4    Q.   That page has certain portions highlighted; correct?

5    A.   Yes.

6         MR. BURRIS:   Counsel, do me a favor and help me find

7    what you're talking about.

8         MR. MORIARTY:   Of course.

9         MR. BURRIS:   Is this --

10        MR. MORIARTY:   Yeah.

11        MR. BURRIS:   Thank you.

12        MR. MORIARTY:   No problem.

13   Q.   Do you see the second line in the highlighted portion

14   below at about 11:54 hours?   The second line says, "Turner was

15   upset because she had not given permission to Tindle to pick up

16   their son as she had physical custody of their children," and

17   in parentheses, it says "although there were no court documents

18   awarding her sole legal custody."

19        My question, Ms. Turner, is did you tell the police that

20   you had full physical custody of your --

21   A.   I basically did.   Nobody had custody.   They lived with me.

22   I don't -- they lived with us.   We pick them up.

23   Q.   And we can agree during this incident of September 24th,

24   2016, you had issues with Mr. Tindle; correct?

25   A.   Yes.

1  **Q.**   There was an argument?

2  **A.**   Yes.

3  **Q.**   During that argument, your son was involved.  He was with

4  you; correct?

5  **A.**   Yes.  And he wanted to go with his dad.

6  **Q.**   Okay.  And during that argument, you disagree with the

7  sixth and seventh lines that says, "Tindle became increasingly

8  angry and using both of his hands, shoved Turner on her upper

9  chest area, causing her to make contact with the building

10  behind her."  Are you saying that did not happen?

11  **A.**   We were never by a building.  We were just in the -- I

12  can't say that that's a building right there.  I never got

13  pushed into a building.  That's what I'm saying.  We were

14  playing tug-a-war with the coat, and I chased him.

15  **Q.**   Did he ever shove you in the chest area?

16  **A.**   No.  He didn't get a chance to shove or do anything.  He

17  tried to run from me.

18  **Q.**   And when he ran from you, he ran with your property;

19  correct?

20  **A.**   He ran with his phone that I had.  I had both phones in my

21  coat.

22  **Q.**   And you --

23  **A.**   And that was what was in the jacket when I chased him

24  down.

25  **Q.**   And you testified that there was a good Samaritan in that

1    same paragraph towards the bottom.  Do you agree with the

2    report --

3              **MR. BURRIS:**  Objection.  Asked and answered.  Beyond

4    the scope.

5              **THE COURT:**  Sustained.

6              **MR. MORIARTY:**  Okay.

7    **Q.**   Well, you testified that you disagree with the police

8    report that Mr. Tindle ran away with your son; correct?

9              **MR. BURRIS:**  Objection.  Same objection, Your Honor.

10   There is no stuff on cross-examination about this or direct.

11             **THE COURT:**  This is beyond the scope.

12             **MR. MORIARTY:**  Your Honor, she said that her issues

13   with Mr. Tindle had no affect with his relationship with his

14   son, and I think this goes directly to that testimony.

15             **THE COURT:**  Okay.  What line are you trying to get to?

16             **MR. MORIARTY:**  It would be the same paragraph, six

17   lines from the bottom.  Do you see where it says five-dollar

18   bill?

19             **THE COURT:**  All right.  Hold on.

20             **MR. MORIARTY:**  It will start after that.

21             **THE COURT:**  All right.  Quickly.

22   **BY MR. MORIARTY:**

23   **Q.**   Ms. Turner, I refer you to that same paragraph in the

24   highlighted portion at the bottom.  Do you see that, where it

25   says "Turner attempted"?

**A.**    "Turner attempted" --

**Q.**    Do you see where that is?  And I will ask a question based on that.

**A.**    Yeah.  No, I don't see it, I'm saying.

      **MR. MORIARTY:**  Can I approach, Your Honor?

      **THE COURT:**  You may.

      **THE WITNESS:**  I don't have on my glasses.

**BY MR. MORIARTY:**

**Q.**    Right there.  It starts right there.  I pointed to you to the sentence that starts "Turner attempted."  Do you see that?

**A.**    Yes.

**Q.**    Okay.  And so where it says "Turner attempted to grab Tindle's property to regain possession of her property" -- excuse me.  "Turner attempted to grab Tindle's property to regain possession of her property, but Tindle pushed her away and then left with the six-year-old" --

      **MR. BURRIS:**  "Took."

      **THE COURT:**  "Took."

      **MR. MORIARTY:**  I'm sorry.

**Q.**    "Took his six-year-old boy by the hand and fled the scene on foot."  And it continues that you attempted to follow Tindle and your son.

      Do you think that's inaccurate?

**A.**    I think it's inaccurate because I had already snatched my jacket and the babe -- well, I ain't going to say snatched my

1    son, but I had already took the jacket and my child and chased

2    him up the street for trying to even leave.

3    **Q.**   Your son was present when Mr. Tindle was arrested;

4    correct?

5    **A.**   Yeah.  I had picked him up from school.

6    **Q.**   Was your son present in the 2015 incident at 98 Blythedale

7    when Mr. Tindle was arrested?

8    **A.**   I think he had just came with my cousin or my uncle, if

9    I'm not mistaken.

10   **Q.**   Mr. Burris asked you questions about the fight between

11   Tindle and Newton that led to the shooting, and I just want to

12   make sure I'm clear in your testimony and I'll sit down.

13   **A.**   Uh-huh.

14   **Q.**   You saw the fighting between the two men when it turned

15   physical; correct?

16   **A.**   I seen him rush him, but I wasn't this close at that time

17   when it happened.

18   **Q.**   And you never saw anyone with a gun; right?

19   **A.**   Yeah.  Neither person.

20   **Q.**   You just heard the gunshot; correct?

21   **A.**   Yeah.  And I still didn't see Mr. Newton shot or anything.

22   I just seen them fighting still.  That's the only reason I

23   thought it could be a firecracker or something.

24        **MR. MORIARTY:**  That's all the questions I have --

25   wait, wait, wait.  Maybe not.

1          (Defense counsel confer off the record.)

2          **MR. MORIARTY:**  That's all the questions I have.  Thank

3  you, Ms. Turner.

4          Can I grab that exhibit from her?

5          **THE COURT:**  You may.

6          Redirect?

7          **MR. BURRIS:**  Not much, Your Honor.

8                         **REDIRECT EXAMINATION**

9  **BY MR. BURRIS:**

10 **Q.**  Directing your attention back to the event that counsel

11 has made reference to, is that -- was that a situation with

12 reference to your son, what was going on there?

13 **A.**  Well, what was going on was Sahleem was trying to leave

14 and my son wanted to go with him, and I was already pissed off

15 that he was trying to leave, and then we started -- got into a

16 verbal argument, and then he tried to take his phone back so we

17 were playing tug-a-war with the coat, and he start running, and

18 I chased him.

19 **Q.**  After that --

20 **A.**  Two blocks up.

21 **Q.**  This was in 2016 --

22 **A.**  But we were kind of by a park, not a building.

23 **Q.**  Let me finish this up.

24          After the event on that particular day, did you and he

25 cohabitate together after that?

1   **A.**   Yes.

2   **Q.**   And did you and he have custody of your son during that

3   period of time?

4   **A.**   Yes.

5   **Q.**   And was he -- has his relationship with his children as a

6   dad -- did it change in any way as a consequence of this event

7   that took place in 2016?

8   **A.**   No.

9   **Q.**   Did it improve or not or continue the way it was?

10  **A.**   It continued the way it was.  Loved his dad.  Of course,

11  it improved because my son was older after that and, you know,

12  smarter, stronger.

13          **MR. BURRIS:**  Thank you.  I have no further questions.

14          **THE COURT:**  Anything on that little set of questions?

15          **MR. MORIARTY:**  No, Your Honor.  Thank you.

16          **THE COURT:**  All right.  You may step down.

17      Any more witnesses by the plaintiff?

18          **MR. BURRIS:**  No, Your Honor.  Plaintiff rests.

19      I assume the exhibits have been worked out, but if they

20  haven't been, subject to that.

21                      (Plaintiffs rest.)

22          **THE COURT:**  All right.

23      And next witness for the defense.  Mr. Moriarty,

24  Mr. Allen, your next witness.

25          **MR. MORIARTY:**  Michael Cardoza.  I'm getting him.

1          **THE COURT:**  Michael Cardoza.  All right.

2      So, Mr. Moriarty, let's go about 15 minutes, and then

3   we'll take a break.

4                          **MICHAEL CARDOZA**,

5   called as a witness for the Defendant, having been duly sworn,

6   testified as follows:

7          **THE WITNESS:**  I do.

8          **THE CLERK:**  Please be seated.  And I'm just going to

9   grab a couple things out of the way here.

10      Please state your full name and spell your last name.

11          **THE WITNESS:**  Sure.  My name is Sergeant Michael

12   Cardoza.  That's C-A-R-D-O-Z-A.

13          **THE COURT:**  Good morning.

14          **THE WITNESS:**  Good morning, Your Honor.

15          **THE COURT:**  You may proceed.

16                      **DIRECT EXAMINATION**

17   BY MR. MORIARTY:

18   **Q.**   Good morning, Sergeant.

19   **A.**   Good morning.

20   **Q.**   By whom are you employed?

21   **A.**   I'm employed by the Oakland Police Department.

22   **Q.**   How long have you worked for the Oakland Police

23   Department?

24   **A.**   For 20 years.

25   **Q.**   What's your current assignment?

1  **A.**   I'm currently a sergeant in the patrol field.

2  **Q.**   What was your assignment in January 2018?

3  **A.**   I was a sergeant in the homicide section.

4  **Q.**   Can you explain briefly to the jury what you did as a

5  homicide investigator.

6  **A.**   Sure.  I worked five years in the homicide section, and

7  while I was over there, I worked active homicide cases where I

8  was partnered up with another person, and we would be on

9  rotation to go out and investigate homicides or suspicious

10  deaths, and then towards the tail end of that, I started

11  investigating officer-involved shootings.

12  **Q.**   Explain to the jury what it means, an officer-involved

13  shooting investigation?  What happens that leads to an

14  officer-involved shooting?

15  **A.**   Sure.  It's any time a police officer is involved in a

16  shooting, whether the person dies or not, just the simple

17  shooting.  We, in the homicide section, go out and investigate

18  the incidents and details of that shooting.

19  **Q.**   Were you assigned to investigate an officer-involved

20  shooting that took place on January 3, 2018?

21  **A.**   Yes, I was.

22  **Q.**   Were you the primary investigator for that

23  officer-involved shooting?

24  **A.**   Yes, I was.

25  **Q.**   What does that mean?

**A.**   It means that I'm the lead investigator.  That although
there is a lot of moving parts, I am the primary person, like
the contact person, that pretty much organizes the
investigation and puts the pieces together.

**Q.**   Where were you when you received information that an
officer-involved shooting took place on January 3, 2018?

**A.**   At that time, I was actually in the homicide section
working on another case when I received a phone call that there
was an officer-involved shooting involving BART police.

**Q.**   Were you briefed on any other details of the shooting
while you were still at the Oakland Police Department homicide
section?

**A.**   I just had very little briefing.  I was told that there
was an officer-involved shooting involving BART, and there
were -- there was one person deceased and another person shot.

**Q.**   Did you receive information as to where the shooting took
place?

**A.**   Yes.  I received the information that it was across the
street from the West Oakland BART station, located at 7th and
Chester.

**Q.**   When you -- actually, before we get to that, your work on
this led you to create a report; correct?

**A.**   Yes.

**Q.**   An Oakland Police Department -- they used to be called
follow-up investigations?

1   **A.**   It's now called IAR, which is Investigative Action Report.

2   **Q.**   Okay.  And that's your detective log; right?

3   **A.**   Yes.

4   **Q.**   What is the report number?  Do you have that committed to

5   memory, or would you need to take a look at your report to

6   remember what the report number for -- from the Oakland Police

7   Department is for this shooting incident?

8   **A.**   I'm almost certain it was 18-000494.

9   **Q.**   Okay.

10   **A.**   I could double check, just to make a hundred percent sure.

11   **Q.**   We have it here.

12         Do you have the report with you?

13   **A.**   I do.

14   **Q.**   Go ahead and take a look at it.  Do not read from --

15   excuse me.  Do not speak when you're looking at it, and go

16   ahead and confirm your belief that it is that police report

17   number.

18   **A.**   Okay.

19         Okay.

20   **Q.**   Were you correct?

21   **A.**   I was.

22   **Q.**   Okay.  All right.

23         So those are the details that you knew while you were at

24   the police department, and from there, did you go ahead and go

25   to the scene of the shooting?

```
 1    A.    I did.

 2    Q.    Not too far away from the police department?

 3    A.    No.  It's fairly close.

 4    Q.    Did you learn when you got to the police -- excuse me --

 5    to the scene the name of the officer who was involved in the

 6    shooting?

 7    A.    I did.

 8    Q.    And what was that officer's name?

 9    A.    The officer's name was Officer Joseph, I believe it's

10    Mateu.

11    Q.    Do you see that person in court?

12    A.    I do.

13    Q.    Can you describe where he's seated and what he's wearing?

14    A.    Yes.  He's against the far left wall wearing a blue suit

15    with a blue and striped tie, white shirt.

16    Q.    Okay.  And did you learn the name of the individual who

17    had died at the scene?

18    A.    I did.

19    Q.    What was that individual's name?

20    A.    His name was Sahleem Tindle.

21    Q.    Did you learn -- you previously testified that another

22    individual was shot.  Do you remember that?

23    A.    I do.

24    Q.    Did you learn that person's name?

25    A.    I do.
```

1    **Q.**   What was that person's name?

2    **A.**   His name was Rayvell Newton.

3    **Q.**   Was he at the scene of the shooting when you arrived to

4    7th and Chester?

5    **A.**   No, sir.

6    **Q.**   Where was he?

7    **A.**   He was at the hospital.

8    **Q.**   Now, when you get to the scene of a shooting, what do you

9    usually do as the lead investigator?

10   **A.**   Well, there's a lot of moving parts.  Something involving

11   an officer-involved shooting, there is many, many police

12   officers out there, so -- so the first thing I try to do is

13   have a briefing with the primary people on scene; in other

14   words, the incident commander, the primary supervisor, anybody

15   pertinent to that investigation, including technicians, things

16   of that nature, that will provide me the most updated details.

17   **Q.**   Okay.  And I want to -- I want you to explain to the jury

18   what a technician is.

19   **A.**   Sure.  In the Oakland Police Department, we have

20   technicians.  There is a couple sworn technicians, meaning they

21   are police officer technicians, but most of them are civilian

22   technicians, so they are not sworn police officers; however,

23   their job title is to go out and collect evidence, take

24   photographs, search the scene, prepare diagrams, things of that

25   nature, so that we have all that, and we can later go back, and

1    it helps put everything together.

2    **Q.**    Right.  And so when you get to a scene of a shooting, it's

3    the normal course to go ahead and talk to whichever evidence

4    technician is in charge of the shooting scene; correct?

5    **A.**    Yes.

6    **Q.**    Did you do so when you got to 7th and Chester on

7    January 3, 2018?

8    **A.**    I did.

9    **Q.**    Were you directed to any evidence that a shooting had

10   occurred at that corner?

11   **A.**    Yes.

12   **Q.**    Could you tell, based on what you saw and what you learned

13   from the evidence technician, how -- how many firearms were

14   involved in the shooting?

15   **A.**    Well, I knew that there was at least two firearms involved

16   in that shooting.

17   **Q.**    Before you left the police department, you understood that

18   Officer Mateu had shot his firearm; correct?

19   **A.**    Yes.

20   **Q.**    Did you see evidence at the scene that, in fact, he had

21   shot his weapon?

22   **A.**    Yes.

23   **Q.**    And what did you see?

24   **A.**    There were shell casings, spent shell casings located at

25   the crime scene.

1  **Q.**   Could you briefly describe to the jury what a spent shell

2  casing is?

3  **A.**   Sure.  So a spent shell casing is -- it's the housing that

4  holds the lead bullet, and then when the firearm fires the

5  bullet, it expels the shell casing, so it's a -- usually a

6  brass empty shell casing that ejects from the firearm if it's a

7  semiautomatic firearm.

8  **Q.**   How many shell casings were at the scene that you believe

9  were related to Officer Mateu's shooting of his weapon?

10  **A.**   There were three shell casings that were believed to be

11  Officer Mateu's.

12  **Q.**   Was there evidence of another -- was there any evidence at

13  the scene that another gun was used in the shooting incident?

14  **A.**   Yes.

15  **Q.**   What evidence was that?

16  **A.**   There was an additional shell casing and then there was --

17  there was the building right next to it that had a -- had been

18  shot.

19  **Q.**   Okay.

20      Frances, could I have this on?

21      Sergeant, on the screen is Defense Exhibit 101A.  Do you

22  see that?

23  **A.**   I do.

24  **Q.**   Could you tell us if you recognize that photograph?

25  **A.**   Yes, I do recognize it.

1    **Q.**   What is shown in that photograph?

2    **A.**   So what's shown in the photograph is the Upper Kutz Barber

3    Shop located at 14987th Street.

4    **Q.**   And to the right of that is another business; is that

5    correct?

6    **A.**   It's like a little -- like a little taco place.

7    **Q.**   During your time working homicide and officer-involved

8    shootings with the Oakland Police Department, have you become

9    familiar with the term "strike mark"?

10   **A.**   Yes.

11   **Q.**   What's a strike mark?

12   **A.**   A strike mark is something that we look for.  It's

13   evidence that a bullet has struck an object.  A strike mark

14   could be located on the ground when a bullet strikes the ground

15   or a building.  There's often indication that the bullet head

16   made contact with that item or object.

17   **Q.**   What's a bullet hole?

18   **A.**   A bullet hole is when the lead bullet fired from a firearm

19   actually penetrates that object, and so it could either go

20   through the object, creating a small hole, or it could be stuck

21   in the item itself, whether it be in wood, stucco, anything

22   like that.

23   **Q.**   When you talked to the evidence technician at the scene of

24   this shooting on January 3, 2018, did he or she direct you to

25   any evidence of either a strike mark or a bullet hole?

```
 1    A.    Yes.

 2    Q.    And where was that?

 3    A.    That was at the front window of the Upper Kutz, so if

 4    you're looking at the window in the picture here, it would be

 5    the left window.

 6    Q.    Okay.  And in the picture, which is 101A, there appear to

 7    be two windows underneath the awning that says "Upper Kutz"?

 8    A.    Yes.

 9    Q.    And as we look at it, it's the window on the left side?

10    A.    Yes.  That's what I recall.

11    Q.    Okay.  Could you take a look at Defense Exhibit 101B,

12    which is on the screen now.

13    A.    Okay.

14    Q.    Do you recognize what's shown in that photograph?

15    A.    Yes.

16    Q.    Tell us what is shown in that.

17    A.    That is a -- well, believe it or not, your picture is

18    upside down.

19    Q.    Oh, I believe it.  Let me turn it.

20          So as we're looking at it, 101B has an evidence tag in the

21    upper right-hand corner.  Do you see that?

22    A.    That is correct.

23    Q.    So now I'm going to flip it around, and now the evidence

24    tag is in the bottom left-hand corner; is that correct?

25    A.    Now the picture is correct.
```

1    **Q.**   So that's facing in the correct direction?

2    **A.**   Yes.

3    **Q.**   With the evidence tag on the bottom left-hand corner;

4    correct?

5    **A.**   That is correct.

6    **Q.**   Tell us what you see when we make that adjustment to the

7    exhibit.

8    **A.**   So what you've shown me is a closeup of the window, which

9    shows the window covered by a wrought iron bars, and then

10   beyond the wrought iron bars, there is a glass window which has

11   two holes in it.

12   **Q.**   When you were referring to a strike mark before, which

13   portion of this picture were you referring to?

14   **A.**   Well, if you look at the lower hole made in the glass, the

15   wrought iron right there has a indentation where it was

16   apparent a bullet had struck that wrought iron and then we

17   believe split into two fragments going into the building.

18   **Q.**   Okay.  When you said the lower one, are you referring to

19   where I'm pointing the pen right now?

20   **A.**   Yes.  And there's just a small indentation in the metal,

21   if you keep --

22   **Q.**   Right there?

23   **A.**   Yes.  Right there.

24   **Q.**   And so what you were able to figure out with the

25   technician is that it appeared that a bullet hit this iron of

1    the gate; correct?

2    **A.**    Yes.

3    **Q.**    And then two pieces of the bullet went in two different

4    directions, one broke the window at the lower location where

5    I'm pointing?

6    **A.**    That's correct.

7    **Q.**    And the upper location was also hit by another portion of

8    the bullet?

9    **A.**    That's correct.

10   **Q.**    Okay.

11            **THE COURT:**  Is this a good time?

12            **MR. MORIARTY:**  Oh, yeah.  Thanks, Your Honor.

13            **THE COURT:**  All right.

14       Ladies and Gentlemen, we will take a 15-minute break, so

15   we will stand in recess for 15 minutes.

16       (Proceedings were heard out of presence of the jury:)

17            **THE COURT:**  Okay.  Sergeant, you can step down.

18       Okay.  And why don't I just see -- are you doing this one,

19   Mr. Burris?

20            **MR. BURRIS:**  No.  No.

21            **THE COURT:**  Why don't I -- we will stand in recess for

22   15 minutes.

23                  (Recess taken at 10:41 a.m.)

24                (Proceedings resumed at 10:55 a.m.)

25            **THE COURT:**  Let's call the jury in.

1          (Proceedings were heard in the presence of the jury:)

2               **THE COURT:**  We are back on the record.  The record

3     will reflect the jury is back with us.

4          And you may continue.  You may proceed.

5               **MR. MORIARTY:**  Thank you.

6     **Q.**   Sergeant, we left off when you were testifying about that

7     strike mark on the iron in front of the window.  Do you recall

8     that?

9     **A.**   Yes.

10    **Q.**   Okay.  And during your time in your five years in homicide

11    and your time in officer-involved shootings, had you seen

12    strike marks before?

13    **A.**   Yes.

14    **Q.**   And you had seen the evidence of a bullet striking

15    something hard and that bullet going in a different direction;

16    correct?

17    **A.**   That's correct.

18    **Q.**   Is there any way to predict, based on your experience, the

19    direction a bullet might go after it strikes something hard?

20    **A.**   Based on my experience, if a bullet strikes something,

21    there's really no set place that the bullet will go.  It

22    depends on how hard it strikes, the angle it strikes.  It could

23    go left, it could go right.  It's really unknown where that

24    bullet's going to travel.

25    **Q.**   Staying with this evidence in photo 101B, did you later,

1    in your investigation, confirm that a bullet had, in fact,

2    caused the damage that's shown in that photograph?

3    **A.**    Yes.

4    **Q.**    What did you do?

5    **A.**    Well, I called the -- there was a bullet hole in the back

6    of the barber shop.  It was up high on the back wall.  And I

7    could see the bullet hole there.  I confirmed with the owner of

8    the barber shop that that was not previously there, and so

9    based off that, I believed there was evidence of a lead bullet

10   in the wall of the barber shop.

11       So I called the crime lab and had them come out, and so

12   they assisted in cutting open a portion of the wall and

13   locating the lead bullet that had penetrated.

14   **Q.**    Through the window and then into the wall?

15   **A.**    Yes.

16   **Q.**    Gotcha.

17       Going back a second, you described that three shell

18   casings were found that corresponded to the officer's firearm;

19   correct?

20   **A.**    Yes, sir.

21   **Q.**    And that one shell casing was found that corresponded to

22   the other gun that was involved; correct?

23   **A.**    Yes.  That's correct.

24   **Q.**    What type of gun was that as far as the other gun that was

25   involved in this shooting incident?

**A.**   The other gun was described as a SIG Sauer semiautomatic .40 caliber firearm.

**Q.**   As a part of your investigation, did you try to look for any surveillance video which might have captured this incident?

**A.**   Yes.  We did a full canvas.  I had officers specifically looking in every direction that surrounded the entire crime scene, looking for surveillance cameras.

**Q.**   Were you able to obtain any surveillance from an AC Transit bus?

**A.**   Yes.  It was learned that the AC Transit bus was pulling up to that location at the time of the shooting, and I know from prior investigation that AC Transit buses have full video all the way around their buses.

**Q.**   On the screen right now is Defense Exhibit 101C.  Do you see that?

**A.**   I do.

**Q.**   Are you familiar with what is shown in this photograph?

**A.**   Yes, I am.

**Q.**   Where did this come from?

**A.**   So this came from the front camera of the AC Transit bus as it is driving northbound on Chester towards 7th Street, and then you can see the Upper Kutz Barber Shop in the top portion of that photo.

**Q.**   And this was the still that you were able to take from the AC Transit bus video?

**A.**   Yes.  I had the video, and I was able to pause it and capture a screenshot, which also indicated the date, time, and the time of the -- the video at the time that I stopped it and screenshotted it.

**Q.**   Okay.  As we look at this still, is this before Officer Mateu shoots his firearm?

**A.**   Yes.  This is before the shooting occurred.

**Q.**   Can you see my pen as I point to certain things in the photo underneath the Upper Kutz?

**A.**   Yes, I do.

**Q.**   If we've heard testimony that it looks like two people are fighting under the Upper Kutz -- do you see that where I'm pointing?

**A.**   Yes, I do.

**Q.**   Is that consistent with what you learned during your investigation?

**A.**   Based on my investigation and the -- my observation of the video, I saw what shows to be two people on the ground wrestling at that location.

**Q.**   Okay.  And we heard testimony that there is an individual that is standing, as we look at this still, to the left of those individuals.  Do you see that?

**A.**   I do.

**Q.**   And we've heard testimony that that's Ms. Ciara Turner. Is that consistent with your investigation?

1    **A.**    Yes.   That is correct.

2    **Q.**    Showing you what has been marked as Defendant's 101D,

3    that's now on the screen.   Do you see that?

4    **A.**    I do.

5    **Q.**    Is this another still that you were able to get from the

6    AC Transit surveillance video?

7    **A.**    Yes.   I was trying to capture a timeline from the bus

8    video up to the time of the shooting.

9    **Q.**    There is a red circle in the upper right-hand portion of

10   101D.   Do you see that?

11   **A.**    I do.

12   **Q.**    Where did that red circle come from?

13   **A.**    I put the red circle on there to show that was the BART

14   officer, Officer Mateu, running from the BART station to the

15   two individuals that were on the ground in front of the

16   Upper Kutz Barber Shop.

17   **Q.**    Pointing to the bottom of this Exhibit 101D, do you see

18   where the red pen is?

19   **A.**    Yes.

20   **Q.**    Is the bottom of this exhibit timestamped?

21   **A.**    It is.

22   **Q.**    Okay.   And when you -- when you watched this video, did

23   you understand the 16:40:15 to mean what?

24   **A.**    So it's military time.   So I know that 16:40 is 4:40 p.m.,

25   and in this photo, it's 4:40 and 15 seconds.

1    **Q.**   If I put 103 -- excuse me -- 101C back on the screen, do

2    you see that?

3    **A.**   Yes.

4    **Q.**   That's the one we previously looked at.  Am I safe to

5    say -- actually, I could put them both on the screen -- that

6    the 101C which I'm pointing at now took place 11 seconds before

7    101D?

8    **A.**   That is accurate.

9    **Q.**   During your 20 years with the Oakland Police Department,

10   you've conversed with quite a few members of the community;

11   correct?

12   **A.**   That's correct.

13   **Q.**   Have you ever heard of the term "street slang"?

14   **A.**   Yes.

15   **Q.**   Prior to joining homicide, the homicide section of the

16   Oakland Police Department, it would be normal for you to talk

17   to citizens, whether they be witnesses or suspects or just the

18   general public in Oakland; correct?

19   **A.**   Yes, sir.

20   **Q.**   And that was during your time on patrol?

21   **A.**   Yes.  Patrol, specialized units, traffic, a number of

22   different jobs.

23   **Q.**   Okay.  And that concept of talking to members of the

24   community didn't change when you went into the homicide

25   section; correct?

1   **A.**   No, sir.

2   **Q.**   And during that time, you would talk to witnesses who may

3   have seen a homicide?

4   **A.**   Yes.

5   **Q.**   You talked to suspects who may have been potential persons

6   who committed the homicide?

7   **A.**   That's right.

8   **Q.**   During that time, did you also listen to what are known as

9   jail calls?

10  **A.**   I did.

11  **Q.**   Briefly describe what a jail call is.

12          **MR. NISENBAUM:**  Objection.  Relevance, Your Honor.

13          **THE COURT:**  Overruled.

14          **THE WITNESS:**  So a jail call is something that we --

15  we use in our investigations.  Jail calls are when a person's

16  obviously incarcerated and taken to jail, they make phone

17  calls.  There are -- there's, like, I guess, warnings at the

18  beginning that the police could monitor the jail calls, so

19  they're not subject to privacy, in other words, and so a lot of

20  times, we listen to the phone calls.  We get the tapes from the

21  jail because even though it's clearly read to them that the

22  police could monitor, there's still conversation made that is

23  valuable to us.

24  **BY MR. MORIARTY:**

25  **Q.**   Simple question:  It's legal to do what you do to listen

1    to the jail calls; correct?

2    A.    It is legal.

3    Q.    And during the time that you were a homicide investigator,

4    could you give us a rough estimate of how many times the

5    homicides that you investigated involved the use of a firearm?

6    A.    The majority of them involved a firearm.

7    Q.    Is it safe to say that you learned a lot of street slang

8    in Oakland during the 20 years that you've been in law

9    enforcement?

10   A.    Yes, sir.

11   Q.    Why is it important that you are able to understand what

12   certain phrases could mean in the community of Oakland?

13   A.    Well, it's important because oftentimes someone will say

14   something, and it may not be proper English or said that it's

15   something that you would commonly understand, but it's said in

16   a type of slang that you could interpret what their intention

17   or meaning was.

18   Q.    Could you give us an idea of an example of something that

19   is said either on the street that could have a completely

20   different meaning on the street compared to in a courtroom.

21   A.    Sure.  So if -- this is just a very common street slang.

22   If a person goes up and robs another person, he might use the

23   term "break yourself."  If you hear "break yourself," I know

24   that meaning to be "clean out your pockets, give me everything

25   you got," whereas it might not mean the same to someone else,

1   if that makes sense.

2   **Q.**   In that same context, have you heard of, during your

3   homicide investigations, individuals use -- using the term

4   "hammer"?

5   **A.**   Yes.   That's commonly referred to as a firearm.

6   **Q.**   During this case, the jury will hear evidence that a

7   witness said the following phrase:   "I should clap your ass,"

8   and that phrase was spoken before a shooting took place.   Okay?

9   **A.**   Okay.

10  **Q.**   Based on what you know in your experience in Oakland, do

11  you have any idea what that phrase in that context would mean,

12  that phrase "I should clap your ass"?

13        **MR. NISENBAUM:**   Objection.   Calls for speculation,

14  compound.   There are multiple meanings, even within street

15  slang.

16        **THE COURT:**   Overruled.

17        **THE WITNESS:**   So if I was told that -- that term right

18  before a shooting, I would interpret it as *I'm about ready to*

19  *shoot you* or *I'm going to shoot you.*

20  **BY MR. MORIARTY:**

21  **Q.**   Going back to your arrival at the scene of 7th and Chester

22  on January 3, 2018, one of the technicians who was there was a

23  technician by the name of Middleton; correct?

24  **A.**   Yes.

25  **Q.**   Is that a he or she?

1    **A.**    It's -- it's a she.

2    **Q.**    Okay.  And when you were on the scene, you learned, and I

3    think you've testified to it, that obviously Mr. Tindle died;

4    correct?

5    **A.**    Yes.

6    **Q.**    You also testified that Mr. Newton was shot; correct?

7    **A.**    That's correct.

8    **Q.**    Did you direct her, being Ms. Middleton, to the hospital?

9    **A.**    Yes.  Technician Middleton was directed up to the

10   hospital.  With everything going on, we try our best to try to

11   obtain photographs of injuries and things of that as soon as

12   possible.

13   **Q.**    And you directed her to the hospital to take photographs

14   of Mr. Newton's injuries; correct?

15   **A.**    That's correct.

16   **Q.**    What is "ShotSpotter"?

17   **A.**    So ShotSpotter is a technology that's -- that's commonly

18   used in the city of Oakland.  Without knowing all the

19   technicalities of it, there are microphones that are set up

20   throughout Oakland, and these microphones have the technology

21   to detect and pick up gunshots.  So I couldn't even tell you

22   like how many there are, but I know that they're all over

23   Oakland.  And when there are gunshots, this ShotSpotter company

24   detects the sound of it, and it automatically records the

25   location that they believe the gunshots came from, the time and

1    the date, and it takes an actual recording of the gunshots.

2        It's something that, as police officers, we can play back

3    and listen to that recording to hear if there -- it sounds like

4    there's one set of gunshots or maybe two sets of gunshots, and

5    if they were consecutive or if there was a pause in between, if

6    that makes sense.

7    **Q.**   Did you request a ShotSpotter recording for this case?

8    **A.**   I did.

9    **Q.**   Were you able to obtain that report?

10   **A.**   Yes.

11   **Q.**   And did the report confirm that there was a shooting at

12   the corner of 7th and Chester?

13   **A.**   It did.

14   **Q.**   How many times was the ShotSpotter receptor activated for

15   the time that you requested?

16   **A.**   So the ShotSpotter recorded a total of five gunshots on

17   January 3rd, 2018, at the location of 7th and Chester.

18   **Q.**   Did you -- were you able to tell the time in which the

19   receptor captured those gunshots on that date?

20   **A.**   Yes.  The ShotSpotter -- the first shot that the

21   ShotSpotter picked up came in at 16:39 hours, which is 4:39,

22   and I believe it was 40 seconds.

23   **Q.**   Okay.  Was there -- that was the first one that came --

24   **A.**   That was the first shot that came in.

25   **Q.**   And the next one that was captured, what time was that?

**A.**    And then there was a second shot captured on the ShotSpotter that came in six seconds later, so that would be 16:39, that was the time, and then 46 seconds.

**Q.**    When did the three additional shots come in to the receptor, ShotSpotter?

**A.**    So the additional three gunshots, these were three consecutive gunshots, meaning they were fired consecutively, one after the next.  Those three gunshots came in at 16:40, so that would be 4:40 and 27 seconds, if I recall correctly.

**Q.**    Okay.  You previously testified that when you got to the scene, you were directed to evidence that a shooting had taken place; correct?

**A.**    That's correct.

**Q.**    You found three shell casings that were associated or connected to Officer Mateu's gun?

**A.**    Yes.

**Q.**    And you found one shell casing that was connected to the SIG Sauer pistol; correct?

**A.**    That's correct.

**Q.**    But what ShotSpotter told you is that there was five shots; correct?

**A.**    That's correct.

**Q.**    Has it happened before in your homicide investigations where you have evidence that there was a certain number of shots fired, but the evidence at the scene doesn't match up

1   directly or perfectly with that?

2   **A.**   Yes.   That's correct.

3   **Q.**   Explain how that's happened before.

4   **A.**   It -- it could happen if there was, for instance --

5   there's a shooting in the middle of the intersection and either

6   foot traffic or vehicles or something of that nature, sometimes

7   even our own paramedics and fire engines, come, and they will

8   run over a shell casing or a shell casing will somehow get

9   moved or kicked down the road or something like that, so it

10  doesn't always match up a hundred percent, but it gives us a

11  good indication of what we're looking for.

12  **Q.**   As a part of your session of this shooting, you reviewed

13  the body-worn camera footage of Officer Mateu; correct?

14  **A.**   I did.

15  **Q.**   When you reviewed that video, did you hear, according to

16  you, what sounded like gunshots?

17  **A.**   I did.

18  **Q.**   Were you able to compare what you learned from the

19  ShotSpotter as far as the receptor catching five gunshots to

20  what can be heard on the body-worn camera footage of

21  Officer Mateu?

22  **A.**   Yes.   I compared the ShotSpotter time that the original

23  shot came in to the time that was on Officer Mateu's body-worn

24  camera and compared that to make sure that they all matched up

25  with each other, which they did.

1    **Q.**   They did.   Okay.

2         Did you subsequently request that the SIG Sauer firearm be

3    tested for DNA?

4    **A.**   Yes, I did.

5    **Q.**   Finally, did you -- actually, could you explain to the

6    jury what "ballistics" means?

7    **A.**   Ballistics is simply the process dealing with firearms.

8    It's the -- we have an entire section that is specific to

9    ballistics where they test firearms and they compare the shell

10   casings that ejected from those firearms.

11        Shell casings are very similar to fingerprints, and so

12   under microscopes and the science behind the ballistics, you

13   could essentially compare the shell casings that are on a

14   ground and you can match them up with the firearm to determine

15   that that firearm, because it has a specific firing pin,

16   matches up to the shell casings.

17   **Q.**   In this case, Sergeant, did you ask the two weapons be

18   compared to the evidence that was found at the scene by the

19   crime lab of the Oakland Police Department?

20   **A.**   Yes, I did.

21   **Q.**   Was the work performed?

22   **A.**   Yes, it was.

23   **Q.**   Did you receive any results to confirm that those two guns

24   that were used in this shooting matched the evidence at the

25   scene?

1    **A.**   They did.

2             **MR. MORIARTY:**  That's all the questions I have,

3    Your Honor.

4             **THE COURT:**  Cross.

5             **MR. NISENBAUM:**  Thank you, Your Honor.

6                          <u>**CROSS-EXAMINATION**</u>

7    **BY MR. NISENBAUM:**

8    **Q.**   Sergeant still or lieutenant now?

9    **A.**   Sergeant.

10   **Q.**   Sergeant.  Great.

11        You have your report in front of you still?

12   **A.**   Yes, I do.

13   **Q.**   Great.

14        I think you told us early in your examination you are the

15   primary person who puts the pieces together in a

16   officer-involved shooting; correct?

17   **A.**   Yes.

18   **Q.**   And that's what you did in this case?  That was your job;

19   right?

20   **A.**   I did the best I could, yes.

21   **Q.**   Okay.  Well, you actually sent an evidence technician to

22   the hospital to meet with Mr. Newton; correct?

23   **A.**   Yeah.  There was three technicians on the scene, and they

24   all had different tasks.

25   **Q.**   Well, did they recover a bullet slug from Mr. Newton's

1  leg?

2  A.    No.  My understanding was it was actually a police officer

3  that reported back that it appeared the bullet from

4  Mr. Newton's leg was a through and through, so no bullet was

5  recovered.

6  Q.    So efforts were made to recover a bullet from Mr. Newton

7  from his leg, and no bullet was recovered; correct?

8  A.    Well, if there was a bullet still inside his body, then we

9  would have made an effort to recover that bullet.

10  Q.    Right.  But what you found out, actually, was that it was

11  a through and through, and there was no bullet; correct?

12  A.    That's what I learned, yes, sir.

13  Q.    All right.  So three -- so there were a total, based on

14  your understanding of all the evidence -- there was a total of

15  five shots fired in this incident; correct?

16  A.    That's my understanding, yes.

17  Q.    Three from a gun fired by Officer Mateu; correct?

18  A.    Yes.

19  Q.    And two other shots; right?

20  A.    That's correct.

21  Q.    Okay.  Only one of those two other shots was actually

22  recovered; correct?

23  A.    One meaning what, sir?

24  Q.    Well, one bullet.

25  A.    Yeah.  We did find the one bullet, the one piece of lead

1    in the barber shop.  There was evidence that the bullet was

2    still in the wall.

3    **Q.**   And you recovered it from the wall; right?

4    **A.**   That's correct.

5    **Q.**   Okay.  So that accounts for one bullet.  How did you come

6    to learn that there was a gunshot hole in that wall?  How did

7    that happen?

8    **A.**   Well, it was after looking at the front window, it was

9    very apparent that a bullet had penetrated the barber shop and

10   then it's just a matter of seeing the bullet hole up on the

11   wall.

12   **Q.**   Okay.  Well, there were two holes in the glass, weren't

13   there?

14   **A.**   Yeah.  The way it was described by me is that when a

15   bullet strikes an object, it fragments, and so it was described

16   to me that that bullet had fragmented into two piecings; in

17   other words, there is jacketing, there's -- it's a coating

18   that's on the bullet, and that can fragment off.

19   **Q.**   I understand that.  My question -- may I have the ELMO,

20   please?

21       This is already shown to you, and it's in evidence.  It is

22   Defendant's 101B.

23       Okay.  Now, I think I have the right side up here;

24   correct?

25   **A.**   Yes.  That's correct.

1    **Q.**   And so the two bullets are -- or the two -- the two holes

2    are here and here, just to the left of where I made the marks;

3    correct?

4    **A.**   Your bottom one is --

5    **Q.**   I understand it's off.

6    **A.**   Yeah.

7    **Q.**   Okay.

8    **A.**   But, yes, there's two holes in the glass, yes, that is

9    correct.

10   **Q.**   We're looking from the outside in; correct?

11   **A.**   Yes.   The outside in.

12   **Q.**   And you were able to determine that the -- that the bullet

13   strike that did go through the glass, whether it was one -- one

14   shot or two shots here, only one shot was -- only one bullet

15   was recovered; correct?

16   **A.**   One bullet was recovered, yes, sir.

17   **Q.**   And how high up the wall was it recovered?

18   **A.**   I -- I can't give you an estimate.   I don't have a tape

19   measure, but, I mean, you could look at the outside -- the

20   picture that shows the outside of the building and kind of

21   estimate from there.

22   **Q.**   Well, how about you estimate since you went inside.

23   **A.**   Okay.   If you want to give me the first picture, then I

24   can take a look at that, and I'll give you my best estimate.

25   **Q.**   I will refer you to page 23 of your report.

1    **A.**   Okay.  I'll look at that.

2              **THE COURT:**  I assume this is to refresh --

3         **MR. NISENBAUM:**  Correct.

4         **THE COURT:**  Mr. Nisenbaum?

5         **MR. NISENBAUM:**  That is correct, Your Honor.

6         **THE COURT:**  So once you review it, Sergeant, turn it

7    over and let Mr. Nisenbaum know.

8              **THE WITNESS:**  You said page 23?

9    **BY MR. NISENBAUM:**

10   **Q.**   Page 23 of your report.

11   **A.**   Okay.  I think you're -- are you asking me the -- the -- I

12   thought you meant the -- how high the glass break was.

13   **Q.**   No, no.  I meant the bullet that was recovered in the

14   wall.

15   **A.**   Okay.

16   **Q.**   Where the hole in the wall was.

17   **A.**   I misunderstood your question.

18   **Q.**   Fair enough.  Fair enough.  It happens often, so listen to

19   the question.

20   **A.**   So I would say that -- well, I know it was high enough so

21   I'm five-ten, and it was well over my head, and I know we

22   needed a ladder to even get up to the top of the wall, so I

23   would say it's at least eight or nine feet high.

24   **Q.**   Okay.  And how about the two bullet holes or the two holes

25   in the glass?  How tall were those, approximately, off the

1   ground?

2   **A.**   I would say that those are -- I mean, I'm just -- like I

3   said, I didn't have a ruler, so I didn't do an official

4   measurement of it, but I would say those are about eye level.

5   **Q.**   Okay.  About your eye level?

6   **A.**   Yeah.

7   **Q.**   So you could tell that the bullet, at least one bullet,

8   went through the glass, fragmented, according to what you

9   understand the case to be, and it actually struck a fan before

10  it went in the wall?

11  **A.**   Yeah.  My understanding, after having the -- the expert,

12  the criminalist, respond out there, the bullet that had entered

13  had ricocheted off one of the fan blades.

14  **Q.**   And the fan blade is a ceiling fan; correct?

15  **A.**   Yeah.  But the thing is, there was two pieces of jacketing

16  laying on the floor in the barber shop, so we weren't certain

17  if the jacketing had struck the fan blade or how the bullet --

18  again, it's -- it's too difficult to determine.

19  **Q.**   I guess my question is did the person in the barber shop

20  identify the bullet hole or was that just found independently

21  by officers doing their investigation?

22  **A.**   You know, I really don't know.  I just can tell you it was

23  pointed out to me that there was a bullet hole in the barber

24  shop that was not there before the shooting.

25  **Q.**   Okay.  And it was clear, though, that the bullet had

1  traveled at an upward trajectory through the window; correct?

2  **A.**   The only thing I can tell you is that the bullet, in my

3  opinion, had struck that wrought iron piece and from there,

4  like I explained before, I can't really explain how it travels

5  after that, but it did -- it ultimately -- ultimately it hit

6  the back wall of the barber shop.

7  **Q.**   Is there a better -- a closer-up picture of the wrought

8  iron where it struck?

9  **A.**   Do I have a close-up picture?

10  **Q.**   Yeah.  Do you?

11  **A.**   I have what you're presenting to me.

12  **Q.**   Well, I'm just asking.  Was there a closer-up picture

13  taken?

14  **A.**   If there was, I don't -- I don't have it.  I can tell you

15  the technician takes hundreds of photos, so I would imagine

16  that there is.

17  **Q.**   All right.  Well, where's the second bullet?

18  **A.**   Well, the second bullet, my understanding, went through

19  and through Mr. Newton's leg, so we looked for it, so it's

20  somewhere out there, probably on 7th and Chester somewhere.

21  **Q.**   So you believe that that second bullet was canvassed for

22  but never located; is that right?

23  **A.**   Yeah.  It's a little piece of lead.  It's very difficult

24  to find a bullet.  You can find shell casings easily, but very

25  seldom do you find a bullet unless there's an apparent hole and

1    you can track it down from there.

2    **Q.**   There were no other apparent holes, no other apparent

3    bullet holes that you found in the area?

4    **A.**   I described all the strike marks or the bullet holes that

5    I found in the investigation.

6    **Q.**   Were any of those related to the second bullet?

7    **A.**   The -- the only bullet hole I found was inside the barber

8    shop.  Again, the other bullet traveled through the victim's

9    leg.  It was a through and through, so it's unknown where that

10   bullet ended up.

11   **Q.**   I understand that.  I'm asking you, you're the one who

12   puts the pieces together.  It sounds like if there are five

13   shots fired, you want to ideally be able to recover five

14   bullets; right?

15   **A.**   I could tell you I looked for the fifth bullet.  We looked

16   all on the ground.  We looked everywhere, okay, but at the time

17   that we were out there, it was also -- the weather was bad, it

18   was raining, so there was debris on the ground.  It's very

19   difficult to find a small piece of lead that is on the ground

20   somewhere.

21   **Q.**   Okay.  So I assume you have lights that you use, like

22   flashlights; correct?

23   **A.**   Yes.  We use flashlights.  We were unable to locate the

24   fifth bullet.

25   **Q.**   Metal detectors?

1    **A.**   We don't have -- at least I don't have access to metal

2    detectors.

3    **Q.**   Okay.  So we have two holes into the window.  With respect

4    to where the jacketing was, there is -- well, strike that.

5         How many shell casings were found for the -- for the SIG

6    Sauer?

7    **A.**   There was four shell casings on the ground.

8    **Q.**   Four shell casings from the SIG Sauer?

9    **A.**   No.  There was three shell casings from the officer's

10   firearm.  Then there was one shell casing on the ground from

11   the SIG Sauer.

12   **Q.**   So let me see if I have this right.  Three from the

13   officer -- I'm not that good in math, but I know this one.

14   Three from the officer plus one from the SIG Sauer.  That's

15   four; correct?

16   **A.**   Yes.  That's what I said -- stated.

17   **Q.**   And you recovered four bullets; correct?

18   **A.**   That's correct -- no.  No.  That's not correct.  I did not

19   recover four bullets.  Or -- no.  I'm sorry.  Yes, we did

20   recover three from Mr. Tindle's body.  Okay.  Four was

21   recovered, yes, that's correct.

22   **Q.**   You accounted for four bullets and four shell casings, but

23   there were five shots fired based on your understanding of the

24   ShotSpotter and also the video; correct?

25   **A.**   That's correct.

1   **Q.**   Now, does the ShotSpotter -- do you have to deal with

2   echos?

3   **A.**   I don't -- I'm not aware of that.

4   **Q.**   Okay.  I'm just asking.  I'm not the expert here.

5   **A.**   Yeah.  I'm not an expert when it comes to ShotSpotter

6   either.  I can just tell you what's given to us.

7   **Q.**   Well, my question is on this document that has two shots

8   going through the window, it makes sense if two shots were

9   fired by the SIG Sauer in the direction through the window,

10  then that would make sense, that you would have two holes in

11  the window; correct?

12  **A.**   It makes sense to someone who is not an expert, but if you

13  bring an expert in, he could clearly give you a good reason

14  like they provided to me.

15  **Q.**   Okay.  But they're not here.  So you're here telling us

16  what they told you --

17  **A.**   And I'm also telling you I'm not an expert when it comes

18  to how bullets fragment and go in two different directions.

19  **Q.**   What else did you do to try to find the fifth bullet or

20  the fifth shell casing?  Anything else?

21  **A.**   Well, I think I detailed myself.  We had officers looking

22  everywhere that we could for a small piece of lead on the

23  ground.  Okay.  There was a lot going on out there.  There was

24  people -- there was first responders.  There was a lot going

25  on.  And so no small piece of lead was located.

1    Q.    And no shell casing?

2    A.    No shell casing that I'm aware of.

3    Q.    Okay.  Now, was a further examination of the -- of the

4    wall done where this bullet lodged?

5    A.    Well, we cut out the portion -- we cut out a large portion

6    of the wall, and then we cut out a smaller portion of the wall

7    where the bullet was -- had specifically entered the wall, and

8    that was turned in as evidence.

9    Q.    My question is did you look to see whether or not there

10   was any other bullet entry wound -- or bullet entry into the

11   wall?

12   A.    Yes.

13   Q.    Okay.  And you were able to rule out there was no other

14   bullet entry into the wall; is that right?

15   A.    There was only one bullet, to my understanding, that

16   entered the barber shop and that was found and recovered.

17   Q.    Were you present when that examination took place?

18   A.    I was.

19   Q.    Okay.  And were you directing people in a -- where to

20   look?

21   A.    No.  The crime lab, that's their area of expertise.

22   That's why they were specifically brought there.  There was a

23   team of experts above and beyond me that that was their job,

24   their assignment, to locate and find any evidence in the barber

25   shop related to the bullet.

1    **Q.**   Did they know that they were short one bullet and one

2    shell casing?

3    **A.**   They were provided all the information that I had to

4    provide to them at the time, which was there was five shots

5    fired.

6    **Q.**   Okay.  Thank you.

7        Now, by the way, didn't you request a gunshot residue

8    sample be done on both Mr. Tindle and Mr. Newton?

9    **A.**   Well, gunshot residue is something that -- that we always

10   ask for, and so because Mr. Tindle was taken from the scene, as

11   well as Mr. Newton, that was a task that the technician was

12   tasked with up at the hospital.

13   **Q.**   Okay.  And can you tell the jury what gunshot residue is,

14   please?

15   **A.**   I'm not -- again, it's a scientific thing, so gunshot

16   residue is any time a gun is fired, there are small particles

17   of, let's just say -- let's just say lead, small particles of

18   lead that creates, like, an invisible cloud.  You can't really

19   see them.  But any time a gun is fired, there is this cloud of

20   residue, and I -- again, I would have to have an expert in here

21   to explain how far this -- this residue goes, but, anyways, it

22   oftentimes lands on your hands or your clothing, and so it's

23   very common that we have these little dabbers, and we do our

24   best to try to have a technician take a sample of either the

25   hands or clothing as soon as possible so that no evidence is

1    lost.

2    **Q.**   Thank you.

3         Now, in this case, you were -- you were able to determine

4    or the examination of the GSR determined that there was GSR

5    residue or gunshot residue on Mr. Newton's hands; correct?

6    **A.**   I can't tell you it was on his hands because I wasn't

7    there, so I don't know specifically where the gunshot residue

8    was tested, but that is very common, that it would be taken

9    from his hands.

10   **Q.**   Okay.  Well, look at page 43 of your report and to page

11   44, the last sentence of page 43, the last sentence of 44.

12   **A.**   Okay.

13   **Q.**   Let me know if that refreshes your recollection whether

14   there was -- with respect to where the samples were taken from

15   Mr. Newton.

16   **A.**   Okay.

17   **Q.**   Does that refresh your recollection?

18   **A.**   Yes, it does.

19   **Q.**   And they were taken from his hands; right?

20   **A.**   Yes, it does.

21   **Q.**   And there was, in fact, particles containing lead,

22   antimony, and barium on both hand samples from Mr. Newton;

23   correct?

24   **A.**   Yes.  That's what the test results came back as.

25   **Q.**   When we talked about GSR, we are talking about lead,

1  antimony and barium; correct?

2  **A.**   That's what the report indicates.

3  **Q.**   And the same thing was done for Mr. Tindle; correct?

4  **A.**   As far as I know, it was.

5  **Q.**   Well, you know that it was because it was sampled and the

6  test results were given; correct?

7  **A.**   Well, the technician did -- did take say samples, to the

8  best of my knowledge.   I couldn't actually find it in a report

9  later, but I believe samples were taken, yes.

10  **Q.**   How about this:   Turn the page one page back.   See if this

11  refreshes your recollection.   Look at the last sentence of page

12  43.

13  **A.**   Well, I know what page 43 says.   I'm just saying that I

14  didn't see it in the technician's report, but I'm the one that

15  took both samples to the crime lab in Santa Clara, so I know

16  that samples taken.

17  **Q.**   And you got the results back for Mr. Tindle also; correct?

18  **A.**   Yes, I did.

19  **Q.**   And the results were negative for gunshot residue on

20  Mr. Tindle's hands; correct?

21  **A.**   That's what the results showed.

22  **Q.**   Thank you.

23       Oh, of course Mr. Newton survive the gunshot wound?

24  **A.**   Yes, he did survive.

25  **Q.**   Okay.   Now, you indicated that -- oh, also a toxicology

1  report was taken from Mr. Tindle; correct?

2  **A.**   They were taken on both parties, yes.

3  **Q.**   Okay.  And Mr. Tindle had no drugs or no alcohol in his

4  system; correct?

5  **A.**   Yeah.  Both came back negative.

6  **Q.**   Okay.  Now, you've talked about what the word "clap" means

7  as used apparently in jail phone calls and in your

8  investigations; correct?

9  **A.**   There was a slang term that was given to me for my

10  interpretation, yes.

11  **Q.**   Who gave you the slang term?  Where did you hear that?

12  **A.**   Well, the attorney gave it to me.

13  **Q.**   I'm asking you -- well, let me ask you this.

14  You interviewed Mr. Evans; correct?

15  **A.**   I don't believe I interviewed Mr. Evans.

16  **Q.**   You reviewed his interview?

17  **A.**   I reviewed all the interviews.

18  **Q.**   Okay.  And did you hear there that Mr. Evans used the word

19  "clap"?

20  **A.**   I would have to refresh the interview by Mr. Evans, but

21  there was other officers assisting me with the interviews.

22  **Q.**   I got that.

23  So is there any -- the word "clap" can be used in a number

24  of different ways, in the inner city, correct, or in urban

25  culture, apart from clapping your hands?

**A.**   Like, do you want to give me some, and I'll tell you if I agree or not?

**Q.**   Well, "clap," that could mean I want to box you, right, I want to fight you?  I should clap you?

**A.**   If -- I don't think of it like that, but if that's your interpretation, then that's your interpretation.

**Q.**   Did you grow up in the culture?

**A.**   In the culture?  What culture?

**Q.**   In a culture where you understood the word "clap" to only mean "shoot"?

**A.**   No, I did not grow up where I understood "clap" as only mean "shoot."

**Q.**   Okay.  You understand that when people fight or square off, sometimes they use the word "clap" to mean "hit you," like with a fist?

**A.**   That's your interpretation, sir.

**Q.**   I'm just asking.  Do you have that understanding?

**A.**   I told you what my understanding of the street term was. If it was given to me in that context, that's what I would interpret it as.  You're giving me a different interpretation, your own interpretation, and I answered that for you.

**Q.**   Let me give you a different context then.

**A.**   Okay.

**Q.**   Two people square off like they're about to fist fight.

**A.**   Sure.

1    **Q.**   One says to the other, "I should clap you."  That would be

2    consistent with "I should, like, hit you in the face"?

3    **A.**   If you said that term to me, then I would agree that that

4    probably means you're going to clap me by hitting me in the

5    face, yes.

6    **Q.**   Okay.  "Clap" meaning basically "I'll beat you down"?

7    **A.**   You keep putting your spins on it.  If you want to keep

8    going, then these are more your interpretations.

9    **Q.**   But you understand that it's contextualized; correct?

10   **A.**   Explain "contextualized."

11   **Q.**   That it's context specific; correct?

12   **A.**   It means it's going with what you're trying to get me to

13   think that it is?

14   **Q.**   No.  Not at all.

15        That the way that words are used -- for example, "clap" --

16   **A.**   Yeah.

17   **Q.**   -- it depends on the context in which it's used; right?

18   **A.**   Well, it's based on what the person stating that believes

19   that they're meaning that to be.

20   **Q.**   You found no evidence in your entire investigation that

21   Mr. Tindle pulled a gun out of his pocket; correct?

22   **A.**   Well, based off all the witnesses, I already knew who shot

23   out there.  It wasn't -- I didn't -- it wasn't a matter of

24   trying to figure -- go into great detail to determine who shot.

25   **Q.**   So the question -- my question again, when Mr.-- in your

1   investigation -- well, I'll strike that.

2        Were you able to tell whether the two pieces of bullet

3   jacketing fragment that were recovered from the floor inside

4   the business belonged to the same bullet?

5   **A.**   No.   I did request to have those tested and compared, and

6   I believe that those were inconclusive.

7   **Q.**   They were inconclusive?

8   **A.**   Yes.

9   **Q.**   Meaning they could belong to two different bullets?

10  **A.**   You would have to have the firearms expert talk to you

11  about that.   I -- I'm just saying that they were inconclusive

12  as far as they couldn't really match up to anything as far as I

13  understood.

14  **Q.**   Okay.   And you never -- you never actually -- did you

15  actually speak with Mr. Evans?

16  **A.**   I -- at some point when I was there recovering the bullet,

17  I spoke to him, but he -- his original statement was taken by

18  someone else on the night of the shooting.

19  **Q.**   Okay.   Was Evans the owner of the barber shop?

20  **A.**   I believe so.

21  **Q.**   Okay.   That's how it was represented to you?

22  **A.**   That's my understanding, yes.

23  **Q.**   What is IBiSS?

24  **A.**   IBiSS -- IBiSS is -- it's a DNA-type term that the -- I

25  know there is a -- an expert that is going to come and talk

1    about that, but it's a -- well, it's basically a database

2    where -- where things are stored like -- like, for instance,

3    shell casings, things like that.  If -- if you take -- like,

4    for instance, you go to a scene of a shooting and the only

5    thing that's there is shell casings on the ground, a lot of

6    times we'll have those shell casings tested, and they'll put

7    that into the system called IBiSS.

8         Well, IBiSS can take and detect -- they'll take a look at

9    the shell casings and they'll match them up with other

10   shootings, and they'll say okay, these -- these were shot by

11   the same gun that was also used in -- I'm sorry -- this

12   shooting over here from a year ago or something like that.

13        So IBIS -- it's a database for ballistics.

14   Q.   So it compares firearms to previous known instances where

15   a gun had been fired?

16   A.   Yes.  If there's a match, then that's the database that

17   uses to put that together.

18   Q.   That's a match on the ballistics, basically a ballistic

19   match on the gun?

20   A.   Yeah.  If -- from my understanding -- again, this is

21   way -- this is way out of my league.  This is just like we read

22   this in reports that we --

23   Q.   If you don't know, then just say so.

24   A.   Well, I know the concept behind it.  I just can't give you

25   the science, you know.

1    **Q.**   So -- I hear you.

2         So DNA was taken from -- you obtained Mr. Tindle's DNA;

3    correct?

4    **A.**   Well, Mr. Tindle, we had his DNA, just the fact that he

5    passed.

6    **Q.**   Right.  So you had that.

7         What about Mr. Newton?  Was his obtained?

8    **A.**   No.  Mr. Newton was -- I tried my best to get -- get his,

9    but he was just extremely uncooperative.  I had a search

10   warrant for his DNA, and he just -- he -- he just wouldn't

11   allow us to take it.

12   **Q.**   Well, I thought he was treated at the hospital.  You went

13   to -- you didn't go, but you sent someone to see him at the

14   hospital; right?

15   **A.**   That's correct.

16   **Q.**   Was there an attempt to get his DNA from him then?

17   **A.**   Yeah.  You just can just go take someone's DNA without

18   their permission, unless you have a warrant to get it.  And we

19   weren't able to get his.

20   **Q.**   So at the time that he was visited in the hospital, that

21   was right after the shooting happened; right?

22   **A.**   Yeah.  But he's also being treated for a gunshot wound, so

23   it's inappropriate to go in there to try to swab his mouth

24   while they are treating a gunshot wound to his leg.

25   **Q.**   Was there an attempt to ask him if he would provide DNA at

1   that time?

2   **A.**   I was already writing the search warrant while he was at

3   the hospital, so as soon as he got cleared from the hospital,

4   he was transported to the homicide section where I had the

5   warrant ready to serve him.  However, he refused to get out of

6   the back of the police car, so it was a judgment thing where I

7   could either force him to take it or I could later get it and

8   with his cooperation.

9   **Q.**   Did you learn that there were no witnesses to the

10  shooting, to the officer-involved shooting, because of the

11  earlier shots being fired?  That that had caused everyone to

12  scramble?

13  **A.**   There -- there were witnesses.

14  **Q.**   Okay.

15      Thank you.

16      One moment.

17          (Plaintiff's counsel confer off the record.)

18          **MR. NISENBAUM:**  No further questions.

19          **THE COURT:**  Redirect?

20                     <u>**REDIRECT EXAMINATION**</u>

21  **BY MR. MORIARTY:**

22  **Q.**   Good morning still.

23  **A.**   Hi.

24          **THE COURT:**  Yes.

25          **MR. MORIARTY:**  Just barely.

1   **Q.**   I want to stick with -- to see if we can talk a little bit

2   more about 101B.  Okay?  That's still on the screen.

3   **A.**   Okay.

4   **Q.**   All right.  Let me see here.

5       When you -- when you saw the strike mark, there was one

6   strike mark on the wrought iron fence; correct?

7   **A.**   Yes.  That was very apparent to me.

8   **Q.**   And then there were two holes through the window behind

9   the wrought iron fence; correct?

10  **A.**   That's correct.

11  **Q.**   You discussed a bullet jacket.

12  **A.**   Yes.

13  **Q.**   It sounds like what it is is the bullet jacket covers the

14  bullet core, also known as the slug?

15  **A.**   It's kind of how it sounds.  It's like a jacket that's on

16  the bullet.

17  **Q.**   Right.

18  **A.**   It protects it.

19  **Q.**   Okay.  And after you saw the strike to the -- to the

20  wrought iron, you saw the two holes; correct?

21  **A.**   Yes.

22  **Q.**   And then there was evidence of two parts of a jacket that

23  were also there; correct?

24  **A.**   Yes.  There was two pieces of jacketing, so copper --

25  copper jacketing that was located inside the barber shop.

1    **Q.**   Right.   Meaning that it could have gone through the window

2    in those two holes; correct?

3    **A.**   Yes.

4    **Q.**   And then further into the barber shop, there was a bullet

5    core which previously would have been covered by the jacket

6    which was found in the wall; correct?

7    **A.**   That's correct.

8    **Q.**   And the way you described it before, once that projectile

9    hits something that's wrought iron, there is no telling which

10   direction it's going to go in; correct?

11   **A.**   I have no idea.

12   **Q.**   In other words, where it ends up doesn't tell you anything

13   except it hit the wrought iron fence.   That's it?

14   **A.**   That's correct.

15   **Q.**   You previously testified, Sergeant, that you watched the

16   body-worn camera footage of Officer Mateu; correct?

17   **A.**   That is correct.

18   **Q.**   I'm going to play a portion of this footage from the mark.

19   Right now on the left corner, the bottom corner, it says 6:29.

20   Do you see that?

21   **A.**   I do.

22   **Q.**   I'm going to play about 39 seconds, okay, and then I'm

23   going to ask you some questions about the idea of a secured

24   scene after I play it.   Okay?

25          **MR. NISENBAUM:**  I do have an objection, Your Honor,

1    and that is it's beyond the scope, but hearing that last

2    moment.-

3         THE COURT:  Are you withdrawing your objection or not?

4         MR. NISENBAUM:  I'm just submitting it for the Court.

5         THE COURT:  Well, I'm going to overrule it because I

6    think I know where he's going, although I'm not sure I know

7    where he's going.

8         MR. NISENBAUM:  That's my feeling.

9         THE COURT:  Given all your questions about finding the

10   bullet -- but I don't know.

11        MR. NISENBAUM:  That's my feeling, too.

12        THE COURT:  Proffer?

13        MR. MORIARTY:  I'm going to show my -- my proffer is

14   that these 39 seconds will show that the scene was not yet

15   secured, and it wouldn't be surprising that evidence could

16   possibly be lost.

17        THE COURT:  Go ahead.  Thirty-nine seconds.

18        MR. MORIARTY:  I'm going to go from 6:29 to 7:09 and

19   40 seconds.  I'm going to mute it so it's easier.

20             (Whereupon, the video was played.)

21   BY MR. MORIARTY:

22   Q.   Sergeant, you have previously watched the video of Mateu's

23   body-worn camera; correct?

24   A.   That's correct.

25   Q.   Could you explain to the jury in your experience in

1   homicide investigations, officer-involved shooting

2   investigation, what a secured scene is.

3   **A.**   Well, yes.  This is far from a secured scene.  You're

4   looking at -- you're looking at -- there are citizens all over.

5   This is an active crime scene.  Where all these people are

6   standing in the back, this is -- any -- anywhere around here is

7   where there could be potential evidence, and so by the time I

8   got to the scene, at that point, it was secure where we

9   cordoned the entire place off into an inner and outer perimeter

10  with crime scene tape, police officers, but our first and

11  foremost priority is the -- is the medical care of the persons

12  injured, and so that's always going to be our first concern, is

13  to take care of the -- any person that's injured and then do

14  our best to start backing people out of the crime scene so that

15  we can start looking and collecting evidence.

16  **Q.**   And when you say a "crime scene" and "secure," is that the

17  yellow tape that we've seen on movies that marks the area where

18  the citizens are supposed to stay out of?

19  **A.**   Yes.  In fact, if you show the very, very first picture

20  that you showed to me, that, in my opinion -- that's a secured

21  crime scene.

22  **Q.**   Okay.

23      Can you put the ELMO back on.

24      And are you referring to 101A, which is now on the screen?

25  Do you see that?

1   **A.**   I do.

2   **Q.**   And 101A has tape around the scene?

3   **A.**   Yes.   So there's no individuals in our crime scene.   We're

4   able to mark that area off with crime-scene tape.   We're able

5   to take our time now to do a thorough canvas and look for any

6   evidence.

7   **Q.**   During your five years in homicide, was it unusual to come

8   across a scene where evidence was missing?

9   **A.**   Yes.

10   **Q.**   It was unusual?

11   **A.**   No -- I mean no.   It was very common.   In fact, on more --

12   more than one occasion through surveillance video, I've seen

13   people actually reaching down and picking up shell casings from

14   a crime scene.

15   **Q.**   Before the patrol officers actually get there and are able

16   to cordon off the crime scene; is that correct?

17   **A.**   Yes, that's correct.

18   **Q.**   You had answered some questions about gunshot residue and

19   a sample that was taken from Mr. Tindle; correct?

20   **A.**   That's correct.

21   **Q.**   And you just discussed medical attention that was provided

22   to Mr. Tindle; correct?

23   **A.**   That's right.

24   **Q.**   Do you, based on your investigation of this incident --

25   did you understand that he was tended to at the scene of the

1   shooting?

2          **MR. NISENBAUM:**  Objection.  Calls for speculation.

3   Beyond -- beyond the -- improper opinion.

4          **THE COURT:**  Sustained.

5   **BY MR. MORIARTY:**

6   **Q.**   Okay.  Do you know where Mr. Tindle went from the scene?

7   **A.**   Yes.  He went by ambulance.  The paramedics took him in

8   the ambulance and then transported him up to ACH or Highland

9   Hospital, as we call it.

10  **Q.**   And in the ambulance, the medics, to your knowledge, were

11  attempting to save his life; correct?

12  **A.**   Yes.  They were actively working on him, to my knowledge,

13  trying to save him.

14  **Q.**   The same was true when he got to the Highland Hospital;

15  correct?

16  **A.**   Yes.  He was rushed into the emergency room where they

17  were making all attempts to save his life.

18  **Q.**   Do you have any idea, based on your review of the reports,

19  when the gunshot residue sample was taken from Mr. Tindle?

20  **A.**   Honestly, I don't know at what point that it was taken,

21  but based on -- based on my understanding, it was sometime

22  after -- after he was pronounced.

23  **Q.**   Why is it important -- why is timing of the gunshot

24  residue sample important in your field; in other words, when

25  the sample was taken?

1    **A.**   Well, because you want to take it as soon as possible

2    because people could change their clothes, they could wash

3    their hands.   There's a number of things that could change the

4    outcome of the evidence you're trying to collect.

5    **Q.**   And you don't know what was being done to Mr. Tindle as

6    far as medically from the time the shooting took place until

7    the time when -- whenever it was that the GSR was taken from --

8    the GSR sample was taken from his hand; correct?

9    **A.**   No.   I have no idea.   I did not go with Mr. Tindle.   I got

10   there after he was already transported.

11   **Q.**   And you were asked some questions by Mr. Nisenbaum about

12   this "I should clap your ass."   Do you remember those

13   questions?

14   **A.**   Oh, yeah.

15   **Q.**   And about the interpretations.   And he also asked you if

16   you had reviewed Mr. Evans's statement that he provided after

17   the shooting incident; correct?

18   **A.**   Yes.

19   **Q.**   I want to make sure that we're clear on your opinion, and

20   referring to page 12 of your report -- you don't need to look

21   at it -- if the complete hypothetical was as follows:   That

22   Evans overheard the light-skinned guy say, "I'll clap your

23   ass," as he kept tugging at his gun, which was in front of his

24   pants pocket, what would your opinion be as far as what that

25   phrase meant?

1    **A.**   If that phrase was read to me in that content, then I

2    would think that he -- he had the intent on shooting him with a

3    gun.

4    **Q.**   Mr. Nisenbaum asked you about other parts of your

5    investigation and about the numerous interviews that you had

6    taken of numerous people that were witnesses to this incident,

7    and the question is when you have taken those interviews and

8    reviewed all those interviews, was there anything that

9    suggested that Mr. Newton was the shooter at this incident?

10   **A.**   Yes.

11   **Q.**   That Mr. Newton was the shooter --

12   **A.**   No, no, no, no.  That Mr. Tindle was the shooter.

13   **Q.**   The question is for you was there any witnesses or any

14   evidence that you reviewed that suggested that Newton was the

15   shooter?

16   **A.**   Not one.

17          **MR. MORIARTY:**  That's all the questions I have,

18   Your Honor.

19          **THE COURT:**  Recross?

20          **MR. NISENBAUM:**  Very briefly.

21                          **RECROSS-EXAMINATION**

22   **BY MR. NISENBAUM:**

23   **Q.**   You wrote your report after you found out that the GSR

24   sample for Mr. Tindle had come back negative; correct?

25   **A.**   Yeah.  I think that was towards the end of the report,

1    yes.

2    **Q.**   And we know that because it's towards the end of your

3    report --

4    **A.**   Yes.

5    **Q.**   -- correct?  Okay.

6         Once you got that information, you didn't go back and try

7    to take -- and try to find out whether or not anything had been

8    done to clean Mr. Newton's hands or to otherwise sanitize his

9    hands that would account for the GSR sample being negative;

10   correct?

11   **A.**   No.  I didn't feel I needed to at that point.

12            **MR. NISENBAUM:**  Thank you.  No further questions.

13            **THE COURT:**  Anything on that?

14            **MR. MORIARTY:**  No.  Thank you.

15            **THE COURT:**  All right.  Sergeant, you may step down.

16            **THE WITNESS:**  Thank you, Your Honor.

17            **THE COURT:**  Oh, wait.  Don't step down.

18       Ms. Stone, I have a question.  Grab the question, please.

19       Counsel, let me see you at sidebar.

20            (Sidebar conference held without the reporter.)

21            **THE COURT:**  Okay, Sergeant.  I have a couple more

22   questions for you.

23            **THE WITNESS:**  Yes, Your Honor.

24                  **EXAMINATION OF CARDOZA**

25            **THE COURT:**  First, if gun residue was on Mr. Newton's

1    hands but not on Mr. Tindle's, how strong of an indication is

2    it that Mr. Newton fired the shots?

3         **THE WITNESS:**  That -- that's a really good question,

4    and I -- I wish that an expert could give you a broad or very

5    detailed description of that.

6         So my understanding is that that gunshot residue is just

7    one piece of the totality of everything, that it's something

8    you can look at, but it's -- it's not conclusive in any way.

9         We've had cases where we know for absolute fact that a

10   certain person was the one that fired the shot, but another

11   person just in proximity could have just as much gunshot

12   residue on them as the actual shooter.

13        So, again, it's -- I can't -- I can't look at that and say

14   that that is definitive.

15        **THE COURT:**  All right.

16        Any follow-up on that question?

17        **MR. ALLEN:**  Yes, Your Honor, please.

18                      <u>**REDIRECT EXAMINATION**</u>

19   BY MR. MORIARTY:

20   **Q.**   Putting you in a bad position, but I have to ask you a

21   little bit more about gunshot residue.  Okay?

22   **A.**   Okay.

23   **Q.**   Because you're not an expert, but I think you can explain

24   a little bit more.

25        What is your understanding of where gunshot residue comes

1   from and how it appears after a gun is shot?

2       MR. NISENBAUM:  I would object as being beyond the

3   scope and beyond his -- his expertise as limited as it is.

4       THE COURT:  Overruled, to the extent that you know.

5   If you don't, just say you don't know.

6       THE WITNESS:  I can only give you the -- I guess the

7   elementary version, and that is when a gun is fired, the

8   gunshot powder that is fired from the bullet disperses the --

9   many minute -- like you can't even -- it's not something we can

10  see with our visible eye, and there's these particles that was

11  broken down into the definition described earlier as -- I

12  couldn't even tell you exactly what those definitions of those

13  particles were, but they -- it's like a cloud that is -- that

14  falls on hands, body, clothing within a certain proximity where

15  that gun was fired.

16  BY MR. MORIARTY:

17  Q.   Going back to what you discussed before, have you seen

18  cases in which someone has not fired the gun, however you can

19  tell, whether it's by surveillance video or other ways, to

20  prove who the shooter is, yet that person who did not fire the

21  gun ends up with gunshot residue on their clothes, on their

22  hands or parts of their bodies based on their proximity to that

23  gun being fired?

24  A.   Yes.

25  Q.   And a little bit further, did you say -- and I don't --

1   I'm not sure if I heard you correctly.

2       Have there been instances where the opposite has taken

3   place, where you have had instances where you know someone is a

4   shooter, and for whatever reason, the gunshot residue kit does

5   not lead to the presence of gunshot residue on that person's

6   hands?

7   **A.**   Yes.   It goes both ways.   That's why, you know, we'll take

8   samples, but very seldom do we actually submit it and have it

9   tested.

10  **Q.**   Okay.   Going back to a question asked before, because it

11  gets to the heart of it, your investigation, everything you

12  did, all the witnesses that you interviewed, was there any

13  indication besides this GSR that Mr. Newton was the shooter of

14  the SIG Sauer weapon?

15      **MR. NISENBAUM:**   I would object, Your Honor.   Beyond

16  the scope.

17      **THE COURT:**   Sustained.

18      **MR. MORIARTY:**   That's all the questions I have.

19      **THE COURT:**   Any follow-up?

20      **MR. NISENBAUM:**   Very, very briefly.

21                    **RECROSS-EXAMINATION**

22  BY MR. NISENBAUM:

23  **Q.**   In the example you gave initially, the person shooting the

24  gun at another person and there is no GSR found on the other

25  person, you would expect there to be GSR found on the hand of

1    the person who fired the gun; correct?

2    A.    Yeah.  You would expect that.

3    Q.    Okay.

4    A.    Unless their hands were washed or cleaned.

5    Q.    Or if they were wearing also gloves?

6    A.    That could be true, too, if they had gloves they took off.

7    Q.    If they had something that was covering and preventing GSR

8    from being deposited; correct?

9    A.    That's correct.

10   Q.    That's why you take GSR samples not from one area of the

11   hand but different facets of the hand; correct?

12   A.    It's usually both the webbing of the hands where the --

13   your hand would be wrapped around the hammer of the firearm,

14   the base of it.

15   Q.    Okay.  And when you say "webbing," are you talking about

16   the areas kind of between your fingers?

17   A.    Between the thumb and your pointer finger.

18   Q.    Okay.  And you take the palms?

19   A.    No.  It's usually just -- when they take samples, it's

20   usually just the top -- the top.  That's why I refer to it as

21   the webbing.

22   Q.    And you're talking about the top, and just for the record,

23   we have a jury here, but for the record, you're talking about

24   the top of the inside of your thumb, around through the inside

25   of the index finger?

1    **A.**    Yes.  That's correct.

2    **Q.**    Down through the webbing?

3    **A.**    Yes, sir.

4    **Q.**    In between them?

5    **A.**    Yes, sir.

6              **MR. NISENBAUM:**  Thank you.  No further questions.

7              **THE COURT:**  Anything on that?

8              **MR. MORIARTY:**  No, Your Honor.

9                      <u>**EXAMINATION OF CARDOZA**</u>

10             **THE COURT:**  So here's the next one.  It's long so I

11   can repeat it if you want.

12             **THE WITNESS:**  Okay.

13             **THE COURT:**  Did you take steps to ascertain who the

14   pistol belonged to, and "pistol" referring to the pistol that

15   potentially shot the first two shots, and "belonged to" in

16   terms of who was carrying it prior to the fight, and if so, how

17   did you investigate that and what were your conclusions?

18             **THE WITNESS:**  Okay.  So I think the -- if I understand

19   correctly, the question is who had the -- maybe I'm off, but

20   who had the firearm -- what steps did I take to determine who

21   had the firearm prior to that shooting?

22             **THE COURT:**  Right.

23             **THE WITNESS:**  Okay.  So, again, as an investigator, I

24   have to take the totality of everything, so that means I have

25   to -- I have to look at witnesses and evidence.  I have to look

1    at -- I have to go through everything.  Who first and foremost

2    witnessed it, who saw who with the gun, and based off witness

3    statements, I knew that Tindle was seen with the gun prior to

4    the shooting.  And he was also the same one that was seen

5    shooting Mr. Newton, and so that -- that was directly from

6    witnesses.  Okay?

7        And then I have to look at evidence and tell me what does

8    the evidence suggest, and that's where I have to take it a step

9    further and take DNA samples and things of that nature just to

10   confirm other things that I'm -- that I learned during the

11   investigation.

12           **THE COURT:**  Any follow-up?

13           **MR. MORIARTY:**  No.

14           **MR. NISENBAUM:**  No, Your Honor.

15           **THE COURT:**  Okay.  Anything else?  All right.

16       Now, Sergeant, you may step down.

17           **THE WITNESS:**  Thank you, Your Honor.

18           **THE COURT:**  Okay.  Ladies and Gentlemen, let's go

19   ahead and take our lunch break, so we will stand in recess for

20   30 minutes.  Your lunches -- hold on, Sergeant.

21       Your lunch is in the jury room for you.  We will stand in

22   recess for 30 minutes with the jury.

23       (Proceedings were heard out of presence of the jury:)

24           **THE COURT:**  Okay.  You can stand down now.  Thank you.

25       Can someone tell me how long we expect Wong to be?

1          **MR. MORIARTY:**  Maybe 20 minutes.

2          **THE COURT:**  Twenty minutes.  And then do I have the --

3     where is the deposition transcript that you're going to read?

4     I'm trying to see if I've got that from the last time.

5          **THE CLERK:**  This is the whole thing.

6          **THE COURT:**  I don't want that one.  I want the one

7     that is highlighted that they are going to read.  You can keep

8     that.

9        Ladies and Gentlemen, we are going to stand in recess for

10    30 minutes if you want to go grab a quick bite.

11         **MR. MORIARTY:**  Here is another one.

12         **THE COURT:**  Can I just make a copy so I make sure I

13    have the right --

14         **MR. MORIARTY:**  You can keep this one.

15         **THE COURT:**  I'm sorry.  Here it is.  I found it.

16    Okay.  Thank you.

17       All right.  And give me estimates on closing so I know how

18    to take breaks here.

19         **MR. NISENBAUM:**  20 minutes, unless you are going to

20    dock me 15 minutes -- 20 minutes for mine and then Mr. Burris's

21    rebuttal.

22         **THE COURT:**  And then Mr. Burris doesn't get one.  Just

23    joking.  I'm just joking.

24         **MR. BURRIS:**  I know you were joking.

25         **MR. MORIARTY:**  If -- I'm not positive.  I think it's

1    45 to 55, but I'm not positive.  Somewhere in that area.

2              THE COURT:  So 20 minutes, 45, and then another --

3              MR. BURRIS:  20, 25.

4              THE COURT:  Take your break.  Thank you.

5         Mr. Moriarty, the 101D that you had marked up has not been

6    admitted.

7              MR. MORIARTY:  Okay.

8              THE COURT:  So do you want to offer that?

9              MR. MORIARTY:  Right.  As it's changed, correct.

10             THE COURT:  So where is it?

11             MR. MORIARTY:  I just gave it to -- I didn't give it

12   to you?

13             THE COURT:  Unless you don't want -- do you not want

14   the unmarked one?

15             MR. MORIARTY:  I want the marked one.  Let me double

16   check.

17             THE CLERK:  Here it is.  It's in your paper.  It has

18   the initials CT on it with the red, 101D.  Does it get another

19   number?

20             THE COURT:  So my question is do you want me to give

21   it a different designation, or do you want that -- or do you

22   want to replace it?

23             MR. MORIARTY:  That is the piece of evidence.  I don't

24   need -- I don't need two of them.

25             THE COURT:  I'm just asking.  I admitted -- once I

1    admit something, it cannot be changed.

2            **MR. MORIARTY:**  I understand now.

3            **THE COURT:**  And it's fine if you want to replace it,

4    but I want the record to be clear about what is going in.

5            **MR. MORIARTY:**  Whatever is easiest.  If it can stay as

6    it is and we can just amend that 101D is now marked as opposed

7    to previously being admitted as clean.

8            **THE COURT:**  That's fine.  So ordered.  Okay.  Thank

9    you.

10        If you could be back here at 12:35.

11           (Luncheon recess was taken at 12:15 p.m.)

12   **AFTERNOON SESSION**                                    **12:40 p.m.**

13           **THE COURT:**  All right.  Let's call the jury back in.

14       (Proceedings were heard in the presence of the jury:)

15           **THE COURT:**  We are back in session.  The record will

16   reflect that the jury is with us.

17       Defense, next witness.

18           **MR. MORIARTY:**  The defendant calls Helena Wong.

19                           **HELENA WONG**,

20   called as a witness for the Defendant, having been duly sworn,

21   testified as follows:

22           **THE WITNESS:**  I do.

23           **THE CLERK:**  Please be seated.  And then adjust the

24   mic.  Pull it toward you.  And then please state your full name

25   and spell your last name.

1          **THE WITNESS:**  Helena.  Last name is W-O-N-G.

2          **THE COURT:**  All right.  Good afternoon, Ms. Wong.

3          **THE WITNESS:**  Good afternoon.

4          **THE COURT:**  You may proceed.

5          **MR. MORIARTY:**  Thank you.

6                          <u>**DIRECT EXAMINATION**</u>

7    **BY MR. MORIARTY:**

8    **Q.**   Good afternoon, Ms. Wong.

9    **A.**   Good afternoon.

10   **Q.**   Where do you work?

11   **A.**   I work for the Oakland Police Department Crime Department

12   Lab.

13   **Q.**   How long have you worked for the Oakland Police Department

14   Crime Lab?

15   **A.**   I have been there nine years, and eight years as a

16   criminalist.

17   **Q.**   What is your current position with the crime lab?

18   **A.**   I'm a criminalist, which is another word for forensic

19   scientist, at the crime lab.

20          **THE COURT:**  I'm going to have you scoot just a little

21   closer to that mic so we can hear you a little bit better.

22   Okay?  Thank you.

23   **BY MR. MORIARTY:**

24   **Q.**   In your position as a criminalist at the crime lab, do you

25   forensically analyze DNA?

1    A.    Yes.

2    Q.    How long have you done that for?

3    A.    I've done that for eight years.

4    Q.    When you do your work on DNA, do you physically examine

5    evidence for the presence of biological material?

6    A.    Yes.

7    Q.    Could you briefly describe your educational background

8    relative to your work?

9    A.    Yes.   I have a Bachelor's of Science degree in chemistry

10   from U.S San Diego and a Master's of Science degree in forensic

11   science from U.C. Davis.

12   Q.    Is the Oakland Police Department crime lab accredited?

13   A.    Yes.

14   Q.    Could you briefly describe what it means for the

15   laboratory to be accredited?

16   A.    For the lab to be accredited, we have to have protocols,

17   procedures and policies in place to make sure that the work

18   that we're doing is of high scientific standards, meaning good

19   standards, and we get audited by outside agencies to make sure

20   that we are routinely still meeting those standards.

21   Q.    How often is the accreditation reviewed by those outside

22   agencies?

23   A.    We get, I believe, reviewed every other year by an outside

24   agency, and every other year we do an internal audit.

25   Q.    Do you have formal training with respect to DNA analysis?

**A.**     Yes.

**Q.**     Could you briefly tell us your formal training with respect to DNA analysis?

**A.**     I was trained in the forensic biology unit, and when I was hired to do the criminalist position, we had an in-house training program where I performed lots of training samples and practices on the DNA analysis process.  I also attended courses held by outside agencies such as the California Criminalistics Institutes.

**Q.**     And you mentioned DNA analysis.  The how many times have you conducted DNA analysis in your position with the Oakland Police Department for the last eight years?

**A.**     Thousands of times.

**Q.**     Have you qualified as an expert witness in court in the area of forensic biology and DNA analysis?

**A.**     Yes.

**Q.**     How many times have you qualified in court, let's say, not in federal court but in state court -- how many times have you qualified as an expert in forensic biology and DNA analysis?

**A.**     Twenty times.

**Q.**     And have you testified as an expert in federal court?

**A.**     Yes.

**Q.**     How many times?

**A.**     One time.

          **MR. MORIARTY:**  Your Honor, at this point, the

1   defendant would ask that Ms. Wong -- the defendant would offer

2   Ms. Wong as an expert in forensic biology and DNA analysis.

3          **MR. NISENBAUM:**  No objection.

4          **THE COURT:**  She is admitted as such.

5   **BY MR. MORIARTY:**

6   **Q.**   What does DNA stand for?

7   **A.**   DNA stands for deoxyribonucleic acid.

8   **Q.**   Where is it found in the human body?

9   **A.**   It's found in cells that have a nucleus and in-common

10  bodily fluids such as sperm, saliva and blood.

11  **Q.**   Does DNA differ from person to person?

12  **A.**   Yes.

13  **Q.**   Within a specific person, does the DNA vary?  In other

14  words, would my blood be different from my saliva?

15  **A.**   No.

16  **Q.**   Is each person's exact DNA sequencing unique?

17  **A.**   Yes.

18  **Q.**   Okay.  When you described the thousands of times you have

19  done your DNA analysis, could you briefly describe what that

20  means to do a DNA analysis?

21  **A.**   Do you want me to briefly go over the process of DNA

22  analysis?

23  **Q.**   Yeah?

24  **A.**   So the first thing we do when we receive evidence to

25  examine, we'll examine the evidence to see if there is any

1    staining or any areas that might potentially contain biological

2    material, and then we would take a sampling of it either by

3    swabbing or by cutting.  And the first step in the DNA analysis

4    process is called digestion, which is to break open the cells

5    to release the DNA from the nucleus.

6        And then the next step is extraction where we purify that

7    sample for just pure DNA since that's the part that we're

8    interested in.

9        The next step is quantitation, which is where we determine

10   how much DNA is present in that sample.

11       The next step is amplification where we make millions of

12   copies of DNA of a particular area of the DNA that we're

13   interested in.

14       And then finally, we have DNA typing, which is the process

15   of getting the DNA type of that person or of that sample.

16   **Q.**   Okay.  And the seven steps that you just walked through,

17   you can perform on pieces of evidence, whether it be clothing,

18   a firearm, or whatever that's presented to you to see if you

19   can find the presence of anyone's biological material on that

20   evidence; is that correct?

21   **A.**   Yes.

22   **Q.**   I want to ask you generally about firearms.  Okay?

23       During your eight years with the Oakland Police

24   Department, have you been asked to examine firearms for the

25   presence of DNA?

1  **A.**   Yes.

2  **Q.**   Could you give us an estimate of how many times such a

3  request has been made, and that's to examine this firearm and

4  determine if anyone's biological material is on it.

5  **A.**   I would say hundreds of times.

6  **Q.**   When -- when that request is made to you, what parts of

7  the firearm are you going to go ahead and do your examination

8  on?

9  **A.**   So the first thing I would do is to look if there's any

10  visible staining that I can see.  If I don't see any staining,

11  then I'm going to typically -- I'm going to take samples from

12  areas that people typically handle when they're handling a

13  firearm.

14       So, for example, a lot of times we would swab the grips

15  because that's where you would have to hold in order to shoot

16  the firearm.  The slide you also would have to handle in order

17  to rack the slide and load the chamber.  Depending on the

18  surface of the trigger, sometimes we would swab the trigger as

19  well, or just other areas that a person would expect -- be

20  expected to touch.

21  **Q.**   During your analysis, you used the phrase "multiple

22  donors."

23  **A.**   Correct.

24  **Q.**   And you've used that phrase many times during the time

25  you've been with the crime lab; correct?

1    **A.**    Yes.

2    **Q.**    What is meant by the phrase "multiple donors" in the area

3    of biological material found, for example, on a firearm?

4    **A.**    So going back, if you have just one person touching a

5    sample and I was able to get a DNA profile from just that one

6    person, then we call that a single-source sample, meaning only

7    one person contributed to that sample.

8         There are many types of evidence samples where more than

9    one person might have touched the evidence, and in that case,

10   we would detect the presence of more than one person in that

11   sample, and that's where the multiple donors is used.

12   **Q.**    Again, generally speaking, with respect to the time that

13   you've worked with the Oakland Police Department examining

14   firearms, would you say it's usual or unusual to find multiple

15   donors on the firearms that you examine?

16   **A.**    I would say it's pretty usual to find multiple donors.

17   **Q.**    Can you explain that?

18   **A.**    So firearms is a type of evidence or an item that could be

19   passed around from person to person.  It just depends on the

20   way the person handles their gun.  So if it's a gun that you

21   own and you don't want to let anyone else touch it, then the

22   possibility of finding someone else is a lot lower, whereas if

23   it's a gun that you know you might share with another friend or

24   friends and you know you take turns shooting it, then there's a

25   good chance that, you know, you'll have more than one person's

1   DNA on there.

2   **Q.**   What is meant by the phrase or the term "major donor"?

3   **A.**   The word "major donor" means it's going back to the fact

4   that there is more than one person's DNA contributing to the

5   sample, and the major donor is the person who is contributing

6   the majority of the DNA to that sample.

7   **Q.**   And the next question would be what's meant by the term

8   "minor donor"?

9   **A.**   The minor donor would mean the person who is contributing

10   less DNA to that sample.

11   **Q.**   Okay.  I want to focus on what you did here.  Okay?

12   **A.**   Okay.

13   **Q.**   What were you asked to do in this case?

14   **A.**   I was asked to examine swabs of a firearm and a magazine

15   for the presence of biological material.

16   **Q.**   What was the Oakland Police Department crime report number

17   that corresponded with your work in this case?

18   **A.**   It is 18-000494.

19   **Q.**   When you were asked to do the work, that was at the

20   request of Sergeant Michael Cardoza of the Oakland Police

21   Department; correct?

22   **A.**   Correct.

23   **Q.**   My law firm did not hire you to do your work; correct?

24   **A.**   Yes.

25   **Q.**   And you were asked to examine swabs -- swabs that were

1    connected to the gun; is that correct?

2    A.    Yes.

3    Q.    Okay.  And when you get a request to examine swabs, what

4    does that mean?  What are you going to do?

5    A.    So instead of looking at the actual firearm, swabs that

6    have already been previously collected from areas of the

7    firearm are examined instead, so I'll look at swabs that

8    basically looks like a cotton swab.

9    Q.    Like a Q-tip?

10   A.    Yes.

11   Q.    And when you look at those swabs, it's your understanding

12   that an evidence technician has already used that Q-tip on

13   certain parts of the subject firearm?

14   A.    Yes.

15   Q.    Okay.  When you tried to -- when you did your process of

16   examining -- excuse me.

17       The examination and the swabbing had already been done

18   before you got involved in this firearm; correct?

19   A.    Right.

20   Q.    Okay.  So you went to your process of digestion,

21   extraction, quantification, and amplification to see if you

22   could do the DNA typing; correct?

23   A.    Yes.

24   Q.    What different areas -- in which different areas had that

25   gun been swabbed before you became involved in your work?

**A.**   So there were four swabs that were collected from the firearm.  The first one was from the grips.  The second one was from the trigger.  The third is from the rear of the slide.  And the fourth one is the hammer.

**Q.**   And you understand that firearm to be a SIG Sauer; correct?

**A.**   Yes.

**Q.**   What, if anything, could you do with your analysis of the swabs that had already been done by the evidence technician? What did you learn?

**A.**   Could you repeat or rephrase that question?

**Q.**   Sure.  You went to the property section and retrieved the swabs that had already been done, already been swabbed, of those areas of the gun that you described; correct?

**A.**   Yes.

**Q.**   Why don't you explain to the jury how you were able -- how you are able -- not in this instance, but how you are able to develop a profile of an individual based on a swabbing, in this case, of a gun?  Generally how does that work?

**A.**   So typically we would take a portion of the swab.  In this case, I took half of the swab and subjected it through the entire DNA analysis process that I briefly described earlier.

**Q.**   Okay.  And were you able to develop a profile for any of the swabs that had been done by the initial evidence technician?

1   **A.**   So results were obtained, but I wasn't able to develop an

2   individual profile from the evidence samples.

3   **Q.**   Okay.  Explain that to us.  When results were obtained,

4   what does that mean?

5   **A.**   So there was DNA detected on all of the samples.  The

6   hammer actually didn't have quite enough DNA for us to go

7   forward to the DNA typing process.  So we were able to do DNA

8   typing on the grips, the slide, and the trigger.

9         Results were obtained, meaning I actually got DNA -- or a

10  mixture, DNA mixture, from at least four people from each of

11  the areas, but then due to the -- just how complex it is and

12  how many people were contributing to it, I wasn't able to

13  independently figure out which -- the DNA profile for each of

14  those individuals.  So in that case, I wasn't able to develop a

15  profile for any single individual among the four individuals.

16  **Q.**   Okay.  And if you were able to develop a profile, you

17  would be able to compare that profile of the unknown person on

18  the gun to a known person; correct?

19  **A.**   Yes.

20  **Q.**   But because the levels of DNA were not high enough, you

21  were unable to develop that profile from the swabs that were

22  done by the technician; correct?

23  **A.**   Yes.

24  **Q.**   Did you next go ahead and swab the gun yourself?

25  **A.**   I did.

1    **Q.**   Did you use the same process of examination and swabbing

2    that you described earlier?

3    **A.**   Yes.

4    **Q.**   Okay.  And did you swab the same areas of the firearm

5    yourself with that Q-tip?

6    **A.**   I swabbed the grips again, and then I also swabbed the

7    slide also, and I swabbed certain buttons and releases that are

8    on the gun.

9    **Q.**   When you did your swabs of the gun yourself personally,

10   before you did that, you examined the firearm visually for the

11   evidence of any kind of stains; correct?

12   **A.**   Yes.

13   **Q.**   And did you see evidence of any kind of stains on that

14   firearm, the SIG Sauer, when you did that examination?

15   **A.**   I did not.

16   **Q.**   And when we go back to the biological material that our

17   body secretes, when you're looking for a stain, is it -- is

18   it -- does it go hand in hand that if you see a stain, it could

19   connect with the possible presence of blood?

20   **A.**   It depends on the coloring of the stain.

21   **Q.**   Okay.  Make it simple here.  When you did your swabbing of

22   the firearm, you personally -- you personally -- did you see

23   anything indicative that the biological material could be

24   blood?

25   **A.**   I did not.

1  **Q.**   I want to just focus on your swabbing, your personal

2  swabbing of the gun on the grips.   Okay?

3  **A.**   Okay.

4  **Q.**   All right.   When you swabbed the gun with that Q-tip on

5  the grips of the SIG Sauer, were you able to obtain sufficient

6  quantities of DNA to develop a profile?

7  **A.**   Yes.

8  **Q.**   A stupid question:   When you say "the grips," that's where

9  someone would hold the gun if he or she is holding it the

10  proper way?

11  **A.**   Yes.

12  **Q.**   And you testified that the biological material that you

13  were able to obtain off the gun was not indicative of blood;

14  correct?

15  **A.**   Correct.

16  **Q.**   What did you learn when you went through your process of

17  swabbing, digestion, extraction, quantification, amplification

18  and typing?   What were you able to develop from that -- from

19  the grips?

20  **A.**   The grips, once again, like the previous swabbing that was

21  taken, had a mixture of at least four people contributing to

22  that sample, but in this case, the -- there was one particular

23  person or donor that was contributing a high enough quantity of

24  DNA that I -- his type was distinguishable from the rest of the

25  three people, and so in that situation, I was able to develop a

1    profile for that major donor.

2    **Q.**    And that person you could tell was a man?

3    **A.**    Correct.

4    **Q.**    And you described that as the major donor; correct?

5    **A.**    Yes.

6    **Q.**    Could you break down for us the quantity of DNA on the

7    grips for each of the four donors, the major donor and the

8    three other donors?

9    **A.**    So the major donor was contributing approximately 80

10   percent to that sample, and the minor donors, at least three of

11   them, were contributing about 20 percent in totality.

12   **Q.**    Could you describe -- I want to concentrate now on the

13   major donor.  Okay?

14   **A.**    Yes.

15   **Q.**    Could you describe to the jury what a statistical

16   frequency means in your work?

17   **A.**    Every time we develop a profile, we want to give weight to

18   that profile, meaning we will perform a statistical frequency

19   calculation to see how rare or common that particular profile

20   is.  That way if we were to do any sort of comparison to a

21   known sample and we say they are included or excluded, the

22   statistical frequency would show how strong or how weak that

23   inclusion is.

24   **Q.**    Okay.  And were you able to develop a statistical

25   frequency for the major donor on the grips of the SIG Sauer?

1    **A.**    Yes.

2    **Q.**    What was the statistical frequency?

3    **A.**    The DNA -- the major donor DNA profile was expected to

4    occur approximately once in 172 decillion members of the

5    population.

6    **Q.**    How many zeroes is that, decillion?

7    **A.**    That is 33 zeroes.

8    **Q.**    What does that mean?  In other words, I'm sure you've been

9    asked this question before, but how many people are in the

10   world?

11   **A.**    There is approximately, I think, 7 billion people in the

12   world right now.

13   **Q.**    And obviously 172 decillion with 30 zeroes is a larger

14   number than that; correct?

15   **A.**    Yes.  33 zeroes.

16   **Q.**    Do those numbers correspond at all, or how do you explain

17   that?

18   **A.**    Could you rephrase that question?

19   **Q.**    Sure.  Sure.

20       I'm sure you've been asked this question, that the

21   statistical frequency of the major donor in the population,

22   you've testified, is 172 decillion; right?

23   **A.**    Right.

24   **Q.**    Which is 30 zeroes.  It's a humungous number; right?

25   **A.**    33.

1    **Q.**   What's that?   33.   To be accurate, 33.

2          And the population of the world is 8 billion; correct?

3    **A.**   7 or 8.

4    **Q.**   7 or 8.   Close enough.   Okay.   Do those two numbers, do

5    they correspond with each other or how do they -- do they

6    co-exist?

7    **A.**   Well, 172 decillion is significantly larger than 7

8    billion.   I'm not sure if that's where you're going.

9    **Q.**   Okay.   I guess I'll just stick -- it always confuses me,

10   but, anyway, we will stick with that number is a lot larger

11   than 7 or 8 billion.

12         So now for the grips on the gun, you have the presence of

13   someone -- you have a major donor; correct?

14   **A.**   Correct.

15   **Q.**   And now because you're able to develop a profile, you can

16   compare that unknown person on the grips to someone who is

17   known; is that correct?

18   **A.**   Yes.

19   **Q.**   And did you do that in this case?

20   **A.**   I did.

21   **Q.**   Were you able to compare the profile that you created from

22   the grips of the gun to a DNA card from Sahleem Tindle?

23   **A.**   Yes.

24   **Q.**   What do you do when you get that DNA card?   What's the

25   process that you have to go through in order to make that

1    comparison to the grips to -- to what you learned from the

2    grips to the DNA card?

3    **A.**   So we deal with a certain type of sample called reference

4    sample.  Very often in our lab, a reference sample is a known

5    sample that was collected from a particular individual.  So it

6    could either be saliva or it could be blood, and we will

7    subject that sample through the same DNA analysis process, and

8    so at the end of it, when we get a DNA profile, we know that

9    that's the DNA profile of that particular individual that it

10   was collected from.

11   **Q.**   Okay.  And you did that for the DNA card for Mr. Tindle;

12   correct?

13   **A.**   Yes.

14   **Q.**   When you did your analysis and your comparison between the

15   DNA card and the swabs from the grip, what were you able to

16   learn?

17   **A.**   When I compared the DNA profile from Sahleem Tindle to the

18   major donor, my conclusion was that he is included as that

19   major donor.

20   **Q.**   What does that mean?

21   **A.**   That means that when -- in our DNA analysis process, we

22   look at 26 different locations on the DNA chromosome, and out

23   of those 26 different locations, there is a type of that person

24   at each of those locations, so I compared the type at each of

25   those locations between the unknown profile and the known

1  profile of Sahleem Tindle, and, you know, saw that it was the

2  same at every location.

3  **Q.**   I want to ask you some questions about the 20 percent of

4  the biological material on the grips.  Does that make sense?

5  **A.**   Yes.

6  **Q.**   Because what you discussed is that what we know is that 80

7  percent equals the major donor for the grips; correct?

8  **A.**   Correct.

9  **Q.**   And your analysis, based on what you pulled from the grips

10  and compare that to Mr. Tindle, is that 80 percent of the grips

11  equal Mr. Tindle; correct?

12  **A.**   He was included, yes.

13  **Q.**   Now, when we talk about the 20 percent, that was divided

14  between three donors; correct?

15  **A.**   It was a minimum of three donors.

16  **Q.**   Okay.  In this case, we've received evidence that another

17  individual was involved in this incident by the name of

18  Mr. Rayvell Newton.  Okay?  Did you ever receive a reference

19  sample for a person named Rayvell Newton?

20  **A.**   No.

21  **Q.**   I want you to assume that you had.  Okay?  If you had

22  received a similar DNA sample, whether it be a DNA card or a

23  swab of Mr. Newton's mouth, would you have been able to compare

24  and match that known sample, either the DNA card or the swab of

25  Mr. Newton, to the 20 percent of the material, the biological

910

1    material, that was left on the grips of the gun?

2    **A.**    No.   The reason for that is because we only do comparisons

3    of profiles that we actually were able to determine or develop.

4    And the reason for that is those are the only types of profiles

5    that we're able to calculate a statistical frequency for.

6    Anything that we aren't able to determine a profile for, we

7    can't calculate a statistical frequency for so it wouldn't be

8    fair to do any sort of comparison to those samples because then

9    I wouldn't be able to tell you how strong or weak that

10   inclusion is.

11   **Q.**    Okay.   Going back to the 80 percent and the major donor,

12   again, that's 172 decillion, the frequency in the population;

13   correct?

14   **A.**    Yes.

15   **Q.**    And you testified that that includes Mr. Tindle because

16   his DNA matches it, all the 26 locations; correct?

17   **A.**    Correct.

18   **Q.**    Could that also be an individual, a different individual?

19   **A.**    It's highly unlikely.

20   **Q.**    Okay.   If --

21   **A.**    Or let me further elaborate on that.

22   **Q.**    Yeah.

23   **A.**    The reason why I say it's highly unlikely is the

24   statistical frequency of 1 in 172 decillion means this profile

25   is so rare that I'm only expecting to see it one time in a

1    population of 172 decillion people, which is a huge amount of

2    people, and so it's not very likely that I'm going to see that

3    twice.

4    **Q.**    What if Mr. Tindle had a twin?

5    **A.**    It would have to be an identical twin.

6    **Q.**    And if Mr. Tindle had an identical twin, would those 26

7    spots, those locations, would those match up?

8    **A.**    Yes.

9    **Q.**    And if it's someone unrelated, that gets us back to the

10    highly unlikely?

11    **A.**    Yes.

12         **MR. MORIARTY:**   Thank you.   That's all the questions I

13    have.

14         **THE COURT:**   Cross?

15                    **CROSS-EXAMINATION**

16    **BY MR. NISENBAUM:**

17    **Q.**    Good afternoon --

18    **A.**    Good afternoon.

19    **Q.**    -- Ms. Wong.

20    **A.**    Hi.

21    **Q.**    Were you -- you were never provided Mr. Newton's DNA to

22    compare?

23    **A.**    No.   When I -- looking back at my notes, when I was

24    starting the analysis, the reference of Mr. Newton was not

25    available.

1   **Q.**   But you don't know -- was it -- did you at some point

2   request his DNA?

3   **A.**   I did not.   I only perform analysis on things that were

4   requested of me, so if it wasn't available or requested, I

5   don't then go back and do further requests.

6   **Q.**   Is it true that DNA cannot tell you who fired a gun?

7   **A.**   Yes.

8   **Q.**   That means that DNA -- a person's DNA being on a gun can

9   tell you that the person touched the gun; correct?

10  **A.**   Correct.

11  **Q.**   It doesn't tell you what they did with it?

12  **A.**   Correct.

13  **Q.**   In this case, there were at least four people who touched

14  this gun?

15  **A.**   Yes.

16  **Q.**   And it could have been a lot more?

17  **A.**   Yes.

18  **Q.**   And it doesn't tell you when the person touched the gun;

19  correct?

20  **A.**   Correct.

21  **Q.**   For example, a person could have had the gun and left all

22  kinds of DNA on it, been a major donor.   The gun could have

23  been in another person's possession very briefly, and they may

24  not have left enough DNA on it to develop a profile; correct?

25  **A.**   Correct.

1    **Q.**   Okay.

2         Now, did you amplify the DNA samples that you -- that you

3    took yourself?

4    **A.**   Yes.

5    **Q.**   Okay.  I'm not sure if I heard that.  Can you explain that

6    process?

7    **A.**   The amplification process?

8    **Q.**   Yes.

9    **A.**   Amplification is where -- like I mentioned earlier, we're

10   interested in 26 different locations on the DNA strand, and so

11   the amplification process is a process where we make millions

12   of copies of those specific 26 different locations.

13   **Q.**   And was this from the swabs that you had taken yourself?

14   **A.**   Yes.

15   **Q.**   So when you took the swabs, you didn't have enough DNA to

16   develop a profile without doing the amplification; correct?

17   **A.**   Correct.  So the standard process for a DNA analysis is to

18   do the amplification process, and that's where we get enough

19   DNA to do any sort of forensic DNA analysis.

20   **Q.**   Okay.  What does it mean that the profile is not eligible

21   for entry into CODIS?

22   **A.**   CODIS, spelled C-O-D-I-S, stands for the Combined DNA

23   Index System.  It's a DNA database that has a lot of the DNA

24   profiles from different evidence samples from all over the

25   city, state, and nation.  And so eligibility to enter a profile

1    into CODIS is based on whether or not it was directly collected

2    from an evidence that was related to a crime.

3    **Q.**   Okay.  So because -- I'm sorry.  The reason why this --

4    strike that.

5         Was there a reason why the DNA sample in this case was

6    not -- was not eligible for entry into CODIS?

7    **A.**   Yes.  So the reason why this firearm was not eligible for

8    entry into CODIS is because it was collected at the scene near

9    the location of an individual, so if -- let's just say that

10   particular individual that it was next to, we find their DNA on

11   there.  It doesn't -- it's not necessarily a crime because we

12   know that he was there in that location.

13        It would be a different story if a shooting happened or a

14   homicide happened and there was a gun left next to the body and

15   we have no idea who left that gun behind.  So in that case,

16   that gun is directly related to a crime and so any profile that

17   gets generated from that gun would be eligible for CODIS.

18   **Q.**   Okay.  I take it you were not able to determine whether

19   Mr. Newton touched this gun or not; correct?

20   **A.**   Correct.

21   **Q.**   And you're not here offering any testimony that would say

22   that Mr. Newton did not touch this gun; correct?

23   **A.**   Correct.

24   **Q.**   And, of course, you're not here saying that Mr. Newton did

25   not fire this gun; correct?

1    **A.**    Correct.

2    **Q.**    You talked about the 1 in many decillion.  That number was

3    too high.  It boggles my mind.

4         What you're saying there is that basically unless you have

5    an identical twin, we all have individual different DNA;

6    correct?

7    **A.**    Yes.

8    **Q.**    So what DNA was found on the slide?

9    **A.**    The results from the slide was a mixture of at least four

10   donors.

11   **Q.**    Okay.  Was there a major donor on the slide?

12   **A.**    No.

13   **Q.**    But if I understand correctly, there were -- other than

14   the slide, there were three minor donors and one major donor;

15   correct?

16   **A.**    On the grip.

17   **Q.**    Right.  On the grip.

18   **A.**    Yes.

19   **Q.**    And in total, there were what appear to be four separate

20   donors in total to the DNA found on the gun; correct?

21   **A.**    Yes.

22   **Q.**    Okay.  Now, you indicated that you didn't see any blood

23   stain on the gun; correct?

24   **A.**    Correct.

25   **Q.**    Did you test the gun for blood?

1    **A.**    No.

2    **Q.**    Okay.  Are you here testifying that there was no blood on

3    the gun?

4    **A.**    I am here to say that I didn't see any stains that were

5    consistent with the appearance of blood.

6    **Q.**    Okay.  How about saliva?

7    **A.**    I did not test for the presence of saliva.

8    **Q.**    Does saliva carry DNA?

9    **A.**    Yes.

10   **Q.**    So if I -- and that's how you get DNA; right?

11   **A.**    Correct.

12   **Q.**    How you get the sample, is by swabbing the cheek?

13   **A.**    Yes.

14             **MR. NISENBAUM:**  One moment, please.

15   **Q.**    What about the buttons on a gun?

16   **A.**    Are you specifically referring to the buttons I referred

17   to?

18   **Q.**    Yes.

19   **A.**    I swabbed three different buttons on the gun:  The

20   magazine release button, the slide stop, and the decocker.

21   **Q.**    The what?

22   **A.**    The decocker.

23   **Q.**    Oh.  Is that on the hammer?

24   **A.**    It's near that area.

25   **Q.**    Okay.  And was there any DNA recovered from the buttons?

**A.**   Yes.

**Q.**   And was -- were you able to determine whether Mr. Tindle's DNA was on the buttons?

**A.**   The DNA from the button resulted in a mixture of at least three individuals that I was not able to individually sort out their profiles from, so I wasn't able to do any comparison to the results from the buttons.

**Q.**   Now, if a person handles a gun -- this may be beyond your expertise.  Let me know if it is.

If a person handles a gun on a daily basis and they touch the whole gun with their hand and their hand is normal, it's not gloved or anything, would you expect their DNA to be all over the gun?

**A.**   Yes.

**Q.**   And you would expect their DNA to be all over the gun as a major profile all over the gun; correct?

**A.**   If they're the person that's touching it most of the time, then, yes.

**MR. NISENBAUM:**  Okay.  I don't think I have any other questions.  Hold on.

Thank you.  No further questions.

**THE COURT:**  Any redirect?

**MR. MORIARTY:**  Just briefly.

**REDIRECT EXAMINATION**

1   BY MR. MORIARTY:

2   Q.   Ms. Wong, you were just asked about someone who handles

3   the gun -- handles the gun every day, something to that effect.

4   Did you hear that?

5   A.   Yes.

6   Q.   I want to ask you -- say I have a gun at home and I'm the

7   only person that touches it.  I clean it.  I take it to the

8   range.  I bring it back.  I clean it.  I put it in.  I'm the

9   only person who touches it.  Who are you going to expect to see

10  on that firearm if you were able to do a DNA analysis and swab

11  it?

12  A.   So if you mentioned cleaning, if you just cleaned the gun

13  and you have wiped off all the DNA that's on there, I probably

14  wouldn't expect to find much DNA on there at all.  If there was

15  DNA on there, then I would expect it to be the person who is

16  the person handling it.

17  Q.   Okay.  And assume -- take the cleaning out.  Just I get

18  the gun.  I purchase it.  I put it in my safe at home.  I'm the

19  only person who touches it from the firing range, shooting

20  range, back to the safe, and I come and you to go ahead and

21  swab the gun and analyze it.  What do you expect to see on that

22  gun?

23  A.   I would expect to see that person's DNA.

24  Q.   Okay.  Now that gets me back to this idea of major donor

25  and minor donor that you were just asked about, and I'm a

```
1   little confused.  Okay?
2   A.    Okay.
3   Q.    You testified earlier that it's not unusual to find
4   multiple people on guns that you test for the Oakland Police
5   Department Crime Lab for the presence of biological material.
6   Is that what you testified to?
7   A.    Yes.
8   Q.    Explain what that means, why it's not unusual to see
9   multiple people on a gun.
10  A.    So going back to just how the gun is handled and how it's
11  passed around, a lot of the guns that we see in the city of
12  Oakland are guns that belong to individuals that don't
13  necessarily, first of all, clean the guns very often, and it
14  gets passed around between different individuals, and so that's
15  why, in most of the gun cases that we see, a lot of times we'll
16  see more than one person's DNA on there.
17  Q.    And when you happen to see a gun, it's because the
18  investigator believes that that gun was involved in a crime;
19  correct?
20  A.    Yes.
21  Q.    Okay.
22        That's all the questions I have.
23            THE COURT:  Anything on that?  Recross?
24            MR. NISENBAUM:  No.
25            THE COURT:  Okay.
```

1       Ms. Wong, you may step down.  Oh, wait.

2       You know, I don't know why I just don't look over.

3               (Sidebar conference held and not reported.)

4           **THE COURT:**  Okay, Ms. Wong.  Just a few more questions

5   for you.

6           **THE COURT:**  How easy is it for a person touching a gun

7   to leave a significant DNA trace?

8           **THE WITNESS:**  So to answer that question, it really

9   depends on, I guess, the status of your hands.  So if you wash

10  your hands very often, like we're all doing nowadays, you're

11  probably going to get rid of a lot of the DNA that's been left

12  behind by your hand, either by sweating or just touching your

13  face and things like that.  But if you tend to not leave -- you

14  tend to not wash your hands very often or let's say you just

15  exercised and so you're sweating profusely, then the chances

16  that you are going to leave DNA behind just by touching

17  increases, so it really just depends on how much DNA there is

18  on your hand at the moment.

19          **THE COURT:**  Can someone holding a gun for a short

20  period of time leave a bigger DNA trace than it's long-term

21  owner, and if so, in what kind of circumstances?

22          **THE WITNESS:**  I would say it's usually unlikely.  If

23  it's all just touch DNA, it's very unlikely that someone who

24  touched it for a very short amount of time would be leaving

25  significantly more DNA than the person who has routinely held

1    the gun.  There are situations where that can happen.

2        So, for example, if the person is -- the person who is

3    touching it for the short amount of time -- let's just say he

4    had a cut on his finger and he was bleeding.  There is a lot of

5    DNA in blood, and so even just touching for a short amount of

6    time, you could leave behind more DNA than the person who has

7    just been touching it with their skin cells, which doesn't

8    leave as much DNA behind as blood.

9        **THE COURT:**  Okay.  And can you estimate who is the

10   long-term owner of a gun based on where and how much DNA is

11   present on the gun?

12       **THE WITNESS:**  We typically don't like to make that

13   sort of conjecture just because there's different situations

14   that can arise as to how much DNA gets left behind.  I mean,

15   there's correlations and likelihood of the person who is

16   contributing more of the DNA under a normal just touching basis

17   is probably the person who handled the most, but like I said,

18   you know, just depending on if that person was bleeding at the

19   time or sweating profusely or whatnot, there is many reasons

20   that could change that, so we don't like to make that sort of a

21   assumption.

22       **THE COURT:**  Okay.  Any follow-up with respect to those

23   questions?

24       **MR. NISENBAUM:**  No, Your Honor.

25       **THE COURT:**  Not your turn.

1

<u>**REDIRECT EXAMINATION**</u>

2    **BY MR. MORIARTY:**

3    **Q.**   Just a follow-up question on the third question that you

4    just answered about your response where it says you said the

5    difference between just touching it or -- excuse me -- the

6    person who is handling it the most and the likelihood that that

7    person who is handling it the most is going to leave the most

8    DNA behind.  Can you explain that further in the context of

9    your work in this case.

10   **A.**   I'm not sure if I'm answering it correctly, but typically

11   the person who is handling it the most, meaning they've touched

12   it the most amount of times, let's just say just from like a

13   theoretical standpoint, every time you touch the gun, you leave

14   ten percent of DNA behind.  So the more times you touch it,

15   then the amount of DNA, even though each time is very little,

16   you're increasing the amount of DNA that you're leaving behind

17   as a total unless that gun gets cleaned or whatnot.  But if it

18   hasn't been cleaned and it's just staying the way it is, then

19   the more you touch it, the more times you've handled it, you

20   are leaving more DNA behind on it.

21          **MR. MORIARTY:**  Thank you.

22          **THE COURT:**  Anything -- any follow up?  Mr. Nisenbaum.

23          **MR. NISENBAUM:**  Could I have ten seconds just to

24   think?

25

1
### RECROSS-EXAMINATION

2
**BY MR. NISENBAUM:**

3
**Q.**   Are you given any evidentiary basis of -- for example, are

4
you given any account of how DNA got left behind when you do

5
your analysis to help guide you where to look?

6
**A.**   It depends on the situation.

7
**Q.**   Okay.  That wasn't the case in this one, was it?

8
**A.**   No.

9
**Q.**   Okay.  So in this one, you don't have any idea who handled

10
it or for how long; correct?

11
**A.**   Correct.

12
**Q.**   You have no idea if it was cleaned or not cleaned?

13
**A.**   Correct.

14
**Q.**   You know obviously it wasn't totally cleaned before you

15
examined it; correct?

16
**A.**   Yes.

17
**Q.**   And you don't know how long the DNA had been on there for;

18
correct?

19
**A.**   Correct.

20
          **MR. NISENBAUM:**  No further questions.  Thank you.

21
          **THE COURT:**  Mr. Moriarty, anything on his follow-up?

22
          **MR. MORIARTY:**  No.

23
          **THE COURT:**  Okay.  Now, Ms. Wong, you may step down.

24
Thank you.

25
          Okay.  Ladies and Gentlemen, the next piece of evidence

1    comes from a deposition.  A deposition is the sworn testimony

2    of a witness taken before trial.  The witness is placed under

3    oath to tell the truth, and lawyers for each party may ask

4    questions.  These questions and answers are recorded.  When a

5    person is unavailable to testify at trial, the deposition of

6    that person may be used at trial.

7         Here the deposition of Demorea Evans was taken on

8    May 22nd, 2019.  Portions of it will be read to you today.

9    Insofar as possible, you should consider deposition testimony

10   presented to you here in court in lieu of live testimony in the

11   same way as if the witness had been present to testify.

12        However, do not place any significance on the behavior or

13   tone of voice of any person reading the questions or answers.

14   I believe in this case --

15        **MR. ALLEN:**  I'm going to be Mr. Demorea Evans.

16        **THE COURT:**  Mr. Allen is going to be reading the

17   answers that Mr. Evans gave, and obviously Mr. Allen is not

18   Mr. Evans.  Okay?  All right.

19        So just -- you may sit at the stand, Mr. Allen.

20        Just a reminder to the lawyers and Mr. Allen in the chair,

21   I need you to explicitly state question from the deposition and

22   then answer, so that the transcript is clear that this is being

23   read from the deposition as opposed to your own independent

24   questions and answers here in court.

25        You may proceed.

1          **MR. MORIARTY:**  Thank you.

2          "Q. Mr. Evans, please state and spell your first and last

3     name.

4          "A. Demorea, D-E-M-O-R-E-A.  Last name Evans, E-V-A-N-S.

5          "Q. Mr. Evans, have you ever been deposed before at

6     deposition?

7          "A. No.

8          "Q. You started off with a court reporter gave you an

9     oath.  You took an oath to tell the truth.  It's the same kind

10    of oath you would take in a courtroom in front of a judge or a

11    jury.  The fact that -- the fact we're in my office in a

12    conference room doesn't change the effect of that oath.  Do you

13    understand that?

14         "A. Uh-huh.

15         "Q. Yes?

16         "A. Yes.

17         "Q. So why don't you just tell me about -- you own

18    Upper Kutz Barber Shop?

19         "A. No.  At the time it was owned by the other barber.

20         "Q. Okay.  Do you still cut hair at Upper Kutz Barber

21    Shop?

22         "A. No.  I'm doing -- I'm working there part time, but I'm

23    working not -- more so on some custom clothing, shoes, stuff

24    that I just launched.

25         "Q. Cool.  And that's going into business for yourself?

1          "A. Yes.

2          "Q. Good for you.  Can you tell me the address of

3    Upper Kutz?

4          "A. 1498 7th Street.

5          "Q. That's in Oakland?

6          "A. Oakland, California.

7          "Q. You know, you were given a subpoena to show up today.

8    You're here today.  You understand we're here today to talk

9    about the police officer-involved shooting of Sahleem Tindle;

10   correct?

11         "A. Uh-huh.

12         "Q. Yes?

13         "A. Yes.  Sorry.

14         "Q. That's all.  I do it, too.  Normal, conversational

15   tendency is to say 'uh-huh', but depositions are odd.  Anyway,

16   I'm going to ask some questions about what you remember

17   relating to the shooting incident.  Okay?

18         "A. Okay.

19         "Q. Prior to the shooting occurring -- the shooting I'm

20   referring to -- I know from reading your report there were

21   multiple gunshots.  Two different people shot weapons.  So when

22   I -- when I say the word 'shooting' or 'the incident', what I'm

23   referring to is the police officer shooting Mr. Tindle.  Okay?

24         "A. Uh-huh.  Yes.

25         "Q. So prior to the police officer shooting Mr. Tindle,

```
1   what do you remember about the events leading up to that point
2   in time?  So within minutes leading to that incident.
3        "A. Leading up to when the police officer shot him?
4        "Q. Yes, sir.
5        "A. Just gathering the people who was in my shop and in
6   front of the shop and running them to the back of the shop to
7   hide because they were tussling on the ground.
8        "Q. 'They' being Mr. Tindle and Rayvell Newton?
9        "A. Yes.
10       "Q. You know Rayvell prior to this incident happening?
11  You knew who Rayvell was?
12       "A. Yes.
13       "Q. Did you know Sahleem Tindle prior to this incident?
14       "A. I learned his name after the incident.  He's come
15  inside the shop a few times with his son to get his son a
16  haircut.  I saw them.  I was loading up toys Christmas night.
17  They were walking down the street, and I just had some toys.  I
18  remember giving the little boy a couple of toys I had in the
19  back of the truck.  That's the extent.  I just know his face,
20  but I didn't know his name.
21       "Q. Okay.  So on the date of the incident, you recognized
22  Rayvell; correct?
23       "A. Uh-huh, yes.
24       "Q. At that point in time, even if you learned it
25  afterwards, you can tell me that you saw Rayvell in a tussle
```

1    with Mr. Tindle.  Did you recognize that Mr. Tindle -- excuse

2    me.  Did you recognize that that was Mr. Tindle from your prior

3    noticing him, like did you recognize his face as the guy from

4    Christmas when you gave him the toys?

5        "A. Yeah.  Because like you done skipped a whole piece of

6    my statement.  It was clear I had seen -- that I had seen both

7    of them because there was some activity before the tussle even

8    took place to try and prevent the situation from even

9    escalating to a tussle.

10        "Q. You gave the statement to the police officers after

11    the incident?

12        "A. Yes.

13        "Q. You told them what you had observed; correct?

14        "A. Yes.

15        "Q. You tell me.  Do you feel like your memory at the time

16    when you were talking to the officers is better than your

17    memory now of the incident?

18        "A. All I can say is -- all I can really remember is

19    trying to stop it and then I hid my clients.  I hid the

20    barbers.  And then we heard two separate sets of shots.

21    After -- I'm sorry.  Correction.  We heard three sets of shots.

22    The first time we heard a shot, there was just complete

23    silence.  I looked out.  They were still on the ground

24    tussling.  We tried to move out to try to, like, get the gun

25    because it was on the ground, and the gun started moving.  I

1   pushed the people back behind the -- there's like a little

2   wall.  You could see it right there in the picture.  I pushed

3   them back behind the wall again.  That's when we heard, like,

4   three shots.  If you see the bar, you see here in the bar where

5   the bullet hit.  Then the bullet went through the top part of

6   the wall.  I only know that because the police came and got the

7   bullet out a few days later.  That's where we were all hiding,

8   so I never saw anyone shoot.  I just heard them.

9       "Q. I'm going to show the witness page 11.  There's two

10  sets of photographs.  There's a pair of photographs towards the

11  bottom of the page.  There's a pair of photographs towards the

12  top of the page.  Would you agree with me?

13      "A. Yes.

14      "Q. These photographs depict the inside and outside parts

15  of the Upper Kutz Barber Shop?

16      "A. Yes.

17      "Q. And the top pair of photos, they are photos that look

18  like an exterior window that has broken holes through it?

19  That's the window to Upper Kutz; correct?

20      "A. Yes.

21      "Q. Are those holes there from -- caused by gunshots;

22  right?

23      "A. Yes.

24      "Q. From inside the barber shop, there was a -- you said a

25  bullet recovered?

"A. Yes.

"Q. It was recovered from the ceiling or the wall?

"A. The wall.

"Q. The wall?

"A. About right in this area here.

"Q. Prior to this tussle happening, you saw Rayvell walking down the street?"

**THE COURT:** "Correct."

**MR. MORIARTY:** (Reading):

"Q. Correct?

"A. Yes.

"Q. Does Ray go by the name -- do you call him Ray or use the full name Rayvell?

"A. I call him Ray.

"Q. Ray is Mr. Newton. I'm just telling that more for the purpose of the record so we all know who you were talking about.

"A. Okay.

"Q. So you saw Ray walking down the street. Do you remember what street he was walking down?

"A. Chester towards 7th.

"Q. Chester towards 7th. And was he walking with -- was anyone else walking with him?

"A. Mr. Tindle and his kids' mom.

"Q. Okay. And at that point in time when you saw

Mr. Tindle and Mr. Newton, were they saying anything to each

other?

     "A. Yes.

     "Q. What were they saying?

     "A. I don't know.  Arguing.  There was an argument.

     "Q. That would have been my follow-up question.  Even if

you don't know specific words that they were using, they were

in an argument; right?

     "A. Yes.

     "Q. Do you know what they were arguing about?

     "A. No.  They were just -- they were just going back and

forth.  You heard more -- you heard more of the girl than

Tindle.

     "Q. And the girl being Mr. Tindle's child's mother or --

     "A. Yes.

     "Q. Might be his girlfriend or whoever she was?

     "A. Yes.

     "Q. And do you remember anything specific about what she

was saying?

     "A. Not really, man.  I just -- I just seen commotion with

two brothers.  I knew one.  I've seen one.  And all I was going

to try to do is just stop it, especially on my corner, man.  I

tried to keep it as peaceful as possible.

     "Q. Stop things from escalating?

     "A. That was about it.

1       "Q. Do you remember -- you can tell me again if you don't

2  remember.  That's a perfectly fine answer.  Do you remember

3  Tindle's girlfriend or the childs' mother -- I'll just refer to

4  her as the girlfriend, the girl who was with Mr. Tindle.  Do

5  you remember her saying words to the effect of 'go pop him',

6  talking to Ray -- talking about Ray?"

7          **MR. ALLEN:**  I'm sorry, Your Honor.  I've lost the

8  line.

9          **THE COURT:**  Line 6, page 18.

10         **MR. MORIARTY:**  18, line 6.

11         **MR. ALLEN:**  Thank you.

12     "A. I don't -- I don't really -- I don't -- I don't

13  recall.

14     "Q. Do you recall her encouraging Mr. Tindle to fight with

15  Ray?

16     "A. Yeah.  I did hear her say that, but I didn't hear her

17  say 'shoot'.

18     "Q. Or 'pop"?

19     "A. Pop, none of that.

20     "Q. Did you hear her say 'go knock him out' or words to

21  that effect?

22     "A. No.  I think that's what she was probably saying

23  across the street.  And when they crossed the street, I was --

24  I was trying to figure out, like, you know, what happened

25  because I didn't seen him, and I was going to try to catch him

1    again when I saw them again just to talk to them and try to

2    stop it.  I couldn't really make out what they were saying.

3    But you could hear her.  She was extremely loud.

4        "Q. I'm trying to find out if you saw Mr. Tindle and his

5    girlfriend across the street before you saw what we were just

6    talking about, the argument with Ray.

7        "A. No.  They walked right past me.  They walked up on --

8    my back was to them as they were walking up, and I can hear

9    them arguing coming up.  The closer they got to me, I turned

10   around.  I could see all three.  They had to literally walk

11   past me.  Here's my shop.  This is the street.  This is BART.

12   You have to cross over.  So they were coming up Chester towards

13   7th, and I was standing right on the corner.  I have, like, a

14   little wood stool.  Just sitting there.  And about four or five

15   of us is outside talking, and they were coming up the street

16   arguing.  You hear it all the time.  As they got closer, I

17   turned around and looked, boom, it's one of my friends, and

18   it's just a person who had been in the shop.  So I'm listening

19   because there's words, and then I tried to, like -- well, she

20   was really egging Tindle on, the girl was.  I mean, she was

21   really -- the best word I can use is messy.

22       "Q. Messing?

23       "A. Messy.

24       "Q. Messy.  'She' being the girl Tindle was with?

25       "A. Yes.

1        "Q. After they walked past you, at this point in time,

2   what do you remember next?  What happened next?

3        "A. Tindle turned around and started talking to Rayvell.

4   He was in the crosswalk.  That's when he was like 'I should

5   clap your ass'.

6        "Q. Tindle said that to Ray?

7        "A. Yes.

8        "Q. What do you understand 'I should clap your ass' to

9   mean in the vernacular?

10       "A. I guess he was saying it can be either 'whoop your

11  ass' or it could be 'I shoot your ass'.  So what I did in that

12  instance was now that I saw it was about to get ugly, I stepped

13  in between them.  I stepped in between both of them.  I said

14  'not right here, not right here'.  And he walked off.

15       "Q. Tindle walked off?

16       "A. Yep.  Didn't say anything to me.  No foul, no fussing,

17  no yelling.  I was like, 'Bro, not right here.'  I stood

18  between both of them and he walked off.

19       "Q. What happened next?

20       "A. He walked off almost to BART.  That's what I was going

21  to say anyway.  And then she was -- she was in his ear.  But

22  what probably looked like to Tindle was Rayvell telling us

23  something as if he was rallying troops.  So Tindle was trying

24  to -- he gave her in his ear' --

25            THE COURT:  He have --

1          **MR. ALLEN:**  I'm sorry.

2          "A. He have her in his ear, and I'm watching him the whole

3     time, and he's trying to see what's being said on the corner.

4     At that point, I'm learning that the whole dispute was about a

5     pair of shoes.

6          "Q. Who did you learn that from?

7          "A. Rayvell.  I'm like 'What happened?'  He was like,

8     'Man, they were trying to take my shoes.  They thought I was

9     walking back, but I came back on a bike, so I got back fast.'

10    That's what the whole dispute was all about.

11         "Q. During this time, you could see -- tell me if I'm

12    wrong -- you could see that Tindle was looking back towards

13    your direction where Rayvell is telling you guys what happened?

14         "A. Yes.

15         "Q. Okay.  Tell me what happened next.

16         "A. He came back.

17         "Q. Tindle?

18         "A. Tindle came back.  He ran across the street.  Now,

19    everybody is like, 'Hey, don't come back."  Like, 'Stop.  It

20    ain't worth it.'

21         "Q. Telling that to Tindle?

22         "A. Yes.

23         "Q. Okay.  Then what happened?

24         "A. Then he came back, and Rayvell went into the

25    restaurant next door, and he pulled out his phone, man.  I

1  didn't get what he was doing with that.

2      "Q. 'He' being Tindle?

3      "A. Tindle, yeah.  He was recording, but he was like

4  really upset.  So no one wanted to move, and he had his left

5  hand in his -- he had his left hand in his pocket.  He chased

6  him into the restaurant, and then he came out, and then he

7  turned the camera on everybody.  It was like, 'I need all you

8  niggas' faces.'

9      "Q. Did he tell you why he was doing that?

10      "A. No.

11      "Q. Did you have a belief based on --

12      "A. No.

13      "Q. Had you ever seen that happen before?

14      "A. No.  I never seen anything like that.

15      "Q. After he tells you he needs all your faces, could you

16  see what was in his left pocket with his left hand?

17      "A. I was trying but was trying not to move, man.

18      "Q. You were?

19      "A. Yeah.  Didn't want to make a sudden move because that

20  situation got real.  It was real antsy real fast.

21      "Q. At that point in time, did you think Mr. Tindle was

22  armed with a gun just based on what you observed?

23      "A. I don't know.

24      "Q. Okay.  That's fair.  Like I told you, 'I don't know'

25  is a fine answer.  What happened next?

1          "A. That's when Rayvell come running out of the restaurant

2     and tackled him.

3          "Q. Rayvell tackled Tindle?

4          "A. Yes.

5          "Q. Did Tindle go down to the ground?

6          "A. Yes.

7          "Q. Did Rayvell go down on the ground with him?

8          "A. Yes.

9          "Q. So now they're both on the ground.  Are they tussling?

10         "A. Yes.

11         "Q. Does anyone exchange blows?  Did anyone punch anyone

12    in the face?

13         "A. No.  Rayvell was trying to get to the left hand.  He

14    was intentionally trying to grab the hand.

15         "Q. Explain to me what you saw with Rayvell trying to go

16    for Tindle's left hand.

17         "A. That's it.  Because when that jumped off, I had a -- I

18    had an elder lady and her two grandkids and then two other kids

19    that were there and then barbers and then like some older men

20    who were outside.  When they started tussling, I'm looking at

21    the hand, Rayvell trying to get to the hand, and Tindle trying

22    to move the hand.  I wasn't trying to see no more.  My focus

23    was to get the people out from right here because we were all

24    literally like how close we were.  That's just how close we all

25    were standing to the tussle.  So I ran everybody back into the

barber shop, ran everybody behind a little wall that I have,
put everybody on the ground.  I'm going to just lay it out for
you.  We heard one shot; complete silence.  We look out.  They
were still tussling.  You see the gun.  So I'm like -- I
tell -- I tell one of the other customers 'let's take the gun
and call the police.'  But the gun started moving.

"Q. Who had the gun?

"A. You couldn't really tell.  It was on the ground.

"Q. Were Ray and Tindle fighting over the gun?

"A. No.  Ray was just like, 'Come and take it.  Come and
take it.  I got him pinned down.'  That was all of that.
That's the end.  That's all I know.  Once they started wiggling
on the ground again, I pushed everybody to the back.

"Q. Got it.  So at that point in time when you described
the gun is on the ground, is the gun by itself, by itself
meaning no one is holding it?  It's on the sidewalk?

"A. No, no, no, no.  It's in the hand, but they're
tussling.  It's not like oh, it's in the light-skinned hand or
it's in the dark-skinned hand.  No.  It's a gun being
recklessly moved in two hands between two people tussling.  I
got innocent people that I need to be concerned about, so my
focus was get them out of the sight of the gun.  Once I saw the
gun, I just wanted to get the people out of the way.

"Q. I understand.

"A. You have two people tussling.  'I'm letting you know

1   I'm about to touch you.'  This is what it like.  So I don't

2   know who have -- who have what on the ground, but I just know I

3   saw a gun, and I had innocent people who had nothing to do with

4   any of it.

5       "Q. I understand.  Ray is telling you 'I've got him pinned

6   down, take it'?

7       "A. Uh-huh.

8       "Q. But at that point, you see that there's still an

9   ongoing tussle.  Your concern is about the innocent folks with

10  you?

11      "A. Yes.

12      "Q. Before you saw Ray tackle Mr. Tindle, did you see

13  Mr. Tindle take the gun out of his left pocket?

14      "A. He never pulled the gun out.

15      "Q. Tindle?

16      "A. When I stepped between them and the crosswalk, I could

17  see the handle.  That's what made me step in between them.

18      "Q. You could see the handle of the gun?

19      "A. Yes.

20      "Q. In Tindle's pocket?

21      "A. Yes.

22      "Q. Was it in his left pocket?

23      "A. I would say yes.

24      "Q. Okay.  It's fair to say it's in one of his pockets you

25  saw the handle of the gun?

1    "A. Yes.  That's when I said 'stop' and he left.

2    "Q. Got it.  There's the first shot.  Silence.  You come

3    back out, and you see that the tussle is ongoing.

4    "A. Uh-huh.

5    "Q. There's the -- there's the gun.  You got your folks

6    back inside the barber shop for protection; correct?

7    "A. Yes.

8    "Q. Okay.  Then what happens after that?

9    "A. So I get everybody back into the back, and then I

10   heard about three shots, boom-boom-boom-boom.  I mean,

11   boom-boom-boom.  That's what I heard.  Now, when I looked at

12   the ground, they have more little numbers down there, but I can

13   hear three shots, boom-boom-boom.

14   "Q. And after you heard those three shots, did you hear --

15   what did you hear next?

16   "A. Silence for a few seconds.  Just literally maybe

17   like -- I don't know.  Maybe three or four, five seconds.  Then

18   you heard boom-boom, 'stay down.'  That's when I came out.

19   That's when we all came out.  Didn't see -- didn't see him

20   shoot.

21   "Q. Meaning you didn't see the officer shoot Mr. Tindle?

22   "A. No.  Didn't see any of it.

23   "Q. So for the first gunshot, you didn't see that?  You

24   just heard it?

25   "A. For the record, I saw not one shot.

1      "Q. Thank you.

2      "A. I didn't see one.

3      "Q. After the -- after you heard the -- was it boom-boom,

4 'stay down,' and then you came outside?

5      "A. Yeah.  I just knew that.

6      "Q. Why don't you tell me again.

7      "A. Boom-boom-boom.  First it was one shot.  Then the

8 second time it was three shots I heard.  That's when we back --

9 that's when we went back behind the wall the second time.  The

10 last set of shots I heard was two, pop-pop, 'stay down,' and

11 then I came out.  That's when I saw the police uniforms.  I

12 didn't know if it was OPD or BART police or housing authority.

13 I didn't know who it was.  I just seen -- I just knew the words

14 were some kind of law enforcement.  Then I saw it was BART

15 police.

16      "Q. Before you heard the 'stay down,' did you hear any

17 other similarly authoritative voice say something like 'show me

18 your hands, show me your hands'?

19      "A. No.  I didn't hear.  I didn't hear anything.  When I

20 watched the video to hear all that, I didn't hear none of that.

21 You have -- you have literally six, seven, maybe eight people

22 trying to get into this space, and I have, like, these

23 Craftsmen toolboxes in the back so all you can hear back there

24 where we were in is like boom-boom, boom-boom-boom, like people

25 was running in.  You know, you hear feet.  So a voice with the

1   window closed outside I know I wouldn't be able to hear -- I

2   ain't hear nothing, but you can hear the gunshots.

3        "Q. Got it.

4        "A. You can hear the gunshots.

5        "Q. After you come outside, the point in time I'm talking

6   about is after you hear 'stay down' and you come outside, after

7   that point in time, did you tell anyone what happened?

8        "A. What you mean?

9        "Q. Did any other witness come up to you and say 'Hey,

10  Mr. Evans, I saw X, Y, Z'?  Did anyone tell you what went down?

11       "A. No one was out there.  So if they say -- if somebody

12  say they saw something, they're lying.  There wasn't nobody

13  outside but me and the people that I was -- that I was talking

14  to.  I have had a lot of people, man -- and I hate to see that

15  two brothers ended up in that situation, but I've had a lot of

16  people come to me telling me they saw, and there was no one

17  outside.  The commotion, although it was loud, it was on the

18  corner.  It wasn't -- it wasn't like -- it was only loud

19  because I was in it.  I was right there.  You know what I'm

20  saying?  And there was nobody.  There was nobody standing

21  outside.  And there was -- there was nothing to pay attention

22  to until you heard the gunshots.  So like in the video when you

23  saw the girls running back inside saying 'they're shooting,'

24  that should have been -- that should have been anybody else's

25  response if they were standing outside because you heard

1   gunshots and you just took off running.  There was nobody on

2   the corner.

3       "Q. What video is that?

4       "A. Well, the one from the officer's chest cam they

5   showed.  They showed them asking the girl like 'What happened?'

6   She's like, 'They're shooting.'  That's when you know on the

7   video, it show him running across the street.

8       "Q. Did you see that video on the news?

9       "A. Yes.

10      "Q. Which can include --

11      "A. YouTube.

12      "Q -- social media on YouTube?

13      "A. Yeah."

14         **THE COURT:**  You may proceed.

15         **MR. NISENBAUM:**  Thank you, Your Honor.

16      "Q. Good afternoon, sir.

17      "A. How you doin'?

18      "Q. Pretty good.  You started testifying that you heard

19   one shot and then silence?

20      "A. Uh-huh.  Yes.

21      "Q. And then some time later, you heard three shots in

22   rapid succession?

23      "A. Yes.

24      "Q. How long in between the one single shot -- what was

25   the time frame between that one single shot and the three

1   successive shots?  Do you know how much time passed?

2       "A. I'm going to say probably the whole -- the whole

3   situation from the first shot to the officer probably was less

4   than two minutes.  Maybe two minutes at the most.  I'm really

5   guesstimating because I'm saying there was a space.  I ain't

6   saying it was no lengthy space.  There was just a pause.  Shot.

7   Pause.  Three shots, pause.  Two shots, 'stay down.'

8       "Q. Okay.  So let me ask, in between the time of the first

9   shot and the three successive shots, did you hear anyone

10  announce themselves as police?

11      "A. No.  Not in the first three shots.

12      "Q. Did you hear in that time frame any commands such as

13  'Drop it, show me your hands'?  Anything?

14      "A. No.

15      "Q. How much time elapsed between the three rapid shots

16  and the two final shots?

17      "A. Man, I really want to say like less than a minute.

18  Like, all that stuff seemed like it was all going fast.  It

19  really seemed like it was going fast.  Like the first shot and

20  then when I peeked out, we tried to go and get it, that was

21  probably like the longest.  Because they were tussling and we

22  were trying to get to the door.  Shit, I wish I would have made

23  it.  We were trying to get to the door.  That's the longest in

24  between time.  When the gun started moving, I didn't look to

25  see who had it.  My thing was let me not get shot and let me

make sure nobody else gets shot.  Then we went to the back.

    "Q. Gotcha."

        **THE COURT:**  Wait.  "Then we went back to the back."

        **MR. ALLEN:**  Sorry.  "Then we went back to the back."

        **MR. NISENBAUM:**  (Reading):

    "Q. Gotcha.

    "A. That was the longest stretch of time.

    "Q. Where do you preach at?

    "A. Word Assembly.

    "Q. Where is that located?

    "A. East Oakland.  1445 23rd Avenue."

        **THE COURT:**  Okay.  Thank you.  You can step down, Mr. Allen.

    Mr. Allen, as you're going past the mic, does the defense rest?

        **MR. MORIARTY:**  Yes.

        **MR. ALLEN:**  The defense rests, Your Honor.

                (Defense rests.)

        **THE COURT:**  Any rebuttal, Mr. Burris?

        **MR. BURRIS:**  No, Your Honor.

        **THE COURT:**  No rebuttal.  Okay.

    Ladies and Gentlemen, that concludes the evidence for phase 2.  We are going to go ahead and take just a short 10-minute break or so.  The attorneys will get set up.  You will start hearing closing arguments on this phase.  Okay?

1          We'll stand in recess for about 10 minutes.

2          (Proceedings were heard out of presence of the jury:)

3          THE COURT:  I assume we have -- no.  No motions at

4     this phase?

5          MR. ALLEN:  No.  It's the negligence phase,

6     Your Honor.

7          THE COURT:  We will stand in recess for about 10

8     minutes.

9                    (Recess taken at 1:57 p.m.)

10                   (Proceedings resumed at 2:11 p.m.)

11         THE COURT:  Let's call the jury in.

12         (Proceedings were heard in the presence of the jury:)

13         THE COURT:  We're back on the record.  The record will

14    reflect that the jury is with us.

15                      **JURY INSTRUCTIONS**

16         THE COURT:  Ladies and Gentlemen, I will now instruct

17    you on the law that applies specifically to phase 2.  I will

18    not repeat all of the prior general instructions that I

19    provided to you for phase 1; however, those apply to this phase

20    as well, and you will remember that you still should have a

21    copy of those instructions that I used to instruct you last

22    week in your binder.

23         So in this phase, the plaintiffs bring a second claim.

24    This one for negligence under California law for the use of

25    unreasonable force by a law enforcement officer in the arrest

1   or other seizure of a person.

2        Under California law, a law enforcement officer may use

3   reasonable force to seize a person when the officer has

4   reasonable cause to believe that that person has committed or

5   is committing a crime.

6        However, the officer may only use that degree of force

7   necessary to accomplish this seizure.

8        Plaintiffs claim that defendant, Joseph Mateu, used

9   unreasonable force in seizing decedent, Sahleem Tindle.

10       To establish this claim, plaintiffs must prove all of the

11  following elements:

12       One, that defendant, Joseph Mateu, used force in seizing

13  decedent Sahleem Tindle.

14       Two, that the amount of force used by the defendant was

15  unreasonable.

16       Three, that plaintiffs were harmed.

17       And, four, that defendant, Joseph Mateu's use of

18  unreasonable force was a substantial factor in causing

19  plaintiff's harm.

20       In deciding whether Joseph Mateu used unreasonable force,

21  you must consider all of the circumstances of the seizure and

22  determine what force a reasonable police officer in Defendant

23  Joseph Mateu's position would have used under the same or

24  similar circumstances.

25       Among the factors to be considered are the following:

1      Whether Decedent Sahleem Tindle reasonably appeared to

2  pose an immediate threat to the safety of Defendant Joseph

3  Mateu or others; two, the seriousness of the actual crime at

4  issue.  Next, whether Decedent Sahleem Tindle was actively

5  resisting seizure or attempting to avoid seizure by flight.

6  And Defendant Joseph Mateu's tactical conduct and decisions

7  before using deadly force on decedent Sahleem Tindle.

8      The defendant asserts that the decedent, Sahleem Tindle's,

9  own negligence contributed to his death.  Under California law,

10 to succeed on this affirmative defense, the defendant, Joseph

11 Mateu, must prove both of the following elements:

12     One, that decedent, Sahleem Tindle, was negligent; and,

13 two, that decedent, Sahleem Tindle's, negligence was a

14 substantial factor in causing his death.

15     If Defendant Joseph Mateu proves the above, then

16 plaintiffs' damages are reduced by your determination of the

17 percentage of Decedent Sahleem Tindle's responsibility.  I will

18 calculate the actual reduction.

19     Now, under California law, a person can be negligent by

20 acting or by failing to act.  Decedent Sahleem Tindle is

21 negligent if he does something that a reasonably careful person

22 would not do in the same situation or fails to do something

23 that a reasonably careful person would do in the same

24 situation.

25     You must decide how a reasonably careful person would have

1    acted in Decedent Sahleem Tindle's situation.

2         Every person has a right to expect that every other person

3    will use reasonable care and will not violate the law unless he

4    or she knows or should know that the other person will not use

5    reasonable care or will violate the law.

6         Under California law, there is or can be a presumption of

7    negligence.  You must decide whether Decedent Sahleem Tindle

8    violated California Penal Sections 25400(a)(2) or 25850(a) or

9    29800(a)(1) or 417(a)(2) as I define them in a moment and

10   written below; and, two, whether the violation or violations

11   was or were a substantial factor in bringing about the harm.

12        If you so find, then you must find that Decedent Sahleem

13   Tindle was negligent.  If you find that Sahleem Tindle did not

14   violate California Penal Code Sections 25400(a)(2), 25850(a),

15   29800(a)(1), or 417(a)(2), or that the violation or violations

16   was or were not a substantial factor in bringing about the

17   harm, then you must still decide whether Decedent Sahleem

18   Tindle was negligent in light of all the other instructions.

19        Those Penal Code sections are as follows:  California

20   Penal Code Section 25400(a)(2) states a person is guilty of

21   carrying a concealed firearm when the person does any of the

22   following:  Carries a concealed, upon the person, any pistol,

23   revolver or other firearm capable of being concealed upon that

24   person.

25        California Penal Code Section 25800(a) states in pertinent

part a person is guilty of carrying a loaded firearm when the person carries a loaded firearm on the person or in a vehicle while in a public place or on any public street in any incorporated city or in any public place or on any public street in a prohibited area of unincorporated territory.

California Penal Code Section 29800(a)(1) states in pertinent part, any person who has been convicted of or has an outstanding warrant for a felony under the laws of the United States, the State of California, or of any other state, government, or country is guilty of a felony.

And California Penal Code Section 417(a)(2) states in pertinent part, every person who, except in self-defense, in the presence of any other person, draws or exhibits any firearm, whether loaded or unloaded, in a rude, angry, or threatening manner or who, in any manner, unlawfully uses a firearm in any fight or quarrel is guilty of a misdemeanor.

Now, under California law, a substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm.  It must be more than a remote or trivial factor.  It does not have to be the only cause of the harm.

A person's conduct may combine with another factor to cause harm.  If you find that Defendant Joseph Mateu's conduct was a substantial factor in causing Decedent Sahleem Tindle's death, then he's responsible for the death.  Defendant Joseph

Mateu cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing the death of Decedent Sahleem Tindle.

Defendant Joseph Mateu claims that he was not negligent because he acted with reasonable care in an emergency situation.  Defendant Joseph Mateu was not negligent if he proves all of the following three elements:

One, that there was a sudden and unexpected emergency situation in which someone was in actual or apparent danger of immediate injury; two, that Joseph Mateu did not cause the emergency; and, three, that Joseph Mateu acted as a reasonably careful officer would have acted in similar circumstances, even if it appears later that a different course of action would have been safer.

If you decide that plaintiffs have proved their claim under California law against Defendant Joseph Mateu for the death of Decedent Sahleem Tindle, you must also decide how much money will reasonably compensate plaintiff for his death.  This compensation is caused damages.

Plaintiffs do not have to prove the exact amount of the damages.  However, you must not speculate or guess in awarding damages.  The damages claimed by plaintiffs fall into two categories called economic damages and non-economic damages. You will be asked to state the two categories of damages separately on the verdict form.

1      Plaintiffs claim the following economic damages:  Funeral

2  and burial expenses.  Plaintiffs also claim the following

3  non-economic damages:  The loss of Decedent Sahleem Tindle's

4  love, companionship, comfort, care, assistance, protection,

5  affection, society, and moral support and the loss of Decedent

6  Sahleem Tindle's training and guidance.

7      According to the National Vital Statistics Report, Volume

8  68, No. 7, from June 24, 2019, a 28-year-old male is expected

9  to live approximately another 50 years.  This is the average

10  life expectancy.  Some people live longer and others die

11  sooner.

12      This published information is evidence of how long a

13  person is likely to live but is not conclusive.  In deciding a

14  person's life expectancy, you should also consider, among other

15  factors, that person's health, habits, activities, lifestyle,

16  and occupation.

17      No fixed standard exists for deciding the amount of

18  non-economic damages.  You must use your judgment to decide a

19  reasonable amount based on the evidence and your common sense.

20      In determining plaintiffs' loss, do not consider, one,

21  plaintiffs' grief, sorrow, or mental anguish; two, Decedent

22  Sahleem Tindle's pain and suffering; and, three, the poverty or

23  wealth of plaintiffs.

24      You must not include in your award any damages to punish

25  or make an example of Defendant Joseph Mateu.  Such damages

1    would be punitive damages, and they cannot be part of your

2    verdict.  You must award only the damages that fairly

3    compensate plaintiffs for their loss.

4        Okay.  At this point, I will invite the plaintiffs,

5    Mr. Nisenbaum, to give a closing argument.

6            **MR. NISENBAUM:**  Thank you, Your Honor.

7                    **CLOSING ARGUMENT**

8            **MR. NISENBAUM:**  And Happy Tuesday, Ladies and

9    Gentlemen of the jury.  We are finally reaching the end,

10   although it feels like it went by pretty quickly.

11       There is a lot of evidence that came before you.  I think

12   the most critical evidence you've likely already addressed.  As

13   I indicated in my opening statement, there is an additional

14   component in the negligence claim for wrongful death, and that

15   really incorporates and gives greater emphasis to the

16   defendant's own negligent tactical conduct and his actions that

17   precede the shooting.

18       Now, you've heard a lot of this before, but I can't

19   emphasize strongly enough that under California law, they have

20   more bearing here, and that is not giving a warning, and of

21   course we know that that's wrong.  If he couldn't see, not

22   taking steps to get a better view, but, again, we know that he

23   could see.  So he could see there was still a struggle going on

24   over the gun, so there's that, too.  If there is still a

25   struggle going on over the gun and a man is showing you one

1    hand when you're yelling at him to show his hands, what is the

2    man supposed to do?  It's very obvious.  He can't show the

3    other hand.

4         What the officer is not supposed to do, shoot him in the

5    back multiple times.  That's negligent.  It's negligent because

6    it violates the officer's training and standards.  You heard it

7    from the officer himself, and, again, I don't want to rehash

8    everything, and it's, frankly, beyond belief.  You are giving

9    him orders to show his hands.  His hand comes out.  You give

10   him no chance.  You shoot him in the back.  It doesn't make any

11   sense because the officer wasn't thinking.  He wasn't

12   evaluating.  He was simply reacting, and he killed a man

13   because of it.

14        Later you heard him say, "Well, he was getting up and it

15   was my error."  Well, of course we know he wasn't getting up.

16   Yes, it was your error, but that's an error you can't take

17   back.  That's a negligent error.  You don't see things that

18   don't happen.

19        So making that error, not stepping to the right to get a

20   better view after losing sight of the gun, but, again, he could

21   see.

22        There is another point here, and we heard some testimony

23   in the previous phase from Mr. Papenfuhs about an unintentional

24   discharge, a discharge that can happen when people are

25   struggling over the gun.  Now, it's clear that we heard the

1    sound of two gunshots in rapid succession.  So who is the

2    witness here?  Who is the witness who saw these gunshots?  And

3    I'm going to tell you how important this is in this phase of

4    the case.  There is something that changes.  The burden of

5    proof with respect to the comparative fault with respect to

6    Mr. Tindle's own negligence, now the defense has it.  Now the

7    defense must prove Mr. Tindle's negligence.  So it's not enough

8    to simply say well, Mr. Tindle had a gun and shots went off;

9    therefore, that's on him.  No.  It's not enough to simply say

10   Mr. Tindle fired -- took to the streets, armed himself and took

11   to the streets of Oakland, and that's that.  That's not enough.

12   That's not the negligence that is the substantial factor here.

13        If this officer reacts in a responsible way, according to

14   his training, Mr. Tindle completes the surrender -- and, by the

15   way, what are you supposed to do when an officer tells you to

16   "show your hands"?  Show your hands to the best of your

17   ability.  So how is it negligent to show your hand, the only

18   hand that you can?  It's the opposite of negligent.

19        So the officer, it is on him.  That misperception is huge,

20   again, and it looms large over this case as it did in the

21   preceding phase of the case.  Mr. Tindle was obviously not

22   standing up, and we all know that.  Mr. Tindle was trying to

23   surrender.  That's very clear.  He was trying to do what you're

24   supposed to do.  We saw that in the video.  He rolls over to

25   his back.

1      So did he start this fight?  We've heard some evidence in

2  the form of deposition testimony, and you've heard from

3  Ms. Turner herself.  It sounds like obviously there was an

4  issue between Mr. Newton and -- and the other man -- Mr. Tindle

5  and Mr. Newton.

6      Mr. Newton apparently has one side of it, but he didn't

7  come here to tell you that side.  You didn't hear it from him.

8  You got to -- you heard it kind of secondhand through

9  Mr. Newton's friend, who referred to himself as Mr. Newton's

10  friend, the barber, saying that's what he told me.  Well, of

11  course the barber didn't see that.  He didn't see how this

12  thing started, but we have Mr. Tindle's own words, his own

13  dying declaration.  And in case you missed it in the opening

14  statement, I would like to play that again at this point.  And

15  this is Plaintiffs' Exhibit 10B, as in "boy."

16      It starts into the incident so we're not going to waste a

17  lot of time here.  Hopefully.  If you need a moment, I can --

18  okay.  Thank you.

19           (Whereupon, the video was played.)

20      **MR. NISENBAUM:**  That was his voice: "He started it,"

21  pointing him out.  "He started it."  His dying declaration, the

22  last words that he would ever speak.  They tell us who started

23  it.  We've heard -- like I said, in a sense Mr. Tindle has come

24  into court to say this.  There he is.  And there's his hands.

25      I can only imagine what it must feel like to shoot a man

1    in the back who was trying to surrender.

2         Now, with respect to whether or not this was an

3    unintentional discharge, where's the proof from the defense?

4    Where is their witness?  Where is there person to say that

5    Mr. Tindle pulled this gun out?  Where is there person to say

6    that Mr. Tindle pulled the trigger?  We don't have that.  What

7    we have is speculation and inference.

8         Now, I'm not telling you you can never decide a case based

9    on circumstantial evidence, but is there a tiebreaker here?

10   And, again, the burden is theirs.

11        So Mr. Tindle, according to Mr. Evans, had a gun in his

12   pocket, and if he did and if you find that that is credible,

13   then that's certainly a piece of negligence against Mr. Tindle,

14   and so, you know, we're not here telling you he has no fault.

15   It takes two to fight.  It takes two to argue.  Remember this,

16   though.  Mr. Evans was out there calming the situation down,

17   and Mr. Newton was in the restaurant and came running out of

18   the restaurant and tackled Mr. Evans -- not Mr. Evans --

19   Mr. Tindle.  Mr. Newton came out of the restaurant and tackled

20   Mr. Newton.  And that's when they went to the ground and where

21   ultimately the struggle happened.  That's what happened.

22        Now, if we go back to back, if you think about he started

23   it and you think about running out and tackling a person, well,

24   that might cause you to think the person who ran out of the

25   restaurant and tackled him started it.

You know, what about this issue around shoes?  "They were trying to take my shoes."  Where is the evidence of that?  We don't have any evidence of that, period.  So you don't have that.

So what you have is a person who clearly should not have a gun, and if you find that he had a gun, he has fault for that.  When that gun came out, how it came out, nobody here can say.  If it fell out, if after being tackled Mr. Newton -- Mr. Tindle felt like he was being severely threatened and maybe he had a gun for protection, and maybe he thought -- you know, maybe somehow it came out.  I don't know the answer to that and neither do you.

What we know, at some point, the gun came out.  It was obviously after they were on the ground.  If the gun is in a pocket, how can it come out?  It can be pulled out or it can fall out.  But, again, it's up to the defense to prove it.

So who pulled the trigger?  Nobody here can tell you the answer to that.  What we do know, remember the oblique angle?  This is what is so important in the first phase.  The oblique angle that the officer claims he saw the gun angled upward at -- angled upward, I think was the analysis.  And you have the two shots through the window glass.  Now they want to tell you it's one shot and the bullet shattered.  Well, we heard two shots.  We have two shots through the window glass.  Somehow we only have four bullets and four shell casings when there should

be five.  I don't know what that is about.  I bet you if you were to examine that wall closely, you would might find another slug in that wall because you have two holes in the window.

**MR. MORIARTY:**  Objection.  Speculation.

**THE COURT:**  Sustained.

**MR. MORIARTY:**  My mic is off.

**THE COURT:**  Excuse me?  We'll turn it on.

Ladies and Gentlemen, there is no evidence of that.  It's speculation.

**MR. NISENBAUM:**  Thank you.

In any event, there is evidence that they only recovered four of the bullets and four of the shell casings.

So when you look at it, this is an officer who failed to take any measures to find out what happened.  This is an officer who failed to recognize obvious surrender when it did happen.  This is an officer who later told investigators that Mr. Tindle was getting up and that was a very thing that caused the situation to change to a shooting situation, when the evidence shows the opposite is true.  He was surrendering.

So I think you have clear negligence.  I told you in the opening phase we're not saying that Mr. Tindle is blameless. We accept some negligence, some culpability for him because he should not have got himself involved.  He shouldn't have had a gun.  I told you we will never make an excuse for that, and we don't.  But that negligence pales in comparison to the

1   officer's own negligence, running up on someone, shooting them

2   in the back three times, killing them.  Again, what is the

3   harm?  You let the surrender happen.  Everyone lives.  You kill

4   a man, he's dead.  He's never coming back.

5        There is simply no comparison, in my view.  You know, is

6   it 10 percent, maybe 15 percent negligence for Mr. Tindle?  I

7   don't think it's any more than that, though.

8        What I would like to do now is take a brief moment to talk

9   to you about the damages, the remaining damages in this case.

10       Now, you have heard that Mr. Tindle cared deeply about his

11  family, and you know it not just from his family members who

12  said so, but Mr. Evans, how did he know Mr. Tindle?  Because

13  Mr. Tindle took his son to get his haircut there.  What's he

14  doing?  Mr. Tindle, who walks his kid to school every morning,

15  where is he walking him to the few times that Mr. Evans had

16  seen him before this?  To the barber shop.  He's with his son

17  getting his -- getting him to get a haircut.  Now -- and

18  multiple times, of course.

19       I would like to show you some of the photographs that

20  we've seen.

21       If I could have the ELMO, please.

22       This is 7A.  It's easy to forget the human being behind

23  all this argument.  But that's him.  That's Mr. Tindle.  There

24  we go.

25       Let's look at 7B.  This is a black-and-white photo.  There

1    we go.  Family.

2         Look at 7C.  We know that Mr. Tindle worked.  We're not

3    here asking you for an award of wage loss.  But he did work.

4    He did keep jobs when he could.  He was a felon, as you've

5    heard.  It's hard to get a job.  But he worked when he could.

6    And there he is with his son again.

7         7D.  I mean, there are so many.

8         7E at Lake Merritt.

9         Teaching his son to swim, life skills that you want to

10   pass on to your kids.  One of the factors that you will hear on

11   damages -- that you did hear, loss of -- we call it loss of

12   care, comfort, and society.  There is a lot more factors to it.

13   Training and guidance is one of them.

14        Now, you have heard that there were domestic issues

15   between Mr. Tindle and Ms. Turner.  But guess what?  Ms. Turner

16   is not here trying to recover for her relationship, her lost

17   relationship with Mr. Tindle.  That's not a part of this

18   equation.  Whether they had a bad relationship, that's not a

19   part of this equation.  Whatever relationship they had, it did

20   not stop Mr. Tindle from being the father that he demanded of

21   himself.

22        This is 7O.  Again, there we know that he spent time away.

23   That he was in custody.  You know, he was a felon.  San

24   Quentin, but still a father who -- who brought Ms. Turner --

25   you've heard all about how bad their relationship must have

1    been.  I guess that was the totality of it.  Right?  All the

2    bad stuff you heard, the police being called.  There was a lot

3    more to their relationship and a lot more to Mr. Tindle than

4    what he has been painted as.  This is a man who cares, cares

5    about his family.  Cares about getting a job.  Trying to

6    support his family.  And cares about the training and guidance

7    that he received from his parents that he could then pass down

8    to his children.  But now he can't.

9         So, like I said, I don't want to take up a whole lot of

10   time on this.  I think there is really no question.  First

11   Mr. Newton started it at the beginning.  Of course there is no

12   excuse for Mr. Tindle doing what he did, reacting that way.

13   You walk away.  That's the example that you should set.  But at

14   the end of the day, the person who bears the most liability and

15   the most responsibility by far is the officer who failed in his

16   fundamental training.  Didn't give -- who didn't give -- didn't

17   give warnings, who gave commands, and when a person tried to

18   comply with it, shot him in the back.  Who relied on the look

19   on one person's face when he couldn't see the other person's

20   face.

21        So it seems to me that you don't get to say simply "it was

22   my error."  You know, you don't get to say that.  You can say

23   that, but it's not an excuse.  It doesn't relieve you of your

24   obligation to be held accountable, to be held responsible to

25   the standards that you are trained for, to the standards that

1    you accepted.  This officer accepted these standards when he

2    took the job.  He told you he knew what the standards were.  He

3    identified them all.  You know -- and again, all the practical,

4    if reasonable, but what's not reasonable about giving a

5    warning?  What's not reasonable about letting a surrender

6    happen?  When you could tell there was still a struggle going

7    on over the right hand and right side, what is reasonable about

8    shooting Mr. Tindle in the back?  I'll tell you what it is,

9    absolutely nothing.

10        So there are damages here, too.  There's about $10,800 in

11    economic damages for the funeral and burial expenses.  You've

12    heard that testimony.  Of course it is what it is.  That's what

13    it was.

14        And then there are damages for Mr. Tindle's children.

15    There are damages for the kids who have lost their father, one

16    who will almost never know her father, will be reminded of him

17    but never have the real sense and opportunity to get to know

18    the type of man that he was.

19        But his son -- and everyone here has heard about how hard

20    it is to raise a son without a father.  His son has lost

21    everything.  His father cannot be there.  He's not there for

22    his martial arts tournaments, not there for every event in

23    life.  Not there to help him through the hard times when he

24    grows to be a teenager.  Not there to tell him, "Son, I went

25    down a bad path.  Don't take the path I took.  Don't take that

1    path.  Don't get yourself in San Quentin."  You know, "Don't be

2    a felon.  I'm doing all this work for you so you don't take

3    that path, and I can tell you what to avoid doing, and I can

4    show you the type of man my mom raised me to be and where I let

5    her down."

6        But it's up to you now to make a decision and determine --

7    again, I can't tell you what amount of money is a fair amount

8    of money to pay for a father's death.  I can't do that,

9    especially for such young kids.  If I knew, I would.  I don't.

10   I know it's -- I know it's terrible.

11       Thank you.

12              THE COURT:  Defense.

13           MR. MORIARTY:  Thank you, Your Honor.

14                        CLOSING ARGUMENT

15           MR. MORIARTY:  Good afternoon, Ladies and Gentlemen.

16   Thank you very much for your time and for your patience.  It's

17   clear to everyone that you're taking your job very seriously,

18   and we appreciate the time that you're away from your families

19   and from your jobs and how difficult it is to be a juror,

20   especially on a very serious case like this, so I'd like to

21   thank you very much.

22       As you're aware, Ladies and Gentlemen, the first phase of

23   the trial was the civil rights phase, and you reached your

24   verdict based on what was known to Officer Mateu at the time

25   of -- at the time that he shot Mr. Tindle.  And I would just

guess, not having been in the deliberations, that your

deliberations focused on all the details surrounding the

shooting.  You probably took a close look at the video.  There

was undoubtedly discussions about the gun, who held it, and

whether, in fact, Officer Mateu's shooting was reasonable at

the time with the information he knew.

Now, at this point, you know so much more about the story,

about the events that led to the death of Mr. Tindle.  You know

it's not as simple of a situation as was presented to you

before.  You know it's not as simple as the deliberations the

first time when you considered what the testimony of

Officer Mateu was and compared that to the video and applied

the elements for the civil rights claim.

I want to be clear on what your job is now for this

verdict, for this time you deliberate.  You will be able to use

all the evidence that's presented in the case, the evidence

presented in the first phase of the case, the evidence

presented in this second phase of the case.

I want to remind you that you can only use the evidence

that is presented in the courtroom.  You can't speculate.  You

can't wonder.  You can't say, "I wonder if a certain person

came in, what he or she would say.  I wonder if there's another

angle."  You can't speculate.  It's only what is in the

courtroom.  Because you use that evidence, you determine what

the facts are, and you apply it to the law that the judge

1    instructed you on.

2          The most important part of this case is the most difficult

3    part of the case for you, and that's what I described for you

4    when we started the case in *voir dire*, and that's emotions.

5    Your job is undoubtedly difficult because someone has died.

6    That's the reason why we're here.  And Mr. Nisenbaum and later

7    Mr. Burris are going to ask you to give a verdict that includes

8    damages and award damages for that death.  And as you know,

9    Ladies and Gentlemen, when I talked to you during jury

10   selection, with death comes emotion.  There is no question

11   about that.  Someone is no longer with us, and no one wanted

12   that person to die.

13         But I just need to remind you, before I get into why we're

14   here and what happened, that your verdict has got to be based

15   on the facts that you determine based on the evidence that was

16   presented in the courtroom and the law the judge gives you, and

17   you've got to try your best to take the emotions out of your

18   decision.  You've taken an oath to follow the law, and sympathy

19   just doesn't have any place in the deliberations and your

20   verdict.

21         At this point, I'd like to walk you through the evidence

22   that you're going to use to determine who is legally

23   responsible for Sahleem Tindle's death.  And, Ladies and

24   Gentlemen, this story does not begin when Officer Mateu hears

25   the gunshots.  It does not begin when he runs across the

1    street.  It does not begin when he sees the gun and has to make

2    a decision.  The story began years before January 3, 2018.

3        Mr. Nisenbaum just said that Mr. Tindle was a man who

4    cared.  Again, you have to distinguish the words of an attorney

5    from what evidence has come in.  The words of attorney -- my

6    words right now are not evidence.  This is my interpretation of

7    what the evidence is and the law.  But you have to question

8    words like this, that Mr. Tindle was a man who cared, and we

9    have to peel back the story to try to figure out how we got

10   here.

11       And what we learned, Ladies and Gentlemen, from the

12   evidence, from the evidence in this case, is that back in 2007,

13   Mr. Tindle choked out a 16 year old on a Muni train.  He took

14   the case to trial.  He was convicted of a felony.  And he was

15   sent to San Quentin.

16       Why that's important to this story, Ladies and Gentlemen,

17   is this:  When Mr. Tindle was released from San Quentin, he

18   knew now he was a felon.  He knew the laws of the country, the

19   United States laws, and the laws of California made it illegal

20   for him to have a firearm.  He was now a felon, and the laws of

21   the land say that felons are not to be trusted with firearms.

22   That's what they're there for.

23       Yet the evidence -- what did we learn next about

24   Mr. Tindle?  In 2009, after he got out of San Quentin, he

25   carried a .357 Magnum in San Francisco.  He was arrested again.

This time he pleaded guilty to a federal gun charge.

We learned, Ladies and Gentlemen, that Mr. Tindle continued to disregard the laws of this land.  In 2011, he was arrested with known gang members, and his parole was revoked. In 2012, Mr. Tindle fought with the police during a routine traffic stop, and his federal probation was revoked.

Now, Mr. Nisenbaum says that there were domestic issues, and I agree.  There were domestic issues, and I think we can agree that the -- the relationship of Ms. Turner and Mr. Tinge -- Tindle, excuse me, was a complicated relationship.

What the evidence is -- and these are not words of attorneys -- is that in 2015 when Ms. Turner was three months pregnant with her daughter Sionye, there was a fight.  There was a punch.  There was the police.  And Mr. Tindle was arrested.

In 2016 when young Sahleem was six years old, again, what started the story for Ms. Turner was this was just an argument over a jacket or a jacket was torn.  What we learn is that Mr. Tindle shoved her against a wall.  A good Samaritan intervened.  Mr. Tindle ran off with young Sahleem and was arrested by the police.

We learned from Ms. Turner when she talked to the police department, the Oakland Police Department, after this event, that in 2017, Mr. Tindle was back possessing guns.  Ms. Turner told the Oakland Police Department that, "No, I didn't see him

1   with a gun today, but I know back in 2017 he stole a gun from

2   someone in San Francisco."

3          So you have to question an interpretation of the evidence

4   that Mr. Tindle cared, because the backdrop to this incident,

5   this day of January 3, 2018, seems to indicate the opposite,

6   that he didn't care.  That he didn't care about the citizens of

7   the State of California.  Because the evidence showed that

8   Mr. Tindle was frequently arrested for crimes involving

9   firearms and violence.  Can't get around that.

10         That he was -- he was dangerous and didn't have any

11  consideration for the law.  And this, Ladies and Gentlemen --

12  this is not a theory.  This is not guesswork.  This is not

13  speculation.  This is what the evidence has proven.

14         And the evidence has proven that Ms. Turner's -- they had

15  a complicated relationship.  You can't get past that.  But her

16  testimony on a prior occasion when she said that he's calm and

17  peaceful and that he's not quick-tempered, the evidence

18  suggests the exact opposite, Ladies and Gentlemen, and the

19  evidence suggests that I'm not so sure he is a man who

20  Mr. Nisenbaum described as a person who cared.

21         And you noticed, Ladies and Gentlemen, during Ms. Turner's

22  testimony that she tried to excuse every single incident that

23  got brought up when I had to question.  It's my job.  I had to

24  question her when she said he's calm, he's peaceful, he's not

25  quick-tempered because the evidence suggested the exact

opposite, and those questions had to be asked of her to
determine if she was really telling the truth when she
expressed those opinions.

When you -- at this point, you're determining and you're
assessing who is to blame for Mr. Tindle's death, and I would
just suggest this:  That you really need to question the words
of his mother and the words of Ms. Turner when they describe
Mr. Tindle.  I don't think you can take their words at face
value.

Without question, they undoubtedly loved him.  That's not
in dispute.  But I -- I think based on their words and based on
the evidence in this case, the evidence suggests they were
trying to portray him to you -- to you -- as someone who he was
not or someone who they believed he was because the evidence
doesn't show what they said about him was true.

And it's important, Ladies and Gentlemen, in this phase of
the case that you realize, based on the evidence, the man that
Mr. Tindle was.

He was not a lightning rod.  Lightning did not find him.
Trouble did not find him.  Mr. Tindle was the type of person,
based on the evidence, who acted in a certain way that brought
pain to himself and pain to others.  He wasn't a reactor, as
Mr. Nisenbaum just described him as.  He wasn't a person -- and
we will get to it -- who was reacting to Mr. Newton.  All the
evidence suggests that he was an actor, and people reacted to

him.

The evidence in this case has also demonstrated for the same 13 years, my client, Joseph Mateu, was a BART police officer.  The dirt that was developed on him was that he was poor at writing reports.  He had to go to the academy twice, and for that he went to a junior college class and got better at writing.

The evidence in the case tells you that he completed and passed all of his training.  The evidence in this case tells you that he was a patrol officer.  He wasn't a fare evasion officer.  He was a BART patrol officer, which you heard is the same as any police officer in any major city.  He deals with serious crimes such as robberies, carjackings, guns and everything.

And the evidence has shown you, Ladies and Gentlemen, that he was an officer who ran to danger and put his life at risk in order to save the lives of others.  It's important that we get away from dissecting that video and looking at it frame by frame and learn why we are here.  How did Mr. Tindle's life converge with Officer Mateu's life?

And with that background, let's look into the day itself, the day of January 3, 2018.

What we've heard is that Mr. Tindle, Ms. Turner, and their two children, Sahleem and Sionye, woke up in Oakland. Ms. Turner lived in an apartment on Willow Street, which is a

1   very short walk to the West Oakland BART station.

2       Again, the shooting led us here, but the decisions made

3   prior to that shooting started the ball rolling, the chain of

4   events.  And what do we know based on the evidence had to take

5   place before January 3, 2018?  Mr. Tindle had to make a

6   decision to break the law, knowing that he was a felon, and

7   it's not the kind of situation where you're a felon and you

8   think you might not be able to possess a gun.  You know you're

9   a felon and you've been convicted of possessing a firearm.  You

10  know full well when you change your plea and plead guilty, *I

11  can't do this*.

12      But the evidence suggests, it proves, it has to be that

13  before January 3, 2018, Mr. Tindle made the decision to

14  purchase a gun, to come into possession of a gun.  He made the

15  decision to make sure he had ammunition that worked in that

16  gun.  And at the time that decision was made, he knew it was

17  illegal to do that.

18      There is not much evidence as to what happened in the

19  morning of January 3, 2018.  I think Ms. Turner might have said

20  that the family was together and had breakfast, so I apologize

21  for that.  But what we know for certain based on what happened

22  later in the day is that Mr. Tindle armed himself with that .40

23  caliber SIG Sauer semiautomatic pistol.  He either loaded the

24  gun or he made sure the gun was loaded.  And he also made sure

25  that gun was in working order, also known as it could be fired.

1        In the late afternoon, Mr. Tindle and his family set out

2   to walk from their house to the West Oakland BART station.

3   Ms. Turner testified that that's about a three- to four-minute

4   walk from their house to the BART station.  And the group was

5   Mr. Tindle, Ms. Turner, Ms. Turner's sister, Ardanna, Sahleem,

6   and Sionye in the stroller.

7        Mr. Tindle had his loaded SIG Sauer pistol in his pocket.

8   And when you look at the negligence per se instruction, you'll

9   learn that not only was he a felon in possession, you can't do

10  that, but you also can't walk in a city with a concealed

11  weapon, so as soon as he put that in his pocket, he's also

12  committing another crime, irrespective of his felon status.

13       As the group of five walked towards the West Oakland BART

14  station, what the evidence has shown is that they came across a

15  bag on the ground that held some Air Jordan girls or female

16  basketball shoes.  We learned later that those Air Jordans

17  belonged to Mr. Newton, who was not around the bag at the time.

18       And you do have evidence -- and I disagree with what

19  Mr. Nisenbaum said about how this came about, because if --

20  when you listen to Mr. Evans's testimony, he said after this

21  beef, when he talked to Mr. Newton, "what's this about," he

22  said, "they took my shoes."  So there is evidence --

23  Ms. Turner, of course, said, "we just looked and kept walking

24  and then he attacked us and instigated and was the aggressor,"

25  but there is evidence at the very least that this argument was

about the shoes on the ground, whether they are taken, whether they are looked at, but that's what started this event.  And what we learned is that Mr. Newton confronted Mr. Tindle about those shoes and whatever he did with them.

The words of attorneys can say that Mr. Newton was the aggressor.  I like to stick to the evidence.  There is no question in the evidence that Mr. Newton was not harmed -- excuse me -- that he wasn't armed.  Ms. Turner even agreed with that.  Mr. Newton didn't have a knife.  He didn't have a gun. This was a verbal argument between Mr. Newton and Mr. Turner.

What we learned is that this is a verbal argument between two people who don't even know each other.  Ms. Turner told us there is no beef.  They don't hate each other.  This is just an argument, I hate to say silly, but stupid argument over a pair of shoes.

And what we learned from the evidence is that the argument made its way to the location in front of Upper Kutz. Ms. Turner testified that there is a lot of cursing and Mr. Evans said something to that effect.  So it sounds like this is a loud movement down the street in front of his barber shop on 7th and Chester.

That loud movement, you just heard the testimony and I dispute what -- what Mr. Nisenbaum said.  That's testimony under oath, and you saw at the beginning of the deposition, this is the same as -- same as testimony in front of a judge

and jury, and you're supposed to accept that testimony.  That's
what you heard come in.  And the testimony of Mr. Evans --
describes this loud argument coming in front of his barber shop
that led to his involvement.  And he said, I think three times
during his testimony at deposition, what his goal was:  "I
tried to stop it."

     At one point, he said, "I'm trying to keep my corner
safe."  He doesn't want that kind of action in front of his
business.

     I have described the barber, the pastor, I guess also the
clothes seller, Mr. Evans, as someone who is kind of a good
Samaritan in this situation.  He is trying to end a dispute.
He knew both Tindle and Newton.  His goal, again, was to stop
it, to end the argument.  He understood what was going on,
Ladies and Gentlemen.  He got it.  He knew, based on what he
saw and what he heard, that this was all bad.

     His goal was to make sure those loud words coming in front
did not turn physical.  And he tried to get involved to end
this.  But it didn't end because of Mr. Turner -- excuse me --
Ms. Turner and Mr. Tindle.

     Evans knew this was all bad.  He got involved, and he knew
it was really all bad when he got involved during the argument
and he saw Tindle with a loaded pistol in his pocket.

     And what did he say in his testimony?  "I could see the
handle.  That's what made me step between."  He was telling you

1    this is going to go all bad.  It's almost like *I've seen this*

2    *before*.  *This has got to stop*.  *I'm just trying to keep the*

3    *corner safe*.  *I'm trying to stop this*.

4        In essence, what Evans told you is that this incident did

5    not need to happen.  He told you the opposite of what

6    Ms. Turner said.  He said the instigators were Ms. Turner and

7    Mr. Tindle.  He said that Turner was egging Tindle on.

8        And Tindle, Ladies and Gentlemen, he predicted to you

9    through his words that he was going to shoot Newton.  He said

10    he should clap his ass.  Mr. Nisenbaum disputed that when he

11    asked Cardoza questions.  That could be hit him.  You never

12    know.  It needs to be the context.  And I asked and I followed

13    up with Mr. Cardoza or Sergeant Cardoza, "Would it change your

14    opinion when he made that statement, 'I should clap your ass',

15    his hand was in his pocket on a gun?"  He said, "Yeah, that

16    would change it."  That would make it stronger to determine

17    these aren't simply words.  That's a threat that can be carried

18    out.  That's not someone threatening to hit someone.  When you

19    have your hand on a gun and you said you should clap his ass,

20    that's a threat made by a man, who, as we've seen, the

21    background, the perspective, is someone who is not a stranger

22    to guns and is not a stranger to violence, and he predicted

23    what he was going to do.

24        Nonetheless, Evans was able to break up the first

25    incident, and there was no physical touching or grabbing or

1    fighting or wrestling between Newton and Turner.

2         At that point, Evans told you they walked away.  They

3    walked away.  Tindle and Turner walked away.  And they walked

4    away towards BART.

5         They're walking -- if they kept walking, they just walked

6    right by Officer Mateu who is talking to the lady from Tucson

7    about fare evasion, but they didn't.  Tindle didn't cool off.

8    He didn't get on the train.  He didn't go to San Francisco;

9    instead, he went back with that gun in his pocket.

10         And this idea that's been floated of self-defense is --

11    some of the ideas and theories boggle -- boggle me and confuse

12    me.  Let's just be clear, Ladies and Gentlemen, you don't need

13    to know the ins and outs of self-defense.  You walk up to

14    someone and threaten to shoot them with a gun and that person

15    runs at you to try to take the gun off you, self-defense does

16    not come into that picture.  The person who's being threatened

17    is trying to defend himself.  In your wildest dreams, if you

18    think that I can walk up to someone, threaten them with a gun

19    in my pocket, they run at me unarmed, and I shoot them and I'm

20    defending myself, that is not self-defense.

21         When Tindle comes back, Newton [sic] tells you what this

22    case is all about.  He tells Tindle, "It ain't worth it."

23    Again, he's telling him, "Come on, man.  I know you got a gun

24    in your pocket."  This is over a pair of shoes.  "Don't come

25    back."

1          From that point, we learn that Mr. Tindle made a move that

2     goes to his character, and I tell you, Ladies and Gentlemen,

3     that the evidence here does not suggest that trouble finds him.

4     And this idea of Newton being an aggressor, focus on this.   You

5     have a man coming at you who has just threatened to shoot you

6     with a gun in his hand.   Newton is unarmed.   There is clearly

7     bad blood.   What choices does he have?   The unarmed man who has

8     someone coming at him with a gun, run for the hills and try to

9     outrun that bullet, or run at that person and try to take the

10    gun away?   And that's what Mr. Newton did.   And that's the move

11    of someone who is cornered, an unarmed man who is staring down

12    someone who doesn't like him, who has a gun, who has threatened

13    to shoot him.   Evans knew it was all bad.   That's why he ran

14    for cover and pushed his clients to the back of the barber

15    shop.

16         What we know from there, Ladies and Gentlemen, there is a

17    shooting.   And I'm going to talk about it later in this

18    discussion about how we know Tindle is the shooter, but there

19    is a shooting by Tindle.   Six seconds later, there is another

20    shooting.   What we know is one bullet goes into the leg and out

21    of the leg of Mr. Newton and the other bullet hits the iron in

22    front of the window, splits, the jacketing goes through the

23    window, the lead core goes into the back of the barber shop and

24    gets stuck in the wall.

25         That's the backdrop.   That's why this case is so, so much

more, Ladies and Gentlemen.  That's the backdrop.  That's what
happened.  That's what we know about Mr. Tindle.  That's what
we know about what he did that day before my client ever
becomes involved in this incident.

     This case began way, way, way before those two shots were
fired.

     I hope you understand, Ladies and Gentlemen, that I'm
doing my job.  It doesn't bring me any pleasure to talk ill of
someone who is not with us.  But it has to be done.  Why are we
here?  Who started this?

     Ladies and Gentlemen, Mr. Tindle brought this upon
himself.  He is the reason why Mateu acted and he had to act.
He's the reason why Mateu is running.  He heard, he ran, people
were screaming.  Mr. Tindle is the reason why Mateu ran, saw a
gun, and had to make that split-second decision.

     The evidence has shown that Mr. Tindle has had many
choices that day to make sure that Mr.-- excuse me --
Officer Mateu did not have to make that split-second decision
and do his job correctly.

     Of course -- and everyone is doing their job here,
plaintiffs' counsel, Mr. Nisenbaum and Mr. Burris -- wants to
turn your attention away from Mr. Tindle and dump on
Officer Mateu.  And we've heard those arguments many times, and
I anticipate we will hear more of them.  A man was shot in the
back as he tried to surrender.  But now that you know the whole

story, I'll just ask this question:  Is that fair?  Is it fair?

We fully understand that Officer Mateu is a police officer.  Being a police officer is dangerous work, and this is what he signed up for.  That's not in dispute.  But what -- your decision at this part of the case when you deliberate, likely tomorrow morning, is to decide who's responsible for Mr. Tindle's death.  And counsel for plaintiff -- I anticipate there will be more of the common theme.  He was shot in the back, he was shot in the back, he was shot in the back, and concentrating on each slide that led up to that shooting.  And I'm not sure for this part of the case that's what the focus needs to be.

And I disagree with what Mr. Nisenbaum says, that Mr. Tindle deserves some of the fault.  This case is completely different than the first phase of the case, Ladies and Gentlemen, because now you know the role that Mr. Tindle played in causing his own death.  And what I'd ask you to do, before we get into the law, is really listen to the evidence that's been proven, apply it to the law, and I think you'll determine that Officer Mateu did his job correctly on January 3, 2018.  But you will also determine that Mr. Tindle caused his own death.

The claim for this first part of the -- excuse me.  The claim for this phase of the case is negligence, and negligence, Ladies and Gentlemen, simply put means you're not doing your

1    job properly.  You're not acting properly.  It's a different

2    standard than the constitutional civil rights standard that you

3    had in the first part of the case.

4        So at this point, you're going to consider different but

5    similar factors to determine whether Officer Mateu did his job

6    correctly.  And now, as I've stated, you can consider what

7    Mr. Tindle did and the role he played in causing his own death.

8        And I've made a roadmap that is a little bit easier --

9    that simplifies your job, Ladies and Gentlemen.  The roadmap

10   goes like this:

11       You are first to determine if Officer Mateu did his job

12   reasonably.  And the plaintiffs are the ones that need to

13   prove -- it's their burden of proof that he did not act

14   reasonably and caused the death of Mr. Tindle.  And if you

15   believe us, that they cannot prove that, and that Officer Mateu

16   acted reasonably, what you would do is check "no" and sign the

17   verdict form and your job is done.

18       If you believe that they have proven to you that

19   Officer Mateu acted unreasonably and his unreasonable actions

20   caused the death of Mr. Tindle, then it's a pivot, and you

21   focus your attention on Mr. Tindle and how his conduct caused

22   the death, if you believe that we've proven that Mr. Nisenbaum

23   is correct.  So for the first part they prove -- it's their

24   burden of proof to prove that Mateu was the cause.  For the

25   second part, the comparative fault, it's our burden.

1      Finally, if you get to the point, Ladies and Gentlemen,

2   where you think Mateu acted unreasonably, where you think

3   Tindle also was at fault, then finally what you would do is

4   assess who is more to blame, and those are the percentages that

5   the judge referred to you, and I will give you a preview.  If

6   you believe that Mateu and Tindle were at fault, I'm going to

7   suggest that Tindle was a very high percentage of that fault

8   for his own death.

9      Let's talk about Mateu in the first portion of the case.

10   The plaintiff has the burden to prove that Mateu's is negligent

11   on January 3, 2018.  And again, these are the four elements

12   that they have to prove, but I'm going to simplify your job for

13   you.

14      The ones that are not in italics are not at issue.  So, in

15   other words, obviously Mateu used force in seizing Mr. Tindle.

16   And the plaintiffs -- and those are the children -- were

17   harmed, and that his unreasonable use of force was a

18   substantial factor in causing the plaintiffs' harm.  And so

19   what the issue in this stage of the case is whether or not they

20   have proven that Officer Mateu used unreasonable force.  And

21   it's their burden to prove that.

22      There are four factors for you to determine whether

23   unreasonable force was used by Mateu and whether they have

24   proven that.

25      The first one is did Mr. Tindle pose an immediate threat,

1    and I would suggest, based on the evidence, Ladies and

2    Gentlemen, that, you know, a man with a gun is a threat.  We

3    know that that gun worked based on the prior two shots fired.

4    Even though Mateu didn't know at the time, Tindle had

5    previously fired that gun, and we know, based on the evidence

6    that we'll discuss later, that that was Tindle's gun and that

7    Tindle had the gun in his hand at the time he was shot after

8    refusing to obey lawful commands of Mateu when he was shot.

9         I don't think, Ladies and Gentlemen, there can be any

10   more -- can be any more of an immediate threat.  Not only was

11   he a threat to Newton, to Mateu, but also other members of the

12   community.  You know, it's a busy day.  It's 4:00 in the

13   afternoon right across from the West Oakland BART station.

14        I'd like to transition for a quick second, and this is a

15   little bit confusing to me.  You've -- I have already talked

16   about self-defense, which I just don't -- I just utterly am at

17   a loss how that could apply to this case, but I would also like

18   to talk to you about this idea, this theory, this statement by

19   a lawyer that is not evidence that has been floated that this

20   was an accidental discharge.  That's not supported by the

21   evidence, Ladies and Gentlemen.  Where is the evidence, besides

22   words of attorneys -- where is the evidence that the gun was

23   accidentally fired twice?  There is none.

24        Remember -- we'll get to Ms. Turner in a little bit.  I

25   asked Ms. Turner, "you're right there" -- and we'll talk about

1    that.  She is standing right there when the gun is fired.  "Did

2    you see it land on the ground?"  "No."  "Did you hear anyone go

3    'oh, shoot, that gun shouldn't have gone off'?"  What you have

4    heard and the evidence is here that guns don't shoot

5    themselves.  You need to have a finger on the trigger, and it's

6    pulled.  So when you hear that accidental discharge theory,

7    that's a theory.  That is asking you to go outside the four

8    corners of the courtroom and speculate.  There is no evidence

9    that anyone accidentally fired this gun.

10       And your duty is to find the facts based on the evidence,

11   not based on speculation outside the courtroom.  You solely

12   determine the evidence based on what's in front of you.

13       Where it gets confusing with Mr. Nisenbaum's arguments is

14   circumstantial evidence and direct evidence.  You have a jury

15   instruction about it raining outside and someone walking in

16   without seeing that it's raining and someone is wet.  I will

17   make it more simple based on this case, Ladies and Gentlemen.

18   Whose gun is it?  Simple, right?  What's direct evidence?

19   Mr. Evans.  Mr. Tindle had a gun in his pocket.  That's a

20   direct observation of someone with a handle of the gun in their

21   pocket.  Okay?

22       What's circumstantial evidence?  To prove the same fact,

23   what evidence can you rely on to prove the same fact?

24   Ms. Wong.  Got the gun, swabbed it, 1 in 172 decillion on the

25   grip where you hold the gun.  That's Mr. Tindle.  And so this

1    idea that it's his gun, that he didn't shoot the gun, and what

2    Mr. Nisenbaum floats as far as this idea of speculation and

3    conjecture and who knows if the gun fell out of his pockets,

4    who know where the two shots came from, what I would like you

5    to do is focus on the circumstantial evidence and the direct

6    evidence, and the key to circumstantial and direct evidence is

7    that you link everything together to see what the evidence

8    proves as far as the facts of the case and what your

9    determination is.

10        I think what you will see in the arguments so far and the

11   arguments to come, that there is not a real focus from the

12   other side on the evidence.  It's more just the hammer and the

13   nail, the same theme that a man got shot in the back.  But what

14   I would like to do is have you rely or use the evidence to see

15   what's been proven.  And the key to the circumstantial evidence

16   and the direct evidence and all the evidence is that the pieces

17   of evidence do not stand in isolation.  You put them together

18   and see what the story tells you.

19        And the nice thing, Ladies and Gentlemen, which you can --

20   you know we can argue and say hey, who knows about Evans?

21   Maybe the guy is full of it, right?  Who knows if he was

22   telling the truth.  Well, that can be an argument when he saw

23   the gun in his pocket.  Who knows what he was thinking because

24   he's human.

25        The beauty of circumstantial evidence, Ms. Wong, she can

come here in 30 years and testify to the same thing.  The
circumstantial evidence, the scientific evidence, it doesn't
take an oath.  It doesn't change.  It doesn't say something on
one occasion and say something else on the next.  It's not
affected by memory, relationships.  I want you to focus on the
evidence and what's been proven.

     Evans sees the argument.  He hears Turner say, "I'll clap
your ass" -- excuse me.  He hears Tindle say, "I'll clap your
ass."  He sees Tindle with a gun.  We know based on other
evidence, Ladies and Gentlemen, that Mr. Tindle is no stranger
to a gun.

     The evidence is that Newton was unarmed.  Newton, with
nowhere to go, rushes at Tindle.  Two gunshots are heard.
Newton is shot in the leg.  And he told -- remember when
Officer Mateu testified?  He told the officer "he shot me."
This is evidence.

     Another bullet goes through the window of the barber shop.
The video shows when Officer Mateu approaches, Tindle has got
the gun in his left hand.  The video at the end shows the gun
coming out of his right hand.  The evidence shows that Mateu,
through his testimony and through the evidence -- through the
video, shot three times.  The evidence at the scene shows that
the SIG Sauer was shot twice.  Granted, some evidence was lost.
What's the answer for the ShotSpotter that says there is a
shot?  There is a shot six seconds later.  And then there is

1    three shots that correspond with Mateu.  And Officer Cardoza,

2    Sergeant Cardoza, said that exact timing corresponded with the

3    shots that are heard in the body-worn camera.

4         The weapon is tested for DNA, and we've talked about that.

5    Mr. Tindle's DNA is on the gun.  That positively corroborates

6    that Evans's testimony that the gun was Tindle's is correct.

7    That positively corroborates Mateu's testimony in the video

8    that that gun was in Tindle's left hand.  And then what do we

9    hear?  We lawyers think we're great at questions.  We're not.

10   We get bogged down.  We withdraw our questions.

11        A juror asked Sergeant Cardoza today, "What evidence do

12   you have about who was the shooter?"  And what did Cardoza tell

13   you?  He did a whole investigation.  I think he said, like a

14   police line, there is a totality of the circumstances.  "I

15   talked to all of the witnesses.  No one said Newton was the

16   shooter.  Everyone said Tindle was the shooter."  That's the

17   evidence.  All of that, Ladies and Gentlemen, is the evidence

18   before you.  That's not a theory.  That's not an argument.

19        You need to piece everything together, and I just -- I

20   don't -- I hear my voice rising.  I don't want to yell at you.

21   But when you piece everything together and when you work

22   through the evidence, it only points to one logical conclusion,

23   Ladies and Gentlemen, and that's Tindle was an immediate threat

24   based on what we know about him, what he did before, and he was

25   a threat to Mateu, to Newton, and to the rest of West Oakland.

1    With respect to the seriousness of the crimes, I don't

2    think this is in dispute.  It might be.  You know, we have

3    someone possessing a gun who can't.  He's got -- he's got a

4    concealed weapon on him.  He's yelling at someone, threatening

5    them to kill them -- excuse me -- to shoot them, to clap his

6    ass.  And we know what happens after that.  I think the

7    evidence is clear, Ladies and Gentlemen, that these actions,

8    this -- when we talk about the seriousness of the crime, this

9    is serious.  Mr. Evans knew it wasn't a joke.  He tried to stop

10   it.  I don't think there is any more weighty serious crime than

11   taking a gun into a crowded area of a city, getting into a

12   beef, and saying, "I'm going to take it out and shoot you."

13       And, again, I go back to what I said at the beginning.

14   This is not a random incident.  This is not someone in a city

15   who stumbles upon a gun and drops it and it accidentally

16   discharges.

17       The next factor is the active resistance of Tindle.  And,

18   again, the active resistance comes in with a failure to abide

19   by commands.  And, of course, we have gone through this enough,

20   but the commands were to "show me your hands" in the plural,

21   and as we know, based on way, way back when when we heard from

22   the experts, the hands is what you need to see.  The gun is a

23   tool that is dangerous.  And once the trigger is pulled, we're

24   in trouble.  So the idea here -- and this is what leads me to a

25   little confusion, is that, you know, the idea of warnings and

surrenders has confused me through this trial.  It's really confused me, and it even confused me more when Mr. Nisenbaum got up and said it's beyond belief that you didn't know that he was -- that he was -- that you didn't warn him correctly and you didn't know that he was surrendering, and the reason why that's confusing me is because the arguments have been that he, being Mateu, gave improper warnings.  He said, and we've heard it a lot, he should have said he was a police officer and said he was going to shoot.  And the reason for that is because if he had done that, Tindle would have heard him and understood the gravity of the situation and would have surrendered.  He would have thrown the gun to the side and ended this tense situation.

But at the same time, this is where it's just very confusing to me.  The argument is that Tindle heard the improper warnings, and he tried to surrender but was unable to surrender.  And it's confusing because I don't think those two theories can coexist.

But I think the evidence that has been presented to you shows you, Ladies and Gentlemen, that Mr. Tindle was actively resisting.

The final negligence factor is improper tactics, and you heard way back when from Mr. Clark and Mr. Papenfuhs, and what it comes down to for them, Ladies and Gentlemen, is, as we have discussed, Clark hasn't trained anyone in 25 years, and he said

1    Mateu should have walked to the right into the location where

2    that gun was pointing, and he should have waited for Tindle to

3    shoot again.

4        And Papenfuhs, Ladies and Gentlemen, he's an individual

5    who trains and trains officers specifically how to react to

6    situations such as we have here, and Mateu -- he testified that

7    Mateu properly ran to the threat, got himself into the correct

8    position, and couldn't wait any longer.

9        For this phase of the case, Ladies and Gentlemen, the

10   plaintiffs have not proven that Mateu was unreasonable.  These

11   are new factors, and I suggest you use all of the evidence in

12   phase 1 and phase 2 and test these factors, test these elements

13   that need to be proven.

14       If you test them and you believe that Mateu was at fault

15   for his -- for the death based on his negligence, again, you

16   turn to Mr. Tindle.  You turn your attention to the conduct of

17   Mr. Tindle on the day of the incident.  The key to this -- and

18   I have gone through this evidence with you, Ladies and

19   Gentlemen.  I will very briefly go through it again -- is that

20   we undoubtedly have the burden to prove that Mr. Tindle caused

21   his own death.

22       And the way it's proven is twofold, Ladies and Gentlemen.

23   Number one, he was negligent.  It's kind of an "or."  Or the --

24   he was negligent or he was negligence per se.  Again,

25   "negligence" means he was acting unreasonable, and "negligence

per se" means he was breaking the law.  And once those two are
proven, then you take a look at that negligence, and that
negligence per se was a substantial factor in causing
Mr. Tindle's death.

    And I ask these questions rhetorically at this point
because you have heard it quite a few times before, but I would
ask you, Ladies and Gentlemen, if these actions of Mr. Tindle's
are -- are actions and conduct that you would describe as
reasonable, and/or are they actions -- and it goes hand in hand
of someone who is unreasonable, of someone who is just out
there breaking the law, and we have already focused on
walking -- excuse me, loading the weapon, putting it in your
pocket.  It's a felon in possession.  Then putting that firearm
in your pocket and walking the streets of Oakland, getting into
the argument, not listening to the good Samaritan, threatening
to shoot Newton, making a decision to restart the argument when
it's over and you could have walked away.  Not listening to
Mr. Evans when he says it's not worth it.  When everyone else
runs away, and Mr. Turner runs at him, that's when the shooting
takes place.

    Someone who is unarmed gets shot in the leg.  One goes
into the barber shop.  I ask this rhetorically, Ladies and
Gentlemen.  Those aren't the actions of a reasonable person.
Those aren't the actions of someone who is trying to obey the
laws.

1      Ms. Turner I've described as a complicated witness.  She

2    found herself in an extremely difficult situation when she

3    testified.  I didn't make it any easier for her because I had

4    to ask her questions based on the evidence.  What did she

5    testify to, Ladies and Gentlemen?  That while she has seen

6    Mr. Tindle with firearms in the past, she definitely didn't see

7    him with one on the day of the incident.  He didn't have one in

8    his hand.  He didn't have one in his pocket.  Based on the

9    testimony of Mr. Evans, based on the testimony of Ms. Wong,

10    based on the video, we know that can't be true.

11      She did agree that the two of them didn't have any bad

12    blood and the argument was over shoes, but then what we learned

13    is that she put off.  She was the exact opposite of Mr. Evans.

14    She said that Mr. Newton was the reason why we're here.  She

15    disagreed with what -- everything that Mr. Evans said.  She

16    disagreed that she was egging on Mr. Turner.  She disagreed

17    that the fight was over; they walked away.  She disagreed that

18    Mr. Tindle said, "I should clap your ass."  She disagreed that

19    Mr. Evans said, "It ain't worth it, just stop."

20      She also said -- which I pressed her on and if -- this is

21    my job, Ladies and Gentlemen, but she -- there is a witness who

22    saw this entire thing, and there is a reason why I kind of

23    painstakingly went through the video and these photographs from

24    the AC Transit.  And one of -- and I think it might be this

25    one.  Exhibit -- she circled "that's me right there."  And she

1    is standing right next to Mr. Tindle and Mr. Turner.  Yet in

2    her testimony, on prior occasions and today, it's a little

3    confusing -- was that she never saw anyone with a gun.  She

4    never saw a shooting.  That she was standing in the middle of

5    the street when the shooting took place.  That's been proven to

6    be wrong.

7        And you can take this photograph in conjunction with the

8    other photograph where you see Officer Mateu running to the

9    corner and you can take it in conjunction with the video.  I

10   think when you take those pieces of evidence together, it will

11   show you that there is a person who knows exactly what

12   happened, who knows that gun came out of Mr. Tindle's pocket,

13   was fired at Mr. Newton, went through his leg, and went through

14   the barber shop window.

15       I -- put it simply, I don't think we can believe

16   Ms. Turner when she says that she did not see the shooting.

17       I have a little bit more, and it's very important.  Okay?

18       I don't know what "a little" means.  It might be a little

19   bit more -- a little more than a little.

20       Damages.  Mr. Nisenbaum talked about damages.  Damages,

21   Ladies and Gentlemen, are not easy to talk about.  I don't feel

22   comfortable talking about your decision, if you get to that

23   point, to award money for someone who is no longer with us.

24   But that's what the law requires.  It's my job to discuss this

25   issue.  It's your job to follow the law, and you've taken an

1   oath to follow the law.

2       I think I need to give you some guidance if you think

3   Mateu was at fault at all for Mr. Tindle's death.

4       What can you not talk about?  Again, it's the sympathy,

5   it's the emotions.  You must -- you got to keep -- if you get

6   to this point and you're discussing damages, you got to keep

7   the emotions out of the discussion.

8       And the jury instruction tells you you can't consider how

9   sad or grief stricken the children are because their father is

10  gone.  That's what the jury instruction says.

11      And I'm not trying to rile you up here.  I'm just telling

12  you what you have to do.  You have got to keep the emotions out

13  of it.  I'm trying to focus you on what the law says and what

14  the evidence has been presented here.

15      The first part is the funeral expenses, the $10,000,

16  whatever it is.  We are not contesting that if you get to this

17  point.

18      What I want to focus your attention on is the second part,

19  which is the children's loss and Mr. Tindle's love, affection,

20  moral support, care, assistance, and the guidance he supported

21  when he was alive.  The measure of damages, Ladies and

22  Gentlemen, is not the value of his life.  It's not the value of

23  his life.  Not how much his life was worth.  There shouldn't be

24  any kind of comparison of the value of his life to something

25  that is inanimate, that's high in value, such as a piece of

art, a jet airplane or whatever.  That's not what you are to

assess.

The loss is to the children because their father is not

around anymore.  And the loss has to be evaluated by what

Mr. Tindle provided before he passed, the support he provided

to the children.

And what is not surprising, Ladies and Gentlemen, is that

Mr. Nisenbaum said that they're not asking you to -- to award

any damages based on financial support.  That's what he said.

And that made sense that that was conceded because the evidence

in the case did not show that he financially supported his

children.

The evidence is not clear, I would say, on how often he

stayed with his children, Ladies and Gentlemen.  We know that

he lived part time with his mother, and we know that he lived

part time with Ms. Turner.  At one point, Ms. Turner told the

police that he comes and goes as he pleases.  Another time

Ms. Turner told the police that she has full custody of her

children.  We know that they never shared a bank account, they

never shared household expenses.  This is the evidence when you

determine the support that Mr. Tindle supplied for his

children.  And Ms. Turner at one point testified, that he helps

out when he can.

Now, Mr. Nisenbaum argued that Mr. Tindle was expected to

live 50 years and all of the events that he's going to miss out

1   in those 50 years for the support of his children.  And I would

2   focus your attention again, Ladies and Gentlemen, back to the

3   jury instruction that says that's what a normal person is

4   expected to live, 50 more years, someone who dies when they are

5   27.  And it says that some may live longer and some may live

6   shorter, and that's based on their lifestyle, their habits.

7        And, again, we have to rely on what's in the record, and

8   when I say "the record," what has been brought into this

9   courtroom.  And the evidence, Ladies and Gentlemen, is that

10  Mr. Tindle led a very dangerous lifestyle.  It's his

11  lifestyle -- that's what it asks you.  Look at the evidence.

12  Is this someone who we expected -- is this the normal person,

13  the person who has been to prison, who has beat up a police

14  officer, who is always around guns, who has had difficulty with

15  the mother of his children, to say the least.  And what does

16  this incident say about his lifestyle choices, Ladies and

17  Gentlemen?  We know this was an argument over a pair of shoes.

18       And I just ask you, if you get to this point, what

19  evidence are you relying on if you're determining that

20  Mr. Tindle is someone who would be around, who would be

21  supportive of his children for another 50 years.  I'm

22  questioning that.

23       I am now near the end.

24       Your verdict is what ends your involvement here.  And

25  "verdict" comes from a Latin and French word which means "to

1    speak the truth."  And what's the truth for this phase of the

2    trial, Ladies and Gentlemen?  The focus of this phase of the

3    trial is Sahleem Tindle.  He died, and that's why we're here.

4         Without question, Mr. Tindle did not want to die on the

5    day that he died.  No one in his family wanted him to die.

6    Officer Mateu did not go to work that day with the idea that he

7    was going to shoot someone.  He knew police work was dangerous,

8    but he didn't think he was going to need to shoot someone.

9         I am turning into the person where you can say stop saying

10   the same thing over and over, but your verdict cannot speak to

11   sympathy.  You cannot be influenced by that.  Your verdict has

12   to speak to the evidence and the law.

13        And there are two parties in this courtroom.  We represent

14   Officer Mateu.  And on his behalf, I'm requesting that your

15   verdict speak the truth and very simply that he did his job

16   correctly on January 3, 2018.  You're not judging him as a

17   person.  I understand that.  You're judging him how he did his

18   job on January 3, 2018.

19        And you need to solely base your evidence -- excuse me --

20   solely base your verdict on the evidence that's been presented

21   to you.

22        Your job has been made easier, Ladies and Gentlemen, based

23   on the position of the plaintiffs, what I just heard

24   Mr. Nisenbaum say.  What he said, he conceded, Mr. Tindle had

25   the gun before this incident.  That's what he said.  Okay.

1    He also conceded that Mr. Tindle should have walked away.

2    I agree with that.  Because what is the evidence and what has

3    it proven?

4    Tindle, Ladies and Gentlemen, was the sole cause of this

5    incident, now that you know everything.  If you previously,

6    during your deliberations, got bogged down about a possible

7    struggle over the gun, do not get bogged down now.  What you

8    did not know then, you now know.  He brought the gun.  Without

9    the gun, we are not here.

10   The gun comes into play because he brought it.  The gun is

11   fired because Mr. Tindle brought it.  Laws are in place in our

12   country and our state to make sure that felons do not have guns

13   because society knows that bad things happen when a felon has a

14   gun.  The laws are in place to avoid what happened here.

15   There might be a dispute of how this gun was fired.

16   Ladies and Gentlemen.  There should be no dispute -- and like I

17   said, your job has been made easier for you because the

18   plaintiffs do not dispute who brought the gun.  Tindle brought

19   his loaded gun that day.  Newton was unarmed.  Tindle said he

20   was going to shoot Newton, and Newton got shot.

21   When Mateu approached, the gun was in Tindle's left hand.

22   The actions of Mr. Tindle caused the situation.  When Joe Mateu

23   heard those gunshots, he ran to the emergency situation created

24   by Mr. Tindle.  He confronted the threat to himself, to

25   Mr. Newton, to Oakland, and he followed his training to make

1    sure that Tindle would not shoot anyone else.

2         And the question is what will your verdict say?  Will it

3    be the truth?  Will it be that Officer Mateu is supposed to

4    stay where he is?  To not run to danger?  To take cover and

5    wait?  To wait until Mr. Tindle shoots Newton again?  Wait

6    until another bullet finds someone in the barber shop?

7         We just hope that the verdict says the truth, Ladies and

8    Gentlemen.  And the truth is that you should check "no" for the

9    first question, that he did not act unreasonably.

10        And if you find, Ladies and Gentlemen, that he, being

11   Mateu, is at fault at all for the death of Mr. Tindle, we would

12   ask that you place his percentage of fault at a very, very low

13   number.

14        Like I said, I agree about certain things.  I'm confused

15   about other things.  When we think about this, it must be very

16   confusing how we got here, when you think about it.

17        Now, when you're done, you can talk to your significant

18   others, your family about this case.  It seems confusing that

19   we're all here over an argument over shoes.  It doesn't make

20   any sense.

21        How can this be?  How can an argument over a pair of shoes

22   on the ground lead to what you guys have dissected during the

23   first part of the case, a shooting at 4:00 in the afternoon in

24   broad daylight in a very busy section of Oakland.  The question

25   is how do we make sense of this?

1    Ladies and Gentlemen, I would just suggest -- and you guys

2    are going to work through it like you've done before.  I would

3    suggest it is our position that there shouldn't be any

4    confusion about who is wrong here.  When Mr. Nisenbaum said he

5    should have walked away, remember, Mr. Evans got involved, he

6    should have walked away.  I went back, and I double checked

7    Mr. Evans's testimony.  Mr. Evans agrees with Mr. Nisenbaum,

8    because he knew something bad was going to take place.  He knew

9    it based on what he knew about the neighborhood, based on what

10   he knew about Mr. Tindle, based on what he knew about that gun

11   that Mr. Tindle had brought.  And when he saw him coming

12   back -- and I want to make sure I'm clear about this -- he said

13   his last effort before he ran and took cover was, "Hey, don't

14   come back."  Like "stop," like he had tried to do before.  "It

15   ain't worth it."

16       And I think Mr. Evans was speaking for the society that's

17   passed these laws about guns.  And I disagree with

18   Mr. Nisenbaum about you didn't hear from him.  It's not that

19   important because he wasn't here.  Because while you didn't

20   hear from him on the witness stand, I'd ask you, Ladies and

21   Gentlemen, to consider whether his testimony was loud and clear

22   to you, that he told you the people in society cannot act as

23   Mr. Tindle did.  You can't have a wild fight and gunfire over a

24   pair of shoes.

25       And that gets us to this jury instruction, and I'm going

1    to end on this, and then I'll sit down.

2        Ladies and Gentlemen, the way our society works, we live

3    in a society in which we expect people either to act reasonably

4    or follow the law.  That's how it works.  And the evidence that

5    you're going to work through confirms that Mr. Tindle did

6    neither of those.  And I'd ask you that you use all the

7    evidence from the first phase, from the second phase of the

8    trial, and if you use that, you will determine, Ladies and

9    Gentlemen, for this, for this test of the reasonableness of the

10   police officer and whether he did his job properly, that you

11   will determine that in fact Officer Mateu did his job properly

12   when you have all the evidence and you know the whole story

13   that went into this unfortunate shooting and unfortunate death.

14       I thank you very much for your time this afternoon.

15       **THE COURT:**  Okay.  Let's stand and stretch, and then

16   we will get the rebuttal and finish up for the day.

17            (Pause in proceedings.)

18       **THE COURT:**  Ready, Mr. Burris?

19       **MR. BURRIS:**  Thank you, Your Honor.

20       **THE COURT:**  You are going to have to stay next to one

21   of those two mics.

22       **MR. BURRIS:**  Yes, I understand.

23                 **REBUTTAL ARGUMENT**

24       **MR. BURRIS:**  You know, in listening to counsel's

25   argument, I was -- thought about what's the prize here?  Let's

1    keep our eye on the prize.  The prize here is getting to the

2    truth on the counts that have been put before us.

3         Counsel's whole argument on negligence was really about

4    hindsight.  It was about hindsight.  Because the question of

5    negligence on the officer is what did he know at the time he

6    did the shooting and what did he do?  It has nothing to do

7    with -- at all who Mr. Tingle [sic] was before.  It has nothing

8    to do at all what happened before, years and years before, or

9    even what happened as they were walking up the street, because

10   the officer did not know.  He did not know.

11        And so negligence is what was his conduct at the time he

12   committed this shooting, when he shot him three times in the

13   back.  What was the conduct that he engaged in and was his

14   conduct negligent or not.

15        We presented evidence to you in the first phase that

16   suggests there were cues, there were things that occurred that

17   he missed and he misinterpreted, and by misinterpreting them,

18   he then shot and killed him when, if he had interpreted

19   correctly, he would not have had to use deadly force.  That's

20   really what is at issue here.  It's not about what happened

21   later.  We will talk about that because that goes to a

22   different aspect of the case.

23        But the first question was:  Was this officer negligent.

24   Not that he's a good guy.  Not that he was doing fare evading

25   stuff.  It's not even the fact that he ran over there.  The

1    question is when he ran over there, what did he do?  And how

2    did he do it?  And what judgments did he make?  And all those

3    factors, I talked to you about before, they're totally relevant

4    as it relates to was his tactics proper or not.  It's one of

5    the factors to consider.  Did he exercise proper tactics in

6    approaching?  And as a consequence of that, did those tactics

7    lead him to make a decision to use deadly force?

8        If he had acted properly, he would not have used deadly

9    force.  If his judgment was better.  If he had recognized that

10   when the hand went up, that was a sign of surrender or not.  Or

11   he would have recognized when he made a mistake and thought

12   Mr. Tindle was standing up when he wasn't standing up and he

13   shot him because of that.  Or he forgot that the last time he

14   saw the two men, they were grappling over the gun.  They were

15   on the gun.  And it wasn't like one person had it.  They were

16   grappling over the gun.

17       And if he had recognized that when the back was turned and

18   they were down on the ground, he himself would have seen that

19   two men were grappling, and just like the other officer --

20   Mr. Papenfuhs had said, two men grappling over a gun, you can't

21   shoot either one of them.  That is the facts, Ladies and

22   Gentlemen, of what, in fact, he knew at the time.

23       The fact that -- all this other evidence that came in

24   later, that may go to some other issues, but we're not here to

25   decide the question or the fact that Mr. Tingle *[sic]* made --

1   he thinks he's a bad guy because he had a prior criminal

2   history.  That doesn't mean the fact that he argued with his

3   wife and his girlfriend on the street -- that doesn't make him

4   a person you get to kill him because his argument is really,

5   well, Tindle was a bad guy.  He liked guns.  And as a

6   consequence of liking guns, he puts himself in a position where

7   he should be -- he can be killed and it's lawful.

8        Well, is it really?  Do we kill bad people, people we

9   think are bad because they're bad?  Is it a character question

10  that we're looking at here?  Because that's the argument.

11  That's the argument by counsel.  It's a character argument.

12       And there is nothing in any of these records and

13  instructions that you have been given that you can kill a

14  person because they have bad character.  Even under the laws

15  that the Court had given you, none of those laws are

16  death-sentence laws that you get to kill the person because he

17  carried a gun.  You get to kill the person because he had a

18  loaded gun.  You get to kill the person because he's walking

19  down the street and he's cursing and he's yelling and he picks

20  up a bag.  Do you get to kill him because of that?  No.

21  Absolutely not.

22       And so this whole issue about what was going on between he

23  and Mr. Mayfield [sic], obviously there is something that took

24  place.  And a reasonable person can view from Mr. Tingle's

25  [sic] point of view when he sees those men over there talking,

1   he's not from the neighborhood, he's taking photos, he can

2   think there's potential danger here.  You know, there is

3   potential danger.  This could conjure up a question of

4   self-defense in his own mind's eye because he's not from the

5   neighborhood.  Mayfield *[sic]* is over there with his boys, and

6   then he wants to take a photograph.  Why does he want to take a

7   photograph?  Because he's a bad guy?  No.  He wants to take a

8   photograph because he doesn't know about these guys and this

9   neighborhood.

10       I'm not making any kind of judgment about the

11  neighborhood, but in his own mind's eye, he had some real

12  concerns about Newton and -- Newton and his boys.  And remember

13  this.  Maybe Newton was unarmed and maybe he saw what appeared

14  to be a gun, but he, in fact, charged.  So then he's charging,

15  and then they start grappling.  They start grappling over the

16  gun.

17       Well, anything about that would then suggest you get to

18  kill one person -- that you get to kill Mr. Tingle *[sic]*

19  because of that?  Does that make him a person that the --

20  the -- that the defense counsel says well, it makes him more

21  worthy of being killed.  You should not give him any credit.

22  He's unworthy as a human being because he has had a criminal

23  record.

24       There is a lot of sociological reasons before those kind

25  of issues, but even so, that doesn't mean that you get, because

1   of that, his protection, the veil that's around him, around all

2   of us that is entitled to constitutional protection, the laws

3   that protect us -- it isn't diminished.  It doesn't become

4   less.  It doesn't exist because you have a prior conviction or

5   you've had to carry the gun or you've had a fight in the street

6   with your girlfriend.

7       Remember this, putting this in context, these are

8   20-year-old people.  They're like -- anybody recognize a 20

9   year old, they're arguing back and forth all the time.  There

10  is a push/push -- push/pull situation.  That doesn't make her a

11  bad person as counsel is trying to suggest that somehow she is

12  devious in some way.  This is her guy.  And they tried to make

13  it up.  They tried to handle it.  But that's not up for us to

14  make a judgment about.  When we really get down to it, that

15  really isn't our deal.

16      So what counsel looks at -- and I'm just suggesting to you

17  that the first portion you should keep in track in your

18  analysis.  What did the officer know at the -- and what did he

19  do at the time he did -- he fired his firearms?  It doesn't

20  matter what was going on before because he didn't know that.

21      I think that one of the things we've talked about often is

22  hindsight.  Counsel's argument was about hindsight.  Don't give

23  any credit at all to Mr. Tingle *[sic]* and his life because of

24  hindsight, and that the officer -- because he, in fact, was an

25  officer and he had been 15 years on the force and he was doing

1  whatever he was doing, therefore he deserves credit and he

2  can't make a mistake.

3       He can -- he can make a mistake.  And he can use bad

4  judgment.  He can misperceive.  He can kill someone who

5  shouldn't have been killed at the time, period.

6       So on the question -- the next portion of the -- of the

7  jury verdict, what you have to decide, and that is Mr. Tingle's

8  [sic] negligence.  What was his negligence?  One would

9  certainly -- and we would not dispute that carrying a gun under

10  these circumstances creates an issue for you.  But that doesn't

11  mean that whatever happened was your fault -- or his fault.

12  Mr. Newton have something to do with that.  The sense of the

13  neighborhood has something to do with that.  And so, yeah,

14  there was a feeling of self-defense atmosphere that could

15  happen to them.

16       Well, what is that?  Does that mean that the officer's

17  conduct was purely negligence that caused his death?  Should be

18  excused period because of what was taking place between

19  these -- these individuals beforehand?  The law doesn't say

20  that.  It says you should give some thought to it.  You could

21  give some percentage.

22       There is no question.  But you got to remember that at the

23  time, what did Mr. Tingle [sic] do that caused the officer to

24  shoot and kill him?  He didn't know what the officer was trying

25  to do.  He tried to put -- he tried to put his hands up.  That

1    should have told the officer *hey, look out, look out, I'm*

2    *trying to surrender*.  The officer should have been able to see

3    that Mr. Newton was down on the ground, perhaps holding his

4    hand down.  Circumstantial evidence.  That goes to the question

5    of negligence.

6         Let me go to this whole question of the gun.  I don't want

7    to have a lot of time on the gun, but there is evidence that

8    doesn't prove anything.  It's just like going in the circle.

9         The DNA that they make reference to, is that not

10   conclusive evidence that he possessed a gun on that particular

11   day?  I think the evidence is pretty clear, the DNA could have

12   been put on that gun at any point in time, and we don't know

13   that Mr. Newton didn't -- wasn't on that gun.  We also know

14   this:  There was gunpowder on Mr. Newton's hand.  It's not

15   conclusive, but it means that his hand was right there with

16   that gun, and he could have pulled that trigger himself, which

17   makes more sense when there is no gunpowder on Mr. Tingle's

18   *[sic]* hand.  It only means that there was some grappling going

19   on, but all I'm saying to you is that's not conclusive evidence

20   of anything.  The only thing you know from that is that both

21   those men were grappling, and we know that from the video.  We

22   don't need anybody to tell us that.  We know that they were

23   grappling.  And we also know that the officer said before he

24   shot him, shot Mr. Tingle *[sic]*, the two men were grappling

25   over the gun.

1    So, again, these are red herrings, if you will.  It's all
2  about demonization of Mr. Tingle [sic], not giving him any
3  credit for his life.  Given that who he was at whatever age he
4  was in, he was growing.  He was a young man trying to grow.
5  Took his whole 50 years away from him in an instant.  And what
6  the -- and what the defendant wants to do is to diminish the
7  life, diminish the life as if it has no value.  That part is
8  hard to -- and that's just for you to decide.
9    Now, this -- on the issue of damages, you know, I was
10  thinking about it the other day, and what you lose -- what
11  is -- what is these kids' loss?  I was thinking about the
12  little girl who doesn't know her dad.  But you know what she
13  missed?  There is going to come a time when that little girl
14  was going to have her dad have to comb her hair.  And any dad
15  who has been through that, they know what it's like to try to
16  comb a little girl's hair.  She doesn't get that.
17    And that boy, you know what he missed?  Let me tell you
18  what he missed.  He was going to be 12 years old soon.  He was
19  going to miss the talk that every African American man has to
20  give to his son to let him know the world is a very complicated
21  place.  It is not just the gangsters you got to look out for,
22  you got to look out for the police, too.  That's the talk that
23  he doesn't get, that he needs to have.  Somebody has got to
24  give him that talk.
25    All of these things that a dad is going to give to his

1  son, we saw evidence of that.  Counsel wants to diminish that

2  because he didn't think he was leading his kind of life.  But

3  people get to decide their own lives.  And their lives are

4  decided often by circumstances:  Certain conditions, place of

5  birth, any number of reasons.  But poor people can have good

6  relationships with their children, too.  They can live in a bad

7  neighborhood and still love their children.

8          MR. MORIARTY:  Objection, Your Honor.  That goes

9  against the jury instruction.

10          MR. BURRIS:  No.  It's about the quality of a

11  relationship.

12          THE COURT:  I don't understand the objection.

13  Overruled.

14          MR. MORIARTY:  Well, the objection is the jury cannot

15  consider the poverty or the wealth of the plaintiffs, so it

16  goes against the jury instruction.

17          THE COURT:  That is true.  You cannot consider their

18  poverty.

19          MR. BURRIS:  The issue is not so much the poverty,

20  it's that wherever you live and whatever your relationship is,

21  it is the relationship regardless.  And, sure, counsel has his

22  arguments to diminish the relationship, but I'm going to tell

23  you, when we see those photographs of this man with his

24  children, with his daughter, with his son, you can imagine and

25  easily understand the affection that existed there, the desire

1    to train, to try to teach, to try to love, to try to hold, and

2    to protect.  Those are the kind of conditions that you can't

3    necessarily diminish because of the quality of the life that

4    counsel would try to put up against it by being disingenuous in

5    the manner in which he describes it.

6        All I'm really telling you is this:  The way to look at

7    it, this case, is there negligence?  I don't think there is any

8    dispute, and I don't have to tell you.  I've given you the

9    facts there.

10       And then the question, is there some negligence on the

11   part of Mr. Tingle [*sic*]?  One could argue yes.  Some part.

12   But he didn't cause his death.  The officer killed him.  So if

13   he has some cause of -- some contributorily part of it, it's

14   the small percentage, 10 percent or so.  But certainly he's not

15   negligent up to the point where he is the substantial cause of

16   his death.  Let's not be confused here.

17       The substantial cause of the death is the officer running

18   up on him, shooting him three times in the back as he was

19   trying to surrender and he was being held down.  And counsel

20   doesn't like you to talk about the three times in the back.  I

21   want you to look at the video yourself, and you can see what

22   position he was in on the ground.  What basis was the officer

23   there to then come up and do what he did?  None.  He could have

24   taken the time.  He could have moved around.  He could have

25   been in a position of cover.  He could have not misinterpreted

1    the movement.  He could have -- he could have misinterpreted

2    the man coming up.  He could have given him a warning.  All of

3    these factors go to your consideration as to whether the

4    officer was negligent and whether that -- those -- absence of

5    those conducts contributed to the use of the force that was

6    unnecessary.  That's the factor to consider.

7        The next portion, of course, is Mr. Tingle's *[sic]*

8    negligence.  And none -- this whole background, this sort of

9    slander, character assassination that goes back 10 years -- and

10   he hadn't been convicted of anything in 10, 12 years.  He has

11   had his disputes with his wife, but counsel acts like these are

12   important facts to consider, for you to consider.  Really?

13   Really?  What, if any, did they contribute in any way to what

14   happened on that particular night?  What happened in 2010 that

15   contributed to the conduct of the officer on 2019 -- 18?  What?

16   What took place in the arguments in the street with -- with

17   Ciara and 15 level -- whenever it was that contributed to your

18   analysis about whether or not he was negligent at the time he

19   was shot and killed?  Any fair, objective of those analysis of

20   that would suggest no, those are stand-alone events.  Those are

21   character assassinations.

22       So -- and when you look at the end -- I -- when you look

23   at the end, just look at the negligent -- I'm not telling you

24   how to do your job.  I'm just giving you a way forward.  It's

25   all I'm trying to do.  A way forward.

1    In the jury form, it says negligence.  Well, you know what

2    those facts are to look for negligence, and then after that,

3    the question is negligence on the part of Mr. Tingle *[sic]*.

4    Well, you have some evidence that you can argue that merely

5    having a gun in and of itself was negligent, but I don't know

6    that you could say that he was involved in a fight with

7    Mr. Tingle *[sic]* -- with Mr. Newton is necessarily that because

8    we know for a fact there was crowds gathering around.  There

9    was indications of Mr. Tingle *[sic]* having to be mindful of

10   where he was; Mr. Tingle *[sic]* taking photographs because he

11   wanted to make sure these people come at him in his

12   neighborhood, he know who they are.  Well, why would he do that

13   unless was some concern that the neighborhood he was in and the

14   people he was involved with, he didn't know them.  Life being

15   what it is in the community, he had some real concerns about

16   it.  That doesn't mean you get to kill him and that doesn't

17   make him a bad person.  He probably was being protective of his

18   family at the time.

19   So -- and counsel's suggesting that he is getting up out

20   of bed that day and going to do something bad, well, what did

21   he really do that day?  He's with his family.  He's in West

22   Oakland.  He's trying to get to BART to go to San Francisco.

23   The fact that he has a gun in and of itself doesn't mean he was

24   out to get anyone.  It may mean he was mindful of protecting

25   himself in case something did go down.  That doesn't make him a

1   bad guy, and it doesn't mean the police get to shoot and kill

2   him either.

3       So I don't know -- and don't feel compelled to go through

4   all the comments that counsel has made.  I would only suggest

5   that the analysis is one of whether a factual basis to conclude

6   that negligence had occurred, and secondly, what, if any,

7   significance do you want to give there terms of a percentage to

8   the carrying of the gun and the fight that took place.  I would

9   suggest to you that is less than 25 percent.  And at the end of

10  the day a substantial award should be given for the children,

11  the children, because it's 50 years from now, and you know

12  what?  The real deal with the children isn't 50 years from now.

13  It's 10 years from now.  It's 15 years for the little girl.

14  It's -- it's adolescence.  It's late teenage childhood.  And

15  then adolescence and then off from there.  That's what damages

16  really are that the kids have been robbed of their fatherhood

17  during their childhood.  That's irreplaceable and should be

18  given a significant award, an acknowledgment of it.

19      Thank you.

20          **THE COURT:**  Okay.  Thank you.

21      Ladies and Gentlemen, you are now to go and deliberate.

22  Obviously you don't have to do it today.  It's already past

23  4:00.

24      Just a reminder that your verdict must be unanimous once

25  again.  I think you know how this all works.

1    Let us know when it is -- what your schedule is going to

2    be.  You've already reached one verdict, so you understand how

3    it's important to have discussions and to communicate with each

4    other, and we expect that you will do so in this next round.

5    I don't -- I also don't want you to rush.  If there's --

6    if you need time, you take your time.  If we get to the end of

7    the day tomorrow, we will have a conversation.  Okay?  But that

8    shouldn't be part of your calculus.  All right?

9    Any questions before I send you back?

10    Yes, sir?

11    **A JUROR:**  I have a question about the law.  Can I ask

12    it here?

13    **THE COURT:**  What's your question?

14    **A JUROR:**  It's about applicability of hindsight to

15    Question 1.  I just want to double check if we are to apply

16    hindsight or the reasonable objective officer standards to

17    Question 1.

18    **THE COURT:**  So the law with respect to negligence

19    is -- well, let me talk to the lawyers.  We don't talk about

20    hindsight in this instruction.  We did with respect to the

21    constitutional claim, but before -- before I give you -- I will

22    have a response for you in the morning.  Okay?

23    Any other questions?  No?  All right.  Then we will see

24    you back here tomorrow, and I will have a response for you

25    then.  Okay?  Thank you.

1        (Jury retired to deliberate at 4:15 p.m.)

2      (Proceedings were heard out of presence of the jury:)

3          (Recess taken at 4:15 p.m.)

4        (Proceedings resumed at 4:20 p.m.)

5      **THE COURT:**  We're going to go back on the record with

6    respect to the use of the issue of hindsight in terms of an

7    analysis of the California negligence claim, and I was asking

8    Mr. Burris, given that he argued it, whether he has law to

9    support the statement with respect to California negligence as

10   opposed to the constitutional Fourth Amendment claim.

11      So, Mr. Burris.

12      **MR. BURRIS:**  I don't have any law directly in front of

13   me.  I've always argued hindsight because that's kind of a

14   standard argument that's made in terms of you can't make

15   decisions about police officer's conduct based upon hindsight.

16   And so that seems to be pretty standard to me in terms of an

17   argument.

18      Now --

19      **THE COURT:**  Hold on.  I'm finding something.  Hold on

20   just a minute.

21      Okay.  *Brown vs. Ransweiler*, 2009, 171 Cal.App.4th 516 at

22   527 to 528.  This is the use note, and to 440.  "The

23   reasonableness of a particular use of force must be judged from

24   the perspective of a reasonable officer on the scene rather

25   than with 20/20 vision of hindsight.  The question is whether

1    the officer's actions are objectively reasonable in light of

2    the facts and circumstances confronting them without regard to

3    their underlying intent or motivation.  In calculating whether

4    the amount of force was excessive, a trier of fact must

5    recognize that peace officers are often forced to make

6    split-second judgments in tense circumstances concerning the

7    amount of force required."

8        So it appears that Mr. Burris is right.

9            MR. NISENBAUM:  That is --

10           THE COURT:  We'll talk about this, though.  If you

11   want more time, we can talk about it at 8:00 a.m.  I'm going to

12   have to send in some kind of response to the juror who asked

13   the question.

14           MR. ALLEN:  Your Honor, I would just like to

15   reserve -- and hopefully I can see the transcript of what the

16   question was specifically on the record and how it was

17   addressed, and then I could respond.

18       I agree that *Brown vs. Ransweiler* is an accurate statement

19   of the law.  It's all in the way that argument was phrased and

20   how we respond.  That's all I'm -- and I will wait until

21   tomorrow.

22           THE COURT:  All he said is -- I asked what his

23   question was, and he said it's about the applicability of

24   hindsight to Question No. 1.  "I just want to double check if

25   we are to apply hindsight or the reasonable objective officer

```
1   standards to Question No. 1."
2           MR. BURRIS:  The answer to that is "no."
3           MR. ALLEN:  The answer is "yes, you have" -- well --
4           MR. BURRIS:  No -- I'm sorry.
5           MR. ALLEN:  May I finish?
6           MR. BURRIS:  I'm sorry, counsel.
7           MR. ALLEN:  Thank you.
8       It sounds like it's a two-part question.  It's the
9   reasonably objective officer standard, which says then you must
10  not apply the benefit -- the vision of 20/20 hindsight to how
11  you analyze their actions.
12          THE COURT:  I think that's -- I think that that's
13  right.
14          MR. BURRIS:  That's right.
15          THE COURT:  So what I will ask you to do -- I think we
16  did this with the first jury.  But what I can send to them and
17  what you should think about -- are they waiting for a response?
18          THE CLERK:  Yeah.
19          THE COURT:  Okay.  That's fine.
20      They will be back at 8:00 a.m. tomorrow.
21          MR. NISENBAUM:  Does that mean you want us here
22  earlier?
23          THE COURT:  Yep.  Unless we are going to do this right
24  now.
25          MR. ALLEN:  Your Honor --
```

1    **THE COURT:**  Hold on.

2    **MR. ALLEN:**  Sure.

3    **THE COURT:**  What I'm willing to do is to send back a

4    response to them that is the same -- that takes the two

5    sentences from the Fourth Amendment instruction which you have,

6    and it just says that, "You must judge the reasonableness of a

7    particular use of force from the perspective of a reasonable

8    officer on the scene and not with the 20/20 vision of

9    hindsight.  Although the facts known to an officer are relevant

10   to your inquiry, an officer's subjective intent or motive is

11   not relevant to your inquiry."

12   It's two sentences.  I can send back one sentence or two,

13   but at least you have some language to consider.  They are

14   going to be here at 8:00, so I need a response, which means

15   that we need to be on the record at 7:45, unless you're fine

16   with that response.

17   **MR. NISENBAUM:**  We are fine with the response.

18   **MR. ALLEN:**  Your Honor, the only thing I would point

19   out is that I understand this to be a question solely to number

20   1, which is the negligence of Joe Mateu.

21   **THE COURT:**  Correct.

22   **MR. ALLEN:**  All right.  And it should be, I think,

23   specified as that because when they get to comparative fault,

24   it's the negligence of Mr. Tindle, and all that we have

25   explored is subsequent actions and what we know of him before

1    is relevant.  So I am concerned of confusion there.

2              THE COURT:  Well, I can say, "With respect to

3    Officer Mateu's conduct, you must judge the reasonableness,"

4    and finish that sentence.  I don't know that the second

5    sentence actually, as I think about it, is needed.

6              MR. ALLEN:  I would ask that both sentences --

7              MR. BURRIS:  I don't think so, Your Honor.

8              MR. ALLEN:  I would ask that both sentences be there

9    just because it would be complete to what the statement in

10   *Brown vs. Ransweiler* and *Graham vs. Connors* say.  We had it in

11   the first one.  I would just as soon keep it complete.  And I

12   will submit, Your Honor.  We otherwise are fine, but I would

13   ask, for the record, that both sentences be there.

14             MR. NISENBAUM:  We don't oppose that.

15             THE COURT:  All right.  So what I'm going to do is I

16   will send in a response that has those two sentences but

17   just -- but also says with -- prefaces it with with respect to

18   Mr.-- "with respect to Officer Mateu's conduct," comma, "you

19   are to judge."

20             MR. NISENBAUM:  Yes.

21             MR. ALLEN:  Thank you, Your Honor.

22             THE COURT:  Agreed.

23             MR. ALLEN:  Agreed.

24             MR. NISENBAUM:  Agreed.

25             THE COURT:  Then we don't have to be on at 7:45.  You

1   do have to be here at 8:00 when they arrive.

2       One of the things that we -- that I want to do now as

3   opposed to later is -- is understand from you what you want

4   post-trial briefing to look like.  And I want it before --

5   there are always winners and there are always losers.  So

6   before you know whether you are a winner or a loser or

7   something in between, I want to know what you're willing and

8   agreeable to do.  I don't need to push you on this, but I tell

9   my law clerks, trials are the gift that keeps on giving.  With

10  a verdict, they don't go away.  And I hope everyone and your

11  clients on both sides understand that.  We get a verdict, and,

12  you know, if it doesn't get resolved, you don't get it back

13  from the Court of Appeal for three years.  That's the standard

14  in the Ninth Circuit.  It is three years.

15          **MR. BURRIS:**  Yeah.  We know.

16          **THE COURT:**  To get a response back on an appeal of any

17  jury verdict.

18      I also tell the jurors it is my job to protect their

19  verdict.  Whatever it is, whether or not I like it, whatever

20  their verdict is, if it is reasonable, it is my job to protect

21  it.  And you should all know that whatever it is, I will do

22  whatever I can to protect their verdict as long as it is

23  reasonable.  Because it is their choice, it is their decision,

24  not mine.

25      So there is always post-trial briefing.  I need to know

1    what it is, what kind of schedule we're looking at for that

2    briefing.  And I'd like to know first thing in the morning so

3    we can all get a plan in place.

4         MR. ALLEN:  Your Honor, on your typical schedule,

5    because we will follow up on our qualified immunity if it's

6    adverse, what's your post-trial normal schedule?  Because I

7    have a -- I have a trial starting March 23rd --

8         THE COURT:  You know, look, I typically don't impose a

9    particular schedule.  I really leave it to the lawyers.

10        MR. ALLEN:  All right.

11        THE COURT:  And that's why -- everybody's motivations

12   are a little bit different after the verdict comes in, and so

13   that's why I ask you to commit before you know because I think

14   it keeps people a little bit more honest.

15        MR. ALLEN:  Okay.  Well, we will talk with the Burris

16   office.  We, again, have many cases with them and many

17   accommodations we try to work out with each other.  We will

18   wait for the verdict.  We will -- I can assure you, we will be

19   taking this through the motion practice post trial if it's

20   adverse, unless something changes dramatically in the way the

21   verdict actually comes in.  So I just -- but I will work it out

22   with them, and we will come in with a schedule, if we can.

23        THE COURT:  The only thing you should know is I'm not

24   setting any oral argument for the month of June, just so that

25   you know.  No oral argument the month of June.

1        Now, you can always agree to submit on the papers.  I

2   don't know -- I have heard your arguments.

3              **MR. ALLEN:**  You sure have.

4              **THE COURT:**  So much that I have almost torn through

5   stress balls up here.  I don't know that I need your argument,

6   but if you would like to --

7              **MR. ALLEN:**  Read that loud and clear.

8              **MR. BURRIS:**  We got it.

9              **THE COURT:**  Good enough.  We will see you tomorrow at

10   8:00 a.m.

11              (Proceedings adjourned at 4:31 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    CERTIFICATE OF REPORTER

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Tuesday, March 10, 2020

8

9    *Pamela Batalo Hebel*

10   _____
     Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11   U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25