**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **THE ESTATE OF SAHLEEM TINDLE, ET AL.,**<br>Plaintiffs,<br>vs.<br>**JOSEPH MATEU, III,**<br>Defendant. | CASE NO. 18-cv-05755-YGR<br><br>**ORDER DENYING DEFENDANT'S MOTIONS FOR JUDGMENT NOTWITHSTANDING THE LAW AND FOR A NEW TRIAL**<br><br>Re: Dkt. Nos. 151, 152 |

Some cases should be tried. This is one such case.

Video evidence showed two men struggling on the ground. On the voice recording, one could hear, from the perspective of the officer, him yelling "Let me see your hands." A hand did in fact come up, but before anything else could happen, the officer shot that man in the back three times. Following a mistrial due to a hung jury, the second jury found that the decedent, Sahleem Tindle, was attempting to surrender in the moments immediately before he was shot in the back three times by defendant Sgt. Joseph Mateu, III. Having considered the video, the immediate post-event interview of the officer, a sophisticated graphic recreation of the scene, and testimony of bystanders and the officer himself, a jury of eight unanimously agreed on what had occurred, and ultimately, did not believe Sgt. Mateu's version of the facts.

Having carefully considered the papers submitted, the trial evidence, and the prior filings in this matter, and for the reasons set forth below, Sgt. Mateu's post-trial motions are **DENIED**. The jury's verdict in favor of plaintiffs The Estate of Sahleem Tindle; Yolanda Banks-Reed; and minors S.A.T. and S.I.T., who were represented by their guardian ad litem, Ciara Turner, on the Fourth Amendment excessive force and wrongful death-negligence claims stands.

## I.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Incident

The following facts were established at trial:

On the afternoon of January 3, 2018, Sgt. Mateu was on duty at the Bay Area Rapid Transit's ("BART") West Oakland Station when two shots rang out. Bystanders ran into the BART station and sought cover. Sgt. Mateu asked what had happened, to which a bystander responded, "they're shooting." Sgt. Mateu ran out of the station and towards the gunfire. As he ran, Sgt. Mateu radioed-in "[c]ode 33, got shots fired at West Oakland, shots fired." He also shouted: "Let me see your hands! Let me see your hands, now! Both of you! Both of you! Let me see your hands!" Seconds later, Sgt. Mateu reached the sidewalk where Mr. Tindle and another man, Rayvell Newton, were on the ground, engaged in a physical struggle over a gun. As he ran to the scene, Sgt. Mateu had no information. He did not know which of the men was responsible for the altercation or the earlier gunshots. He again ordered the men to show their hands. As the struggle continued, one man, Mr. Tindle, raised his empty left hand. At this point, Sgt. Mateu testified he had lost sight of the gun. Whereupon, and within seconds of arriving on the scene, Sgt. Mateu discharged his weapon, shooting Mr. Tindle in the back three times at close, point blank range. Mr. Tindle was taken to a hospital where he was pronounced dead. An autopsy identified his cause of death as multiple gunshot wounds.

### B.    Trial Proceedings

The jury was advised that the trial would proceed in two phases. The first phase, which addressed plaintiffs' excessive force claim, took place over three court days, with six witnesses testifying: Sgt. Mateu, and experts Dr. John Iocco, Roger Clark, Jason Fries, Steven Papenfuhs, and Gregg Stutchman.[1] Various exhibits, including body camera footage from the incident, portions of Sgt. Mateu's post-incident interview, and expert graphics, were admitted into evidence. After closing statements and approximately three days of deliberations, the jury reached

---

[1] During the second trial, the parties changed tactics and focused questioning on what a "reasonable officer" would have done in the circumstances.

2

a verdict. The Court sealed the verdict, and the trial immediately moved to the second phase. During the second phase, when state law allowed for evidence of contributory negligence not relevant to phase one, five additional witnesses testified: Ciara Turner, Yolanda Banks-Reed, Michael Cardoza, Helena Wong, and Demora Evans (through the reading of deposition testimony). Sgt. Mateu was called back to the stand briefly. Additional exhibits were admitted into evidence. Following the close of evidence, the jury reached a verdict within a day.

On March 5, 2020, the verdict for both phases was read in open court. The jury found for plaintiffs on both the excessive force and negligence claims. The jury also answered two special interrogatories with respect to phase one, replying "yes" to (1) "[d]id Sahleem Tindle possess the gun in the moments before Joseph Mateu III fired his weapon?" and (2) "[w]as Sahleem Tindle attempting to surrender in the moments before Joseph Mateu III fired his weapon?"

Relevant here, on February 28 and March 2, 2020, Sgt. Mateu moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a). The Court refrained from ruling on the motion, noting that it would await the jury's verdict and full briefing on a Federal Rule of Civil Procedure 50(b) motion. Now before the Court are two post-trial motions, both filed by Sgt. Mateu: a renewed motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) and a motion for a new trial pursuant to Federal Rule of Civil Procedure 59.

## II. MOTION FOR JUDGMENT AS A MATTER OF LAW

"[A] party must make a Rule 50(a) motion for judgment as a matter of law before a case is submitted to the jury." *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). "If the judge denies or defers ruling on the motion, and if the jury then returns a verdict against the moving party, the party may renew its motion under Rule 50(b)." *Id.* As explained above, Sgt. Mateu timely moved for judgment as a matter of law prior to closing arguments for both phases. He now renews his motion.

A court may grant a motion for judgment as a matter of law against the nonmoving party only if there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue. Fed. R. Civ. P. 50(a). Specifically, the Ninth Circuit has made clear that a court "cannot disturb the jury's verdict if it is supported by substantial evidence." *Lambert v. Ackerley*,

3

180 F.3d 997, 1012 (9th Cir. 1999). Substantial evidence means "evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion" from the same evidence. *Castro v. County of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (citation omitted). "Thus, although the court should review the record as a whole, it must disregard evidence favorable to the moving party that the jury is not required to believe" and may not "substitute[] its judgment concerning the weight of the evidence for the jury's." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151, 153 (2000). In other words, entry of judgment as a matter of law is warranted only "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Castro*, 833 F.3d at 1066 (citation omitted).

Here, Sgt. Mateu argues that he is entitled to judgment as a matter of law on two grounds: (i) the only reasonable conclusion to draw from the evidence is that Sgt. Mateu exercised reasonable, not excessive, force; and (ii) as of the date of the incident, Sgt. Mateu's use of force was not prohibited by any clearly established law, and thus, qualified immunity applies. Neither argument persuades. The Court addresses each.

### A. Excessive Force

A Fourth Amendment claim of excessive force requires an examination of "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them," which "requires a careful balancing of the 'nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989) (citations omitted). "The strength of the government's interest in the force used is evaluated by examining three primary factors: (1) 'whether the suspect poses an immediate threat to the safety of the officers or others,' (2) 'the severity of the crime at issue,' and (3) 'whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Glenn v. Washington Cty.*, 673 F.3d 864, 872 (9th Cir. 2011) (quoting *Graham*, 490 U.S. at 396). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

4

The parties agree that the use of deadly force is the most significant intrusion on Fourth Amendment interests. Sgt. Mateu argues that the jury's verdict nevertheless lacks a legally sufficient evidentiary basis because the government's interest justified the use of force.

In addressing the governmental interest at stake, the parties' briefing focuses in large part on the jury's responses to the two special interrogatories. By way of background, at the summary judgment stage, this Court found that even after careful examination of the evidence, and particularly the body camera footage, at least two material issues of fact remained in dispute: first, whether Mr. Tindle had possession of the gun in the moments before the shooting, and second, whether Mr. Tindle was attempting to surrender in the moments before the shooting. The Court found these questions so central to determining the nature and immediacy of the threat, as well as whether there was active resistance to arrest, that a dispute of material fact existed warranting a jury's determination of the factual issues, including the evaluation of Sgt. Mateu's credibility.

In response to Special Interrogatory No. 1, the jury found that Mr. Tindle possessed the gun in the moments before Sgt. Mateu shot him. This finding is relevant to the seriousness of the threat posed. However, "that a person was armed [does not] end the [reasonableness] inquiry," *Glenn*, 673 F.3d at 872, including where a suspect was armed with a firearm. *See e.g., Curnow ex rel. Curnow v. Ridgecrest Police Dep't*, 952 F.2d 321, 325 (9th Cir. 1991) ("the police officers could not reasonably have believed the use of deadly force was lawful because Curnow did not point the gun at the officers and apparently was not facing them when they shot him the first time"); *Longoria v. Pinal County*, 873 F.3d 699, 706-07 (9th Cir. 2017) (dispute of fact regarding whether suspect assumed a threatening "shooter's stance" in interaction with officers precluded summary judgment); *Estate of Lopez v. Gelhaus*, 871 F.3d 998, 1017 (9th Cir. 2017) (denying summary judgment where decedent was holding toy AK-47 rifle). Here, while the Court may not speculate about conclusions reached by the jury beyond the verdict forms, their questions about Special Interrogatory No. 1 shed light on the different ways in which "possession," and thus the severity of a threat, can be construed. Specifically, during deliberations, the jury asked (i) whether two people could be in possession of a gun at the same time, to which the Court answered "yes," and (ii) whether a person could be in possession of a gun if he did not have

5

1    enough control to shoot it, to which the Court responded that it was not asking the jury to answer

2    this question.² Thus, when viewed in the light most favorable to the verdict, the jury reasonably

3    could have concluded from the evidence that although Mr. Tindle had possession of the gun in the

4    moments before he was shot, such possession was shared with Mr. Newton and did not necessarily

5    mean that he was in a position to control the weapon to shoot it.  Further, the jury unquestionably

6    found, in response to Special Interrogatory No. 2, that Mr. Tindle was attempting to surrender in

7    the moments before Sgt. Mateu fired.

8        More than ample evidence supported the jury's findings and verdicts.  It is undisputed that

9    Mr. Tindle was on his knees and raising his empty left hand when he was shot.  These are

10   objective indications of surrender.  Sgt. Mateu contends that this evidence was insufficient,

11   however, because Mr. Tindle did not raise his right hand.  Sgt. Mateu repeatedly asserts in his

12   motion, as he did at trial, that during the fight, Mr. Tindle "transferr[ed] the gun to his right hand."

13       The jury was not, however, required to accept Sgt. Mateu's theory or his self-serving

14   testimony.  Sgt. Mateu testified that upon first arriving on the scene, Mr. Newton was holding

15   down Mr. Tindle's left forearm.  The two continued to struggle.  Eventually, Mr. Tindle's left arm

16   broke free.  At the moment shots were fired, Sgt. Mateu could not see the gun or Mr. Tindle's

17   right hand.  Nor could he see what Mr. Newton was doing, besides holding Mr. Tindle in a

18   headlock.  Sgt. Mateu's testimony, combined with the body camera footage, provide, at a

19   minimum, circumstantial evidence from which the jury reasonably could have concluded that Mr.

20   Tindle was not able to raise his right hand when Sgt. Mateu shot him.³

---

² The jury also asked about the meaning of the words "possess the gun."  The Court instructed the jury to use the "ordinary and common" meaning of the words.

³ In arguing that there was a sufficient evidentiary basis for the jury's verdict, plaintiffs proffer three examples of statements from Sgt. Mateu's officer-involved shooting ("OIS") interview that purportedly impeach his trial testimony.  Thus:

First, in his OIS interview, Sgt. Mateu stated that he saw Mr. Tindle and Mr. Newton fighting over the gun.  Plaintiffs argue that this impeaches his testimony at trial that he never saw Mr. Newton holding down Mr. Tindle's right arm.  These statements are not necessarily in conflict, that is, it can be true that Sgt. Mateu generally observed the fight over the gun but could not see the relevant parties' exact hand positions at all times prior to the shooting.  The Court notes, however, that during the OIS interview, Sgt. Mateu failed to mention that Mr. Newton was holding down Mr. Tindle's left forearm when he first arrived on the scene, despite being asked by

6

1    The Court also disagrees with Sgt. Mateu's claim that the jury's response to Special Interrogatory No. 2 speaks to Mr. Tindle's subjective intent rather than the existence of objective signs of surrender. First, the parties crafted the special interrogatories, thus any objection to the form of the interrogatory is waived. Second, the special interrogatories cannot properly be read in isolation. No evidence was presented regarding subjective intent and neither of the parties ever attempted to argue subjective intent. Nothing in the trial supports this post-trial assertion.

By contrast, a primary focus of the instructions and the argument, and in fact the evidence presentation, was the question of the objective standard; here, evidence showing "surrender" to a reasonable officer. Notably, the jury in the first trial asked questions about objective reasonableness, and ultimately, hung. As good trial lawyers do, the parties then shifted their tactics in the second trial and changed the manner of questioning to better focus the jury on this fundamental issue of objective reasonableness. Thus, unlike the first jury, the second jury asked no follow-up questions on the instruction that they were to "judge the reasonableness of a particular use of force from the perspective of a reasonable officer on the scene and not with the 20/20 vision of hindsight." The idea of objective reasonableness pervaded the presentation of evidence, opening statements, and closing arguments. Additionally, on the same page as the special interrogatories, the verdict form asked the jury to decide whether Sgt. Mateu used

---

the interviewer to "freeze-frame" what he saw. Sgt. Mateu's lack of detail in an interview conducted the same day as the incident undermines the veracity of his more detailed testimony years later as a defendant in this case.

Second, Sgt. Mateu stated in his OIS interview that he saw Mr. Tindle hunched over Mr. Newton. Plaintiffs claim this impeaches his trial testimony that he did not realize Mr. Newton had Mr. Tindle in a headlock until viewing the body camera footage. Even if Sgt. Mateu's earlier statement does not necessarily render his later statement untrue, it does show that a jury could reasonably find that Sgt. Mateu acted in a manner inconsistent with the video evidence.

Third, Sgt. Mateu stated in his OIS interview that he saw Mr. Tindle raising his knees as if to stand up just prior to the shooting. At trial, Sgt. Mateu admitted that he was wrong, and that after watching the video, he could see that Mr. Tindle was not standing at the time he was shot. The Court agrees that this testimony undermined Sgt. Mateu's credibility in the eyes of the jury, providing support for their verdict, even if it is not technically "impeachment of trial testimony" since Sgt. Mateu himself admitted his error.

While the Court or others may disagree as to the import of the testimonial references, such is not the inquiry. The issue is the effect of such evidence when viewed in the light most favorable to the jury's verdict. The Court agrees that the jury could have viewed these as either inconsistencies or weaknesses when it judged Sgt. Mateu's credibility.

7

unreasonable force against Mr. Tindle, and whether any such force caused Mr. Tindle's death, which were defined in objective terms. Collectively, these representations focused the jury on reaching its determinations through the proper lens. Thus, the jury's response to Special Interrogatory No. 2 should be read as concluding that Mr. Tindle showed objective signs of surrender in the moments before he was shot and Sgt. Mateu's misperception of this fact was objectively unreasonable.

Additionally, although Sgt. Mateu contends that other, non-*Graham* factors, such as the lack of alternative means, tactical retreat, and warnings, demonstrate the governmental interest in the use of force, plaintiffs themselves presented evidence on these issues. Plaintiffs' police practices expert, Roger Clark, opined that given the circumstances, a reasonable officer would have held fire and taken a step to the side to better understand the positioning of Mr. Tindle's right hand. Mr. Clark also testified that Sgt. Mateu should have run into the doorway of the restaurant for cover as he approached.[4] Further, the expert seized on testimony that Sgt. Mateu was experiencing fear and had not been properly trained resulting in the premature firing of his weapon. It is undisputed that Sgt. Mateu did not warn Mr. Tindle, who had his back to Sgt. Mateu, that he would shoot. These factors are all part of the totality of the circumstances providing support for the jury's verdict.

Finally, the Court addresses Sgt. Mateu's repeated emphasis on this being an active shooter situation. The evidence at trial established that a serious crime was evolving when Sgt. Mateu approached Messrs. Tindle and Newton. The two men were fighting over a gun, which had been

---

[4] Sgt. Mateu makes much of Mr. Clark's affirmative response to the following hypothetical: "If the gun is pointed in the direction of the barber shop at an oblique [sic] toward where the restaurant is, for Officer Mateu to run to the restaurant for cover puts him in the potential line of fire, does it not?" Notably, this testimony got the attention of at least one juror, who asked, "[f]irst time hearing 'obliquely pointed gun towards the restaurant.' Is this part of evidence? Was this an opinion, fact or hypothetical? Did Officer Mateu ever say that he perceived the gun being 'obliquely pointed towards the restaurant'?" After discussion with counsel for both sides, the Court responded, in part: "The reference to, quote, obliquely pointed the gun towards the restaurant, was used as part of a hypothetical. Officer Mateu did not use those words himself. Officer Mateu said the gun was angled upwards towards the restaurant." Thus, the testimony highlighted by Sgt. Mateu was in response to a hypothetical, and the jury understood it as such. The jury was entitled to find that the actual facts were different from the hypothetical.

8

1  fired less than a minute before Sgt. Mateu's arrival on the scene.  The incident occurred on a
2  public sidewalk in the middle of the afternoon.  However, not all active shooter situations are
3  alike, and the case law requires that courts view each case individually.  A significant, qualitative
4  difference exists between this case and, for example, a case in which a gunman is firing
5  indiscriminately at a crowd or large group in an uncontained or expansive setting.  It was the job
6  of Sgt. Mateu to assess the extent of the threat and respond appropriately.  The jury found that he
7  did not.

Reduced to its essence, Sgt. Mateu's challenge to the excessive force verdict is merely a rehash of his own evidence presentation at trial.  However*,* "[i]t is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences." *Tennant v. Peoria & P.U. Ry. Co.*, 321 U.S. 29, 35 (1944).  Said differently, this Court is not "free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions[.]" *Id*.  Rather, the Court must determine whether the evidence at trial permitted the jury to reach only one conclusion which was contrary to the jury's verdict.  Sgt. Mateu fails to show that is the case here.

### B.     Qualified Immunity

The qualified immunity doctrine shields a government official performing discretionary functions from liability for civil damages if the officer's conduct does not violate a "clearly established statutory or constitutional right of which a reasonable person would have known."  *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) (quoting *White v. Pauly*, 137 S.Ct. 548, 551 (2017)).  It is a "longstanding principle that 'clearly established law' should not be defined at a high level of generality." *White*, 137 S.Ct. at 552.  Thus, while the doctrine "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 551.

Where, as here, a qualified immunity case goes to trial, "the jury's view of the facts must govern [the court's] analysis once litigation has ended with a jury's verdict." *A.D. v. California Highway Patrol*, 712 F.3d 446, 457 (9th Cir. 2013).  In the usual case, "courts infer those facts

from the jury's verdict and the theories presented at trial." *Nunez v. Santos*, 427 F. Supp. 3d 1165, 1188 (N.D. Cal. 2019). In this case, the Court also has benefit of the jury's responses to the special interrogatories.

Given the jury's verdict, the Court adopts their findings, explicitly and by reasonable inference, that Messrs. Tindle and Newton were engaged in a struggle for the gun, during which time Mr. Tindle, perhaps not exclusively or with full control, had possession of the gun. Moments before he was shot in the back at close range, Mr. Tindle was on his knees, with his empty left hand raised, attempting to surrender. Mr. Tindle was not able to raise his right hand because of the struggle, and likely because it was being held down by Mr. Newton. As such, the Court concludes that the jury found Mr. Tindle did not pose an immediate threat of serious harm when Sgt. Mateu shot Mr. Tindle while he was attempting to surrender.

It defies logic to argue that a police officer can shoot a person in the back while that person is attempting to surrender.[5] The constitutional right to be free from the use of deadly force absent an immediate threat of harm to officers or others was clearly established at the time of Sgt. Mateu's actions. *See Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) ("Case law has clearly established that an officer may not use deadly force to apprehend a suspect where the suspect poses no immediate threat to the officer or others."); *Curnow*, 952 F.2d at 325 ("[T]he police officers could not reasonably have believed the use of deadly force was lawful because Curnow did not point the gun at the officers and apparently was not facing them when they shot him the first time."). Further, the Ninth Circuit has held that the use of deadly force against a surrendering suspect is unreasonable, even where the suspect has shown a less than perfect sign of surrender. *See, e.g., Longoria*, 873 F.3d at 705 (holding that a jury could find use of deadly force against a suspect who was in the process of putting his hands over his head reflexively or in an effort to surrender unreasonable); *Mendoza v. Block*, 27 F.3d 1357, 1361-62 (9th Cir. 1994) ("[N]o particularized case law is necessary for a deputy to know that excessive force has been used when

---

[5] *See* Dkt. No. 80 (denying as legally frivolous Sgt. Mateu's motion to stay the case pending the outcome of appeal to the Ninth Circuit); *Banks-Reed, et al. v. Mateu, et al.*, Case No. 19-17444 (9th Cir. Jan. 27, 2020) (summarily denying appeal).

a deputy sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control."); *Watkins v. City of Oakland, Cal.*, 145 F.3d 1087, 1090, 1093 (9th Cir. 1998) (denying qualified immunity where the officer allowed canine to continue to bite suspect until he showed his hands despite the fact that the suspect was unable to comply because he was recoiling from the pain of the dog bite). Additionally, as explained, the Ninth Circuit has specifically held that "[t]he mere fact that a suspect possesses a weapon does not justify deadly force." *Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1233 (9th Cir. 2013). These precedents place the "constitutional question" of whether the Fourth Amendment has been violated when the decedent did not pose an immediate threat to officers, and in particular, when the decedent was surrendering, "beyond debate." *Martinez v. City of Clovis*, 943 F.3d 1260, 1275 (9th Cir. 2019) (citation omitted).

The legal nature of the inquiry here is not difficult. In civil society, police officers are not allowed to shoot people in the back while they are trying to surrender.[6] The difficulty of this case was whether such objective surrender occurred, given the nature of the evidence available; hence, the jury trial. Even if Sgt. Mateu was correct, "[t]his [would be] one of those rare cases in which the constitutional right at issue is defined by a standard that is so 'obvious' that we must conclude—based on the jury's finding—that qualified immunity is inapplicable, even without a case directly on point." *A.D.*, 712 F.3d at 457. Sgt. Mateu's argument as to qualified immunity fails.

---

[6] Hence, Sgt. Mateu's discussion at length of the Tenth Circuit's decision in *Estate of Smart by Smart v. City of Wichita*, 951 F.3d 1161 (10th Cir. 2020) is readily distinguishable. Because the legal issue here is so apparent, Sgt. Mateu tries desperately, to no avail, to recast the facts to create more urgency than actually existed. Thus he argues: "[f]inally, a Circuit released a decision addressing Mateu's situation: active shooter, crowded public area, law enforcement does not physically witness the shots fired, police come across a potential suspect (and doing so within seconds of the shooting), and no verbal warning given before police deploy lethal force."

*Smart* involved officers that had arrived as the bars were closing to deal with crowd control as **"hundreds"** of people were emptying the bars and concert venues. *Id.* at 1166. When shots were fired "toward a big crowd of people," everyone ran, including Smart. *Id*. (internal quotations omitted). Ultimately, officers chased after and shot Smart, who they mistakenly believed was armed and dangerous. *Id.* at 1166-67. Such facts did not exist here. This case **is not** *Smart* or the 2017 Las Vegas sniper attack or the 2019 Gilroy Garlic Festival shooting. Rather, the facts here concern the not unusual circumstance, unfortunately, of a fight over a gun on a public street in an urban area between two men.

11

### III. MOTION FOR A NEW TRIAL

A court "may, on motion, grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). Relevant here, a trial court may grant a new trial, "even though the verdict is supported by substantial evidence, if the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999) (citation and internal quotations omitted). The decision to grant a new trial falls within the sound discretion of the trial court. *Kode v. Carlson*, 596 F.3d 608, 611 (9th Cir. 2010). The court "is not required to view the trial evidence in the light most favorable to the verdict," but rather, "can weigh the evidence and assess the credibility of the witnesses." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014). The court should not grant a new trial unless it is "left with the definite and firm conviction that a mistake has been committed." *Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1372 (9th Cir. 1987) (citation omitted).

Sgt. Mateu moves for a new, and third, jury trial on the following grounds: (i) the phase one damages award for pre-death pain and suffering is grossly excessive and against the clear weight of the evidence; (ii) the inclusion of a damages award in phase one confused the jury and potentially prejudiced Sgt. Mateu; and (iii) the Court improperly excluded evidence in phase one that would have corroborated Sgt. Mateu's testimony. The Court addresses each.

#### A. Phase One Damages for "Pain and Suffering"

A jury's award of damages generally "is entitled to great deference" and "should be upheld unless it is clearly not supported by the evidence or only based on speculation or guesswork." *In re First All. Mortg. Co.*, 471 F.3d 977, 1001 (9th Cir. 2006) (internal quotations omitted). If the damages award is supported by the evidence, it "must be affirmed unless it is 'grossly excessive' or 'monstrous' or 'shocking to the conscience.'" *Brady v. Gebbie*, 859 F.2d 1543, 1557 (9th Cir. 1988) (citation omitted).

After the close of evidence in phase one of the trial, the Court instructed the jury on, among other things, damages. In accordance with Ninth Circuit model civil jury instructions 5.1

12

and 5.2, the jury was instructed that if it found for Mr. Tindle on the Fourth Amendment excessive force claim, it should determine damages by considering the "nature and extent of the injuries" and "the mental, physical, and emotional pain and suffering experienced prior to death." After approximately three days of deliberations, the jury returned a plaintiff's verdict, awarding $5.375 million in damages.

Sgt. Mateu claims this amount is excessive and unsupported by the evidence. In support thereof, he notes that Mr. Tindle was shot three times, in quick succession, and died within just 15 seconds of the first shot. The jury's award of $5.375 million for "15 seconds" of pain and suffering translates to $358,333 in damages per second, which according to Sgt. Mateu, is out of step with the jury's award of $1.9 million in phase two, as well as jury awards in allegedly analogous cases.

The Court disagrees. Fundamentally, Sgt. Mateu petitions the Court to save him from his own tactical decision not to argue damages. He fell into the *Texaco-Pennzoil*[7] trap, and no reason exists to rescue him. Not infrequently, defendants choose *not* to provide a jury with any measure for "pain and suffering." Indeed, counsel for Sgt. Mateu did not even mention damages during his closing argument in phase one. There may have been good reasons to adopt this strategy. However, Sgt. Mateu left the jury with only, or at least primarily, plaintiffs' perspective on the damages evidence. Perhaps the jury was not focused on the seconds, but on the searing pain that came with *each shot* that burned through Mr. Tindle's body as each bullet entered from point-blank range. It comes as little surprise then that the jury awarded plaintiffs a large sum. In short, Sgt. Mateu cannot now complain about the consequences of a tactical decision that he himself made.

---

[7] "[D]efendants are often leery about arguing damages, worrying that, if the jury sees them spending too much time arguing damages, they might interpret that as an implicit concession on liability. They are perhaps equally reticent, however, to refrain from arguing damages entirely; the defendant's counsel in *Texaco, Inc. v. Pennzoil Co.,* No. 01–86–0216–CV (Tex.Dist.Ct.), took this approach, and ended up being on the wrong end of the largest jury verdict in American history. *See Texaco, Inc. v. Pennzoil Co.,* 729 S.W.2d 768 (Tex. Ct. App. 1987) ('Pennzoil suffered damages of $7.53 billion . . . [and] was entitled to punitive damages of $3 billion.')." *Anderson Living Tr. v. WPX Energy Prod., LLC*, 306 F.R.D. 312, 456 n.105 (D.N.M.), *adhered to on reconsideration,* 312 F.R.D. 620 (D.N.M. 2015).

Further, the Court finds the evidence presented at trial was sufficient to support the jury's award. Dr. Iocco, who conducted Mr. Tindle's autopsy, testified during trial that Mr. Tindle's cause of death was multiple gunshot wounds to his left lateral back, left lower back, and right lower back. The first of these wounds was the most significant, passing through the left lower lobe of the lung and through the back of Mr. Tindle's heart, causing massive bleeding. The second and third wounds grazed Mr. Tindle's liver and pierced his abdominal wall, respectively.[8] The jury also received evidence that immediately upon being shot, Mr. Tindle spoke three words that could be characterized as showing that he was aware of his circumstances when he spoke them. In addition, the jury watched the body camera footage of the incident multiple times. This footage was affecting. It showed Sgt. Mateu shooting Mr. Tindle three times in the back, at close, point-blank range, with a SIG Sauer handgun, after which Mr. Tindle fell to the ground, appeared to be lucid but in pain, and then went still. Given the full context of the evidence presented to the jury, the Court cannot say with any certainty that the pain and suffering Mr. Tindle experienced as each bullet entered his body, and in the moments immediately preceding his death, was not worth the amount the jury awarded.

The cases cited by Sgt. Mateu do not compel a different result. Setting aside those cases that did not involve police shootings, which are of little comparative value here, the Court acknowledges that the sum awarded by the jury in this case is higher than the amounts awarded in the police shooting cases cited by Sgt. Mateu.[9] Had this Court been tasked with awarding damages, it may have reached a different result, possibly by using the cases cited by Sgt. Mateu as

---

[8] Dr. Iocco also testified that while someone with Mr. Tindle's injury typically would lose brain function within 15 seconds, the autopsy could not predict when electric activity stopped, i.e., when Mr. Tindle's life ended and when the pain and suffering, in actuality, stopped.

[9] The Court notes that this district has made significant affirmative efforts over the last few years to change the manner in which our venire is constructed to expand the diversity of its jury pool. The composition of this eight-member jury included two Black-Americans, one of whom served as the foreperson; one Latina; and two Asian-Americans. The six men and two women included a lawyer, three in the software engineering field, a director of finance and operations, and three who worked in the pharma/medical industries. Two had acquired a high school degree or GED only and three had advanced degrees. Their ages ranged from 36 to 65. They listened attentively and took seriously their duty to be fair and impartial to both sides rendering their unanimous judgment as to the fair measure of pain and suffering, given the evidence and argument (or lack thereof), appropriate.

14

a benchmark. Such is the nature of the pain and suffering damages inquiry, which "is inherently subjective, involving experience and emotions, as well as calculation." *Willis v. City of Fresno*, 2017 WL 5713374, at *8 (E.D. Cal. Nov. 28, 2017).[10] As such, the Court must answer only the question before it on the instant motion, which is whether the jury's award was "grossly excessive." The Court concludes that it was not.[11]

### B. Inclusion of a Damages Award in Phase One

Federal Rule of Civil Procedure 42(b) permits a court to order a separate trial of separate claims or issues "[f]or convenience, to avoid prejudice, or to expedite and economize." The question of whether to bifurcate a trial pursuant to Rule 42(b) is a matter committed to the court's discretion. *Medora v. City & Cty. of San Francisco*, 2007 WL 9810901, at *5 n.3 (N.D. Cal. June 8, 2007). In assessing whether bifurcation is appropriate in section 1983 cases, "the Court's determination is case-specific and includes, *inter alia*, consideration of a [p]laintiff's factual allegations, legal causes of action, and the procedural posture of a case." *Id*.

The idea of bifurcation was raised early in the proceedings, when plaintiffs moved *in limine* to bifurcate the liability and damages phases of the trial. The basis for the request was that while certain character evidence might be relevant to assessing damages, and particularly contributory negligence, such evidence would not be relevant to any liability determination. Sgt. Mateu did not oppose the motion assuming the evidence was appropriately limited. The parties revisited the issue again during the pretrial conference, in a supplemental statement to the Court,

---

[10] Sgt. Mateu's suggestion that the jury's award either was driven by "sympathy and passion" or included damages beyond those for pain and suffering is purely speculative. As explained below, absent evidence, the Court is not inclined to assume that the jury failed to follow the Court's express instructions that any damages award should be based on the evidence presented at trial and that the jury should consider the "nature and extent of the injuries" and "the mental, physical, and emotional pain and suffering experienced prior to death" in assessing damages.

[11] This conclusion is bolstered by the case law cited by plaintiffs, which while factually distinguishable in some respects, demonstrates that juries recently have awarded comparable damages in similar police shooting cases. *See, e.g., Smith v. County of Riverside*, 2019 WL 2902504, at *12 (C.D. Cal. May 28, 2019) (upholding jury award of $1.5 million in pain and suffering damages where there was sufficient evidence for the jury to conclude that decedent was conscious for "some period of time" between the eighth and final shot, which was the constitutional violation, and his death); *Archibald v. County of San Bernardino*, 2018 WL 6017032 *9 (C.D. Cal. 2018) (noting jury award of $7 million in compensatory damages).

1    and before opening statements in the first trial.  On the last of these occasions, while discussing

2    jury instructions, plaintiffs proposed that the excessive force damages should be tried in phase one

3    because they were different in kind as compared to the negligence damages.  Sgt. Mateu objected.

4    After hearing argument from both parties, the Court indicated that it viewed the phase one

5    damages as "segregated and compartmentalized" from the phase two damages, such that

6    bifurcation would be appropriate.

7          Sgt. Mateu now contends that bifurcation of the damages determinations resulted in

8    confusion and potential prejudice.  Specifically, Sgt. Mateu avers that because the Court did not

9    advise the jury at the end of phase one that additional damages would be assessed at the end of

10   phase two, the jury may have awarded excessive damages in phase one, mistakenly believing it

11   was their only opportunity to compensate Mr. Tindle's family for Sgt. Mateu's wrongful actions.

12   Sgt. Mateu further argues that because a damages award was included in both phases, the jury was

13   asked to award damages twice.

14         As to the lack of jury instruction regarding a second damages assessment, the Court

15   emphasizes that Sgt. Mateu never asked for any such instruction despite having numerous

16   opportunities to do so.  The process of drafting and finalizing jury instructions was highly

17   collaborative throughout both trials.  On February 12, for example, the Court proposed an

18   additional instruction advising the jury that the case would be tried in phases.  The proposed

19   instruction was projected in the courtroom, read out loud, and discussed by counsel for both sides.

20   Sgt. Mateu never suggested adding language regarding the phasing of damages.  Moreover, even

21   after the first trial ended in a hung jury, Sgt. Mateu never asked during the second trial for an

22   instruction that would have avoided the confusion he now claims existed.  Again, the Court views

23   this decision as a tactical one, which in retrospective, Sgt. Mateu would have preferred not to have

24   made.  One party's hindsight does not justify a new trial.

25         Further, the Court is not persuaded that the jury over-compensated plaintiffs in phase one

26   or that plaintiffs doubly recovered due to the bifurcated damages determinations.  The jury was

27   properly instructed during each phase to base any damages award on evidence presented as to the

28   claim tried in that phase only.  That is, during phase one, the jury was instructed that if it found for

16

plaintiffs, it should determine the amount of money that would compensate plaintiffs for Mr. Tindle's pain and suffering. During phase two, the Court explicitly instructed the jury that it should *not* consider Mr. Tindle's pain and suffering in assessing any damages. There is a "rebuttable presumption that juries follow jury instructions." *In re Dan Farr Prods.*, 874 F.3d 590, 595 (9th Cir. 2017). Sgt. Mateu proffers no reason to believe that was not the case here.

Finally, the Court notes that bifurcation served an important purpose in this trial. Phase one largely focused on the moments leading up to the shooting through the immediate aftermath. The jury was tasked with deciding whether Sgt. Mateu used excessive force against Mr. Tindle, and if so, the measure of any pre-death pain and suffering damages. It was critical that, in confronting these important questions, the jury not be influenced by evidence from either party about Mr. Tindle's background. The pain and suffering a human being experiences when being shot in the back while surrendering does not differ if that person is a chief executive officer or a humble line worker, armed or unarmed, a consummate rule-follower or a frequent rule-breaker. It is the Court's view that not bifurcating the damages determinations would have prejudiced plaintiffs, not vice versa. The inclusion of damages in phase one was proper.

### C. Exclusion of Phase One Evidence

An erroneous evidentiary ruling may serve as a basis for a new trial if it "substantially prejudiced" a party. *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995). The movant must demonstrate that "more probably than not," the evidentiary error "tainted the verdict." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1030 (9th Cir. 2008) (citation omitted).

Here, plaintiffs moved *in limine* to exclude evidence that Mr. Tindle possessed and fired a gun during the incident to which Sgt. Mateu responded, up to the point when Sgt. Mateu arrived on the scene and observed Mr. Tindle, because Sgt Mateu did not have that information at the time of the use of force. Sgt. Mateu opposed the motion. The Court ruled the evidence would be admissible in the second phase but not the first, citing *Graham*, 490 U.S. at 396, for the proposition that "reasonableness of a particular use of force" must be "judged from the perspective of a reasonable officer on the scene."

17

Relying on *Boyd v. City & Cnty. of San Francisco*, 576 F.3d 938 (9th Cir. 2009), Sgt. Mateu now argues that the exclusion of this evidence in phase one was not only improper, but so prejudicial as to warrant a new trial. In *Boyd*, survivors of a decedent alleged that police used excessive force when they shot and killed the decedent. *Id*. at 942. At trial, defendants asserted that the decedent failed to obey commands to surrender, behaved erratically, and attempted to provoke a shootout that would result in his own death. *Id*. at 944. Plaintiffs affirmatively countered defendants' assertion by claiming that the decedent attempted to surrender but a prosthesis slowed his ability to obey commands. *Id*. On appeal following a defense verdict, the Ninth Circuit held that the trial court properly admitted testimony which rebutted plaintiffs' assertions, namely (i) testimony about a prior arrest during which the decedent obeyed commands with no apparent physical difficulty and screamed at officers to "kill me"; (ii) evidence of prior lawsuits filed by or on behalf of the decedent against law enforcement agencies; and (iii) evidence of the decedent's criminal history, including two attempted kidnappings on the day in question. *Id*. at 943-45. The evidence was admitted in the context of defendants' "suicide by cop" theory because the evidence made it more probable that the decedent was trying to provoke a police shooting rather than surrender. *Id*. at 944. The Ninth Circuit held that "where what the officer perceived just prior to the use of force is in dispute, evidence that may support one version of events over another is relevant and admissible." *Id*.

Since *Boyd*, the Ninth Circuit appears to have retreated somewhat from its holding. *See Hayes*, 736 F.3d at 1232-33 ("[W]e can only consider the circumstances of which [the officers] were aware when they employed deadly force. . . . [W]hen analyzing the objective reasonableness of the officers' conduct under *Graham*, we cannot consider the fact that [the decedent] was intoxicated or that he had previously used a knife in harming himself." (internal citation omitted)); *Glenn*, 673 F.3d at 873 n.8 (9th Cir. 2011) ("We cannot consider evidence of which the officers were unaware—the prohibition against evaluating officers' actions 'with the 20/20 vision of hindsight' cuts both ways." (quoting *Graham*, 490 U.S. at 396)). Further, and perhaps as a result of the Ninth Circuit's subsequent decisions, numerous district courts have read *Boyd* as being "limited to cases where a suicide by cop theory is being asserted or other similar circumstances

18

where the suspect/defendant's intent is clearly at issue." *Stringer v. City of Pablo*, No. C 07–03544 MEJ, 2009 WL 5215396, at *3 (N.D. Cal. Dec. 28, 2009); *Willis v. City of Fresno*, No. 1:09–CV–01766–BAM, 2013 WL 6145232, at *4 (E.D. Cal. Nov. 21, 2013) (declining to admit evidence of prior acts under *Boyd* where the plaintiff's "motive or intent [was] not at issue, as it was in *Boyd*" and where his "absence of mistake or accident [was] not at issue"); *Jackson v. Cty. of San Bernardino*, 194 F. Supp. 3d 1004, 1009 (C.D. Cal. 2016) (declining to apply *Boyd* were defendants "d[id] not assert a 'suicide by cop' defense, and [the decedent]'s motivation or intention to provoke the deputies to shoot him [was] not at issue"). Neither a "suicide by cop" theory nor Mr. Tindle's intent, motive, or plan prior to Sgt. Mateu's use of force was at issue in this trial.

Even if *Boyd* was construed broadly, however, it would not have required the admission of evidence that Mr. Tindle possessed or fired the gun prior to Sgt. Mateu's arrival on the scene. Sgt. Mateu's body camera captured the entire incident for purposes relevant to phase one. There was no material dispute that within moments of arriving on the scene, Sgt. Mateu knew that shots had been fired and that Messrs. Newton and Tindle were on the ground, wrestling, both with their hands on the gun. Nor was there a material dispute that the fight for the gun continued for several seconds, and because of the positioning of the relevant parties, Sgt. Mateu could not be certain what was happening in front of Mr. Tindle's body or with his right arm when Sgt. Mateu fired his weapon. What Mr. Tindle did with the gun before the grappling began had little to no probative value on the question of whether Sgt. Mateu correctly perceived that Mr. Tindle posed an imminent threat at the time Sgt. Mateu shot him.

Additionally, to the extent the evidence had any probative value at all, it would be outweighed by the prejudicial effect of the evidence. Comparative fault was only relevant to phase two. After hearing testimony about how the fight between Messrs. Tindle and Newton began, the jury apportioned 68% of responsibility for the death to Mr. Tindle. The phase two verdict illustrates the potential impact of this evidence may have had on the jury's determination in phase one. The Court properly excluded the evidence and avoided such prejudice.

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** defendant's motions for judgment as a matter of law and for a new trial.

This Order terminates Docket Numbers 151 and 152.

**IT IS SO ORDERED.**

Dated: September 28, 2020

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**